**THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT. THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT.**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF MONTANA**

-------------------------------------------------------------x

| | | |
|---|---|---|
| In re | : | |
| | : | Chapter 11 Case No. |
| | : | |
| MOONLIGHT BASIN RANCH L.P., et al., | : | 09-62327 (RBK) |
| | : | |
| Debtors. | : | (Jointly Administered) |
| | : | |

-------------------------------------------------------------x

**FIRST AMENDED DISCLOSURE STATEMENT FOR**
**FIRST AMENDED JOINT CHAPTER 11 PLAN OF MOONLIGHT**
**BASIN RANCH L.P. AND ITS AFFILIATED DEBTORS**

PATTEN, PETERMAN, BEKKEDAHL & GREEN, P.L.L.C.
James A. Patten
2817 Second Ave. North, Suite 300
Billings, MT  59101
Telephone: (406) 252-8500
Facsimile: (406) 294-9500
Email: japatten@ppbglaw.com

Attorneys for Debtors and Debtors in Possession

Dated: Billings, Montana
         August 26, 2011

# SUMMARY OF THE PLAN[1]

The chapter 11 Plan submitted by Moonlight Basin Ranch, L.P. and its affiliated Debtors provides for the continued operation of the Moonlight Basin Resort (the "Resort") and payments to unsecured creditors funded by the Debtors' prepetition lenders, Lehman Brothers Holdings Inc. ("LBHI") and Lehman Commercial Paper Inc. ("LCPI," and together with LBHI, the "Lenders"). The Debtors are seeking to obtain Bankruptcy Court approval of the Plan. Section 1125 of the Bankruptcy Code requires the Debtors to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of the Plan. This Disclosure Statement has been submitted in accordance with such requirements. The Debtors urge all holders of Claims entitled to vote on the Plan to vote in favor of the Plan.

The cornerstone of the Plan is a settlement by and among the Debtors, the Insiders (together with the Debtors, the "Debtor Parties"), and the Lenders, each of which is supportive of the Plan and the Debtors' emergence from chapter 11. As set forth in more detail in this Disclosure Statement, the settlement serving as the foundation of the Plan relates to disputes between the Debtor Parties and the Lenders regarding certain prepetition loans. Specifically, in September 2007, the Lenders provided loans to the Debtors of more than $170 million pursuant to certain Prepetition Loan Documents. As security for such loans, the Debtors granted the Lenders, among other things, a first lien on substantially all of the Debtors' assets. The Debtors' failure to repay the Lenders by the relevant maturity dates led to a foreclosure proceeding in Montana State Court against the Debtors and certain other parties and ultimately the filing of these Chapter 11 Cases. The litigation over the Lenders' claims has, until now, been the key issue in these Chapter 11 Cases, as the Debtor Parties vigorously challenged the validity of those claims.

With a trial in the litigation fast approaching, the Lenders initiated settlement discussions with the Debtor Parties and, after extensive, good-faith negotiations, the parties agreed to the terms of a settlement agreement and entered into the Settlement and Sale Agreement attached hereto, the terms of which are fully incorporated into the Plan.[2] The settlement contemplates the continued operation of the Debtors' businesses through the transfer of substantially all of the Debtors' assets to the Lenders or Lender Designee(s) in satisfaction of the Lenders' prepetition secured claims. The settlement not only resolves the claims between the Debtors and the Lenders, but also the claims between the Lenders and the Insiders, including Lee Poole ("Poole"), the Debtors' principal, indirect owner, who has agreed to transfer and transition certain assets to the Lenders, provide certain representations and warranties to the Lenders, cooperate in effectuating the smooth transfer of control to the Lenders (to facilitate the continued operation of the Debtors' businesses and preserve value), and provide certain post-closing assistance in the form of executing any documents as may become necessary following the asset transfer to the Lenders and ensuring that certain beverage licenses used in connection with operation of the Resort remain in good standing.

---

[1] All capitalized terms used but not defined in this Summary shall have the meaning ascribed to them in this Disclosure Statement or the Plan.
[2] All parties' obligations under the Settlement and Sale Agreement are subject to Bankruptcy Court approval.

To facilitate the settlement, the Lenders have agreed to fund substantial payments to creditors.  Specifically, the Lenders have agreed to provide an amount of cash sufficient to:

(i) establish a reserve in the amount of $154,040.00 (plus the amount necessary to pay or satisfy costs that were incurred prior to the Effective Date and have not yet been paid or have not yet been Allowed as of the Effective Date, but which are subsequently Allowed, which amount will be agreed to by the Debtors and the Lenders in accordance with the terms of the Plan) to pay allowed administrative expenses and costs associated with the implementation of the Plan;

(ii) establish a reserve in the amount of $258,185.00 (subject to adjustment as described herein) to satisfy in full allowed convenience claims (claims allowed in an amount equal to or less than $10,000.00 or reduced to $10,000.00 by the election of creditors);

(iii) establish a reserve in the amount of $297,110.00 (subject to adjustment as described herein) for the benefit of allowed general unsecured claims;

(iv) pay all cure amounts in connection with the assumption of executory contracts or unexpired leases, which amounts are estimated as of the date of this Disclosure Statement to be $60,262.00;

(v) pay secured claims, which are estimated to be $244,602.00; and

(vi) establish a reserve to pay allowed professional compensation and reimbursement awards by the Bankruptcy Court for compensation for services rendered or reimbursement of expenses incurred through and including the Effective Date.[3]

Taking into account all of the above payments, the Lenders have agreed to fund over $1,000,000.00 under the Plan in aggregate.

The Debtors believe that this Plan provides creditors with the best possible recovery under the circumstances and avoids substantial litigation risk. The Lenders' claims are secured by all of the Debtors' assets and, as such, the Lenders' claims have priority over all other creditor claims.  The aggregate value of the Debtors' assets is not sufficient to satisfy fully the total value of the Lenders' allowed secured claims against the Debtors.  As a result, if the Lenders had were to prevail in the litigation, holders of claims against the Debtors, whether such claims are unsecured, administrative or of some other priority, would receive no recovery on account of such claims.  Given the costs and risks associated with litigation and the rulings by the Bankruptcy Court in the litigation to date, the Debtors believe that the Plan, which incorporates the terms of the Settlement and Sale Agreement and provides creditors with a recovery, is in the best interests of all creditors in these cases.

Importantly, the Lenders have provided the financing necessary to ensure the continued operation of the Resort, demonstrating their commitment to Moonlight Basin and the

---

[3] Because professional fees/expenses will accrue through the Effective Date and some professional fees/expenses will be paid between now and the Effective Date, by its nature, the amount of this reserve cannot be determined at this time. However, the Plan sets forth a mechanism described herein to estimate and set aside the appropriate amount of funds.

surrounding community.  Even after the prepetition loan matured, the Lenders continued to advance funds in excess of $4.8 million to Moonlight Basin to ensure the continued operation of the Resort.  Moreover, the Lenders provided the Debtors with $24 million in postpetition financing after the commencement of the Chapter 11 Cases, also to enable the Resort to continue to operate.  The Lenders' agreement to take over the Debtors' assets and fund substantial payments to their creditors is the only reason creditors are receiving any payments in this case.  The funds that will be paid to creditors will come from the Lenders and not from the Debtors or the Debtors' estates.

The Debtors have determined that it is in the best interests of their estates' creditors to avoid the risk and uncertainty associated with litigation and settle their claims against the Lenders on terms that will allow for a substantial recovery for creditors in these Chapter 11 Cases.  The Debtors believe that putting an end to Moonlight Basin's chapter 11 story will enable the Resort to reach its full potential.  In the event the Plan is not confirmed, there is no assurance that the Debtors will be able to reorganize their business.

**GIVEN THE RISK ASSOCIATED WITH LITIGATION, THE DEBTORS BELIEVE THAT THE PLAN PROVIDES THE BEST RECOVERIES POSSIBLE FOR THE HOLDERS OF CLAIMS AGAINST THE DEBTORS UNDER THE CIRCUMSTANCES.  AT THIS TIME, THE DEBTORS DO NOT BELIEVE THAT THERE IS A BETTER ALTERNATIVE FOR COMPLETING THESE CHAPTER 11 CASES OTHER THAN THROUGH CONFIRMATION OF THE PLAN.  EACH OF THE DEBTORS STRONGLY RECOMMENDS THAT YOU VOTE TO ACCEPT THE PLAN.**

# TABLE OF CONTENTS

**Page**

I.     **Introduction** ...................................................................................... 1

    A.     Holders of Claims Entitled to Vote ........................................... 2

    B.     Voting Procedures ....................................................................... 4

    C.     Confirmation Hearing ................................................................. 6

II.    **Overview of the Plan** ......................................................................... 7

    A.     Summary of the Plan ................................................................... 7

    B.     Classification and Treatment of Claims and Equity Interests ...... 11

        1.     Moonlight Mezz ............................................................ 13

        2.     Moonlight Basin Ranch ................................................. 14

        3.     Lone Mountain .............................................................. 15

        4.     Moonlight Basin ............................................................ 16

        5.     Moonlight Golf .............................................................. 17

        6.     Moonlight Lodge ........................................................... 18

        7.     Moonlight Spa ............................................................... 19

        8.     Mountain Top ................................................................ 20

        9.     Treeline ......................................................................... 21

III.   **The Settlement and Sale Agreement** ............................................. 21

IV.    **General Information** ........................................................................ 28

    A.     Overview of Chapter 11 ............................................................ 28

    B.     The Debtors' Prepetition Business Operations ......................... 29

        1.     The Moonlight Basin Resort ........................................ 29

        2.     Corporate Structure and Current Officers ................... 30

        3.     The Debtors' Businesses ............................................... 32

        4.     Prepetition Indebtedness .............................................. 33

    C.     Significant Events Leading to the Chapter 11 Cases ................. 36

        1.     Downturn in the Real Estate Market ............................ 36

        2.     The Forbearance Agreements ....................................... 36

        3.     The Foreclosure Action ................................................ 37

V.     **The Chapter 11 Cases** ..................................................................... 37

    A.     Retention and Compensation of the Debtors' Professionals ...... 37

    B.     DIP Financing ............................................................................ 38

    C.     Sales of Designated Properties .................................................. 39

    D.     No Appointment of a Committee of Unsecured Creditors ......... 39

**TABLE OF CONTENTS**
**(continued)**

|  |  |  | Page |
|---|---|---|---|
| E. | No Substantive Consolidation | | 39 |
| F. | The Adversary Proceeding | | 40 |
| G. | Claims Process and Bar Date | | 41 |
| H. | Extensions of Exclusive Periods | | 42 |
| I. | Appointment of Examiner | | 43 |
| J. | Motion of Ad Hoc Golf Committee and the Debtors' Objection | | 43 |
| K. | Saddle Ridge | | 44 |
| | 1. | Saddle Ridge Claims and the Debtors' Objection and Motion for Summary Judgment | 44 |
| | 2. | The Debtors' Claims Against Saddle Ridge | 45 |
| **VI.** | **The Chapter 11 Plan** | | 46 |
| A. | Considerations Regarding the Plan | | 46 |
| B. | Classification and Treatment of Claims and Equity Interests | | 48 |
| | 1. | Treatment of DIP Financing Claims, Administrative Expense Claims, and Priority Tax Claims | 48 |
| | 2. | Treatment of Claims Against and Equity Interests In Moonlight Mezz | 49 |
| | 3. | Treatment of Claims Against and Equity Interests in Subsidiary Debtors | 51 |
| C. | Implementation of the Plan | | 54 |
| | 1. | Establishment of Cash Reserves | 54 |
| | 2. | Plan Administrator | 54 |
| | 3. | Duties and Powers of Plan Administrator | 55 |
| | 4. | Directors/Officers/Equity/Assets of the Debtors on the Effective Date | 56 |
| D. | Plan Provisions Governing Distributions | | 57 |
| | 1. | Method of Distributions under the Plan | 57 |
| | 2. | Distributions Free and Clear | 58 |
| | 3. | Delivery of Distributions | 58 |
| | 4. | Undeliverable Distributions | 59 |
| | 5. | Withholding and Reporting Requirements | 59 |
| | 6. | Time Bar to Cash Payment Rights | 60 |
| | 7. | Distribution Record Date | 60 |
| | 8. | Allocation of Distributions | 60 |
| | 9. | Maximum Distributions | 60 |

**TABLE OF CONTENTS**
**(continued)**

|  |  |  | **Page** |
|---|---|---|---|
| | 10. | Setoffs and Recoupment | 60 |
| | 11. | Closing of Chapter 11 Cases | 60 |
| | 12. | Pre-Effective Date Injunctions or Stays | 61 |
| | 13. | Exemption from Certain Transfer Taxes | 61 |
| | 14. | Further Approval | 61 |
| E. | | Procedures for Treatment of Disputed Claims | 61 |
| | 1. | Objections to Claims; Prosecution of Disputed Claims | 61 |
| | 2. | Estimation of Claims | 61 |
| | 3. | Allowance of Disputed Claims | 62 |
| | 4. | Interest | 62 |
| F. | | Treatment of Executory Contracts and Unexpired Leases | 62 |
| | 1. | Assumption and Assignment of Executory Contracts and Unexpired Leases | 62 |
| | 2. | Rejection of Executory Contracts and Unexpired Leases | 62 |
| | 3. | Insurance Policies | 63 |
| | 4. | Approval of Assumption and Assignment of Executory Contracts and Unexpired Leases | 63 |
| | 5. | Objections | 63 |
| | 6. | Claims Relating to Executory Contracts and Unexpired Leases Rejected Pursuant to the Plan | 64 |
| G. | | Administrative Expense Claim Bar Date | 64 |
| H. | | Conditions Precedent to Effective Date of the Plan | 64 |
| | 1. | Conditions Precedent | 64 |
| | 2. | Waiver of Conditions | 65 |
| | 3. | Substantial Consummation | 65 |
| I. | | Effects of Confirmation | 65 |
| | 1. | Vesting of Assets | 65 |
| | 2. | Binding Effect | 66 |
| | 3. | Discharge of Claims | 66 |
| | 4. | Exculpation | 66 |
| | 5. | Retention of Causes of Action/Reservation of Rights | 66 |
| | 6. | Releases of Released Parties | 67 |
| | 7. | Injunction | 67 |
| | 8. | Terms of Injunctions or Stays | 67 |

**TABLE OF CONTENTS**
**(continued)**

                                                                                    **Page**

J.      Retention of Jurisdiction ................................................................ 68

K.      Miscellaneous Provisions ............................................................. 69

       1.     Modification of Plan............................................................. 69

       2.     Payment of Statutory Fees ................................................. 69

       3.     Withdrawal or Revocation.................................................. 69

       4.     Courts of Competent Jurisdiction...................................... 69

       5.     Notices .............................................................................. 69

       6.     Severability....................................................................... 70

       7.     Governing Law .................................................................. 70

       8.     Successors and Assigns ..................................................... 70

**VII.**    **Post-Effective Date Operation of the Resort** ............................... 70

**VIII.**   **Certain Factors Affecting the Debtors** ......................................... 71

A.      Risk of Non-Confirmation of the Plan .......................................... 71

B.      Failure of Conditions Precedent to Confirmation of the Plan...................... 71

**IX.**     **Confirmation of the Plan** ............................................................... 72

A.      Requirements for Confirmation of the Plan................................... 72

       1.     General Requirements of Section 1129 ............................. 72

       2.     Best Interests Tests ............................................................ 73

       3.     Liquidation Analysis ......................................................... 73

       4.     Feasibility ......................................................................... 76

B.      Requirements of Section 1129(b) of the Bankruptcy Code ......................... 76

**X.**     **Alternatives to Confirmation and Consummation of the Plan** ........................ 78

A.      Liquidation Under Chapter 7 ........................................................ 78

B.      Alternative Plan of Reorganization............................................... 78

**XI.**    **Certain Federal Income Tax Consequences of the Plan.** ................... 78

A.      Consequences to the Debtors ........................................................ 79

B.      Consequences to Certain Holders of Allowed Claims.................... 80

       1.     Gain or Loss ...................................................................... 80

       2.     Distributions in Discharge of Accrued but Unpaid Interest ............ 80

       3.     Information Reporting and Withholding ........................... 81

**XII.**   **Conclusion** ..................................................................................... 81

iv

**TABLE OF EXHIBITS**

Exhibit 1      The Plan and Schedule 1 to the Plan

Exhibit 2      Settlement and Sale Agreement

Exhibit 3      Golf Membership Plan

Exhibit 4      Updated Organizational Chart[4]

Exhibit 5      Schedule of Claims Against Each Debtor

Exhibit 6      Examiner's Report

---

[4] The updated organizational chart attached as Exhibit 3 hereto reflects that the Trusts (as described herein in Section IV(B)(2)(b) no longer hold an interest in Poole Holdings LLC.

## I.    INTRODUCTION

Moonlight Basin Ranch L.P., Lone Mountain Food & Beverage, LLC, Moonlight Lodge, LLC, Moonlight Golf, LLC, Moonlight Spa, LLC, Moonlight Basin, LLC, Mountain Top Construction Company, LLC, Treeline Springs, LLC, and Moonlight Basin Mezz, LLC (collectively, the "Debtors") submit this disclosure statement (the "Disclosure Statement") pursuant to section 1125 of title 11 of the United States Code (the "Bankruptcy Code") in connection with the solicitation of acceptances and rejections with respect to the First Amended Joint Chapter 11 Plan of Moonlight Basin Ranch L.P. and its affiliated Debtors, as the same may be amended (the "Plan"), a copy of which is attached hereto as Exhibit 1.  The Plan includes, without limitation, all exhibits, supplements, appendices, and schedules thereto, either in their present form or as the same may be altered, amended or modified from time to time.  *Unless otherwise defined herein, all capitalized terms contained herein have the meanings ascribed to them in the Plan.*

The Debtors' Chapter 11 Cases have been consolidated for procedural purposes only and are being jointly administered under case number 09-62327 pursuant to Bankruptcy Rule 1015(b).  The Debtors are authorized to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

The purpose of this Disclosure Statement is to set forth information (1) regarding the history of the Debtors, their businesses, and the Chapter 11 Cases, (2) regarding the terms and conditions of the settlement of significant disputes between the Debtor Parties and the Lenders, (3) concerning the Plan and alternatives to the Plan, (4) advising holders of Claims and Equity Interests of their rights under the Plan, (5) assisting the holders of Claims in making an informed judgment as to whether they should vote to accept or reject the Plan, and (6) assisting the Bankruptcy Court in determining whether the Plan complies with the provisions of chapter 11 of the Bankruptcy Code and should be confirmed.

On July 13, 2011, the Debtors filed a motion (the "Solicitation Procedures Motion") [Docket No. 671] requesting that the Bankruptcy Court, among other things, approve the Ballot, schedule the hearing on the Disclosure Statement (the "Disclosure Statement Hearing"), set the record date for holders of Claims entitled to vote on the Plan (the "Record Date"), set the deadline by which a holder of a Claim as of the Record Date entitled to vote on the Plan must submit its Ballot (the "Voting Deadline"), establish procedures in connection with voting on the Plan (the "Voting Procedures"), and set the last day to file objections to confirmation of the Plan (the "Plan Objection Deadline").  The Order granting the Solicitation Motion (the "Solicitation Procedures Order") [Docket No. 673] established the following dates and deadlines:  July 28, 2011:  Disclosure Statement Hearing and Record Date; August 26, 2011: Voting Deadline and Plan Objection Deadline.

Following a hearing on approval of the Disclosure Statement on July 28, 2011, the Bankruptcy Court entered an Order [Docket No. 742] continuing the Disclosure Statement Hearing to September 7, 2011, setting October 3, 2011 as the Plan Objection Deadline, and setting a hearing on confirmation of the Plan (the "Confirmation Hearing") for October 17, 2011.

On August 12, 2011, the Bankruptcy Court entered an Order [Docket No. 768] setting September 7, 2011 as the Record Date, and October 3, 2011 as the Voting Deadline.

It is important to the Debtors' creditors that the Disclosure Statement Hearing proceed as scheduled.  Not only is the end of the chapter 11 cloud good for the Debtors' creditors, but as reflected on the docket in these Chapter 11 Cases, third parties have begun to purchase Claims against the Debtors.  It is imperative that this Disclosure Statement and the Plan be distributed to creditors as soon as possible so that such creditors can see their projected recoveries and do not sell their claims for insufficient value simply because they did not know the recoveries they would be entitled to receive under the Plan.

To summarize, the relevant dates and deadlines for holders of Claims are as follows:

- September 7, 2011:  Disclosure Statement Hearing
- September 7, 2011:  Record Date
- October 3, 2011:  Plan Objection Deadline
- October 3, 2011:  Voting Deadline
- October 17, 2011:  Confirmation Hearing

On September ___, 2011, after notice and a hearing, the Bankruptcy Court entered an order (the "Disclosure Statement Order") approving this Disclosure Statement, pursuant to section 1125 of the Bankruptcy Code, as containing adequate information of a kind and in sufficient detail to enable hypothetical reasonable investors typical of holders of Claims against the Debtors to make an informed judgment whether to accept or reject the Plan. APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT, HOWEVER, CONSTITUTE A DETERMINATION BY THE BANKRUPTCY COURT AS TO THE FAIRNESS OR MERITS OF THE PLAN.

Detailed voting instructions accompany each Ballot.  Each holder of a Claim entitled to vote on the Plan should read the Disclosure Statement, the Plan, the Disclosure Statement Order, the Solicitation Procedures Order, and the instructions accompanying the Ballots in their entirety before voting on the Plan.  These documents contain important information concerning the classification of Claims and Equity Interests for voting purposes and the tabulation of votes.  No solicitation of votes to accept the Plan may be made except pursuant to section 1125 of the Bankruptcy Code.  No representations concerning the Debtors or the value of the Debtors' property have been authorized by the Debtors other than as set forth in this Disclosure Statement.  Any information, representations, or inducements made to obtain acceptance of the Plan, which are other than or inconsistent with the information contained in this Disclosure Statement and in the Plan, should not be relied upon by any holder of a Claim entitled to vote on the Plan.

## A.   HOLDERS OF CLAIMS ENTITLED TO VOTE

Pursuant to section 1126 of the Bankruptcy Code, only holders of allowed claims or equity interests which are (i) "impaired" by a plan of reorganization and (ii) entitled to receive a distribution under such plan are entitled to vote to accept or reject a proposed plan.  Under

section 1126(f) of the Bankruptcy Code, classes of claims or equity interests in which the holders of claims or equity interests are unimpaired under a chapter 11 plan are deemed to have accepted the plan and are not entitled to vote to accept or reject the plan.  Section 1126(g) of the Bankruptcy Code provides that classes of claims or equity interests in which the holders of claims or equity interests are impaired under a chapter 11 plan such that they do not receive or retain property on account of their claims or equity interests are deemed to have rejected the plan and are not entitled to vote to accept or reject the plan.  For a detailed description of the treatment of Claims and Equity Interests under the Plan, see Section II(B) of this Disclosure Statement.

Under section 1124 of the Bankruptcy Code, a class of claims or interests is deemed to be "impaired" under the Plan unless (i) the Plan leaves unaltered the legal, equitable and contractual rights to which such claim or interest entitles the holder thereof or (ii) notwithstanding any legal right to an accelerated payment of such claim or interest, the Plan, among other things, cures all existing defaults (other than defaults resulting from the occurrence of events of bankruptcy) and reinstates the maturity of such claim or interest as it existed before the default.  Claims in Moonlight Mezz Class 2, Moonlight Mezz Class 3, Moonlight Mezz Class 4, Moonlight Mezz Class 5, (each to the extent there are holders of Allowed Claims in such Classes), each Subsidiary Debtor Class 2, each Subsidiary Debtor Class 3, each Subsidiary Debtor Class 4, and each Subsidiary Debtor Class 5 are impaired, and holders of Allowed Claims in such Classes will receive distributions under the Plan to the extent not otherwise waived.  As a result, holders of Allowed Claims in those Classes are entitled to vote to accept or reject the Plan.

Holders of Equity Interests (Moonlight Mezz Class 6 and each Subsidiary Debtor Class 6) are impaired and will not receive any distribution under the Plan and are, therefore, deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Holders of Claims in Moonlight Mezz Class 1 (to the extent there are any holders of claims in such Class) and each Subsidiary Debtor Class 1 are unimpaired by the Plan.  As a result, holders of Claims in those Classes are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.

Section 1126(c) of the Bankruptcy Code defines "acceptance" of a plan by a class of claims as acceptance by creditors in that class that hold at least two-thirds in dollar amount and more than one-half in number of the claims that cast ballots for acceptance or rejection of the plan.  For a more detailed description of the requirements for confirmation of the Plan, see Section VIII(A) of this Disclosure Statement.

In this case, if a Class of Claims entitled to vote on the Plan rejects the Plan, each of the Debtors reserve the right to amend the Plan or request confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code or both.  Section 1129(b) of the Bankruptcy Code (commonly known as "cram down") permits the confirmation of a chapter 11 plan notwithstanding the rejection of a plan by one or more impaired classes of claims or equity interests.  Under that section, a plan may be confirmed by a bankruptcy court if it does not "discriminate unfairly" and is "fair and equitable" with respect to each rejecting class.  For a more detailed description of the requirements for confirmation of a nonconsensual plan, see Section VIII(B) of this Disclosure Statement.

3

The Debtors are commencing this solicitation after extensive negotiations with, among others, the Lenders. THE DEBTORS BELIEVE THAT THE PLAN IS FAIR AND EQUITABLE AND PROVIDES THE BEST RECOVERY TO CLAIM HOLDERS UNDER THE CIRCUMSTANCES. A LIQUIDATION ANALYSIS CONTAINING A COMPARISON OF RECOVERIES UNDER THE PLAN VERSUS A CHAPTER 7 LIQUIDATION IS INCLUDED IN SECTION VIII(A)(3) OF THIS DISCLOSURE STATEMENT. AT THIS TIME, THE DEBTORS BELIEVE THAT ACCEPTANCE OF THE PLAN IS IN THE BEST INTERESTS OF EACH AND EVERY CLASS OF CREDITORS ENTITLED TO VOTE ON THE PLAN AND STRONGLY RECOMMEND THAT EACH CREDITOR VOTE TO ACCEPT THE PLAN.

Holders of Claims or Equity Interests in such Classes may obtain a copy of the Disclosure Statement by contacting Debtors' counsel, James A. Patten at (406) 252-8500.

**B.**     **VOTING PROCEDURES**

If you are entitled to vote to accept or reject the Plan, a Ballot is enclosed for the purposes of voting on the Plan. If you hold Claims in more than one Class and you are entitled to vote Claims in more than one Class, you will receive separate Ballots, which must be used for each separate Class of Claims. Ballots should be returned to:

**The Clerk of Bankruptcy Court**
**Mike Mansfield Federal Building and U.S. Courthouse, Room 303**
**400 North Main**
**Butte, MT 59701**

With copies to:

James A. Patten
Patten, Peterman, Bekkedahl & Green PLLC
2817 Second Ave. North
Suite 300
Billings, MT  59101

Neal Jensen
United States Trustee's Office
Liberty Center, Suite 204
301 Central Avenue
Great Falls, MT 59401

TO BE COUNTED, YOUR BALLOT INDICATING ACCEPTANCE OR REJECTION OF THE PLAN MUST BE **RECEIVED** BY NO LATER THAN **ON OR BEFORE OCTOBER 3, 2011, THE VOTING DEADLINE**. ANY EXECUTED BALLOT RECEIVED THAT DOES NOT INDICATE EITHER AN ACCEPTANCE OR A REJECTION OF THE PLAN SHALL NOT BE COUNTED.

4

In addition, as contemplated in the Plan and as further described in Section VI(B), each holder of an Allowed claim in an amount greater than $10,000.00 in Class 4 may elect to voluntarily reduce such claim to $10,000.00 and be treated as the holder of an Allowed Convenience Claim in Class 5 by making such election on the Ballot.  Accordingly, the Ballot provides for such election.

Do not return any other documents with your Ballot.

The Bankruptcy Court set September 7, 2011 as the Record Date.  Accordingly, only holders of record as of the Record Date that otherwise are entitled to vote under the Plan will receive a Ballot and may vote on the Plan.  Moreover, in the Solicitation Procedures Order, the Bankruptcy Court approved the following Voting Procedures:

a.     If a claim is deemed Allowed in accordance with the Plan, such claim is allowed for voting purposes in the deemed allowed amount set forth in the Plan;

b.     If a claim for which a proof of claim has been timely filed[5] is by its terms contingent, unliquidated, or disputed, such claim is allowed for voting purposes only, and not for purposes of allowance or distribution, at $1.00, unless such claim is disputed in the manner set forth in subparagraph (f) below;

c.     If a proof of claim was timely filed in an amount that is liquidated and noncontingent, such claim is temporarily allowed in the amount set forth on the proof of claim, unless such claim is disputed in the manner set forth in subparagraph (f) below;

d.     If a claim has been estimated for voting purposes or otherwise allowed for voting purposes by order of the Bankruptcy Court, such claim is allowed in the amount so estimated or allowed by the Bankruptcy Court for voting purposes only, and not for purposes of allowance or distribution unless otherwise provided by Bankruptcy Court order;

e.     If a claim is listed in the Debtors' Schedules of Assets and Liabilities (the "Schedules")[6] as contingent, unliquidated, or disputed and a proof of claim was not (i) filed by the Bar Date, as defined below or (ii) deemed timely filed by an order of the Court prior to the Voting Deadline, unless the Debtors have consented in writing, the Debtors propose that such claim be disallowed for voting purposes and for purposes of allowance and distribution pursuant to Bankruptcy Rule 3003(c);

f.     If the Debtors have served an objection or request for estimation as to a claim at least ten days before the Voting Deadline, the Debtors propose that such claim be

---

[5]  As described in Section V(G) of this Disclosure Statement, on April 8, 2010 the Bankruptcy Court entered an order establishing May 28, 2010 as the deadline for filing proofs of claim against any of the Debtors.

[6]  As described in Section V(G) of this Disclosure Statement, on their respective Commencement Date (as defined herein), each of the Debtors filed Statements of Financial Affairs and Schedules, as amended and supplemented. The Schedules and Statements (as defined herein) reflect all of the Debtors' known assets and liabilities at the time of preparation based on the books and records available at that time.

temporarily disallowed for voting purposes only and not for purposes of allowance or distribution, except to the extent and in the manner as may be set forth in the objection or request for estimation; and

       g.     There shall be a rebuttable presumption that in the case where more than one timely, properly completed Ballot is received, only the Ballot that bears the earliest date will be counted unless the holder of the Claim receives Bankruptcy Court approval to have the Ballot that bears the latest date counted.

       Moreover, the Solicitation Procedures Order provides that if any creditor seeks to challenge the allowance of its claim for voting purposes in accordance with the above procedures, such creditor must serve on the Debtors and file with the Bankruptcy Court a motion for an order pursuant to Bankruptcy Rule 3018(a) (each, a "Rule 3018 Motion") temporarily allowing such claim in a different amount for purposes of voting to accept or reject the Plan on or before the tenth day after service of notice of an objection or request for estimation, if any, to such claim.  In accordance with Bankruptcy Rule 3018, as to any creditor filing such a Rule 3018 Motion, such creditor's Ballot will not be counted unless allowed by the Bankruptcy Court for voting purposes, after notice and a hearing, pursuant to an order entered at least five days prior to the Voting Deadline.  Notwithstanding the Voting Procedures, the Debtors will not object on timeliness grounds to any Rule 3018 Motion filed on or before ten days prior to the Voting Deadline.

       If you are a holder of a Claim or Equity Interest entitled to vote on the Plan and you did not receive a Ballot, received a damaged Ballot, or lost your Ballot, or if you have any questions concerning the Disclosure Statement, the Plan, or the procedures for voting on the Plan, please call Debtors' counsel, James A. Patten at (406) 252-8500.

## C.    CONFIRMATION HEARING

       Section 1128 of the Bankruptcy Code requires the Bankruptcy Court to hold a hearing on confirmation of the Plan.  The Confirmation Hearing will be held on October 17, 2011 at 9:00 a.m. (Mountain Time) before the Honorable Ralph B. Kirscher, United States Bankruptcy Court for the District of Montana, Russell Smith Federal Courthouse, 201 East Broadway, Missoula, Montana 59802.  The Bankruptcy Court has directed that objections to confirmation of the Plan, if any, must be in writing and must be filed with the Bankruptcy Court and served upon the Debtors, so as to be received no later than October 3, 2011.  The Confirmation Hearing may be adjourned from time to time without further notice except for the announcement of the adjournment date made at the Confirmation Hearing or at any subsequent adjourned Confirmation Hearing.

       THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE AS OF THE DATE OF THIS DISCLOSURE STATEMENT UNLESS ANOTHER TIME IS SPECIFIED HEREIN, AND THE DELIVERY OF THIS DISCLOSURE STATEMENT SHALL NOT CREATE AN IMPLICATION THAT THERE HAS BEEN NO CHANGE IN THE INFORMATION STATED SINCE THE DATE OF THIS DISCLOSURE STATEMENT.

FOR THE CONVENIENCE OF HOLDERS OF CLAIMS AND EQUITY INTERESTS, THIS DISCLOSURE STATEMENT SUMMARIZES THE TERMS OF THE PLAN.  SUMMARIES OF CERTAIN PROVISIONS OF AGREEMENTS REFERRED TO IN THIS DISCLOSURE STATEMENT DO NOT PURPORT TO BE COMPLETE AND ARE SUBJECT TO, AND ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO, THE FULL TEXT OF THE APPLICABLE AGREEMENTS, INCLUDING THE DEFINITIONS OF TERMS CONTAINED IN SUCH AGREEMENTS.

THE DISCLOSURE STATEMENT MAY NOT BE RELIED ON FOR ANY PURPOSE OTHER THAN TO DETERMINE WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN, AND NOTHING STATED HEREIN SHALL CONSTITUTE AN ADMISSION OF ANY FACT OR LIABILITY BY ANY PARTY, OR BE ADMISSIBLE IN ANY PROCEEDING INVOLVING THE DEBTORS OR ANY OTHER PARTY, OR BE DEEMED CONCLUSIVE EVIDENCE OF THE TAX OR OTHER LEGAL EFFECTS OF THE PLAN ON THE DEBTORS OR HOLDERS OF CLAIMS OR EQUITY INTERESTS. CERTAIN OF THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT, BY NATURE, ARE FORWARD-LOOKING AND CONTAIN ESTIMATES AND ASSUMPTIONS.  THERE CAN BE NO ASSURANCE THAT SUCH STATEMENTS WILL BE REFLECTIVE OF ACTUAL OUTCOMES.

## II.    OVERVIEW OF THE PLAN

For a more detailed description of the terms and provisions of the Plan, see Section VI below.

### A.    SUMMARY OF THE PLAN

As set forth above, the Plan is the product of extensive negotiations and discussions by and between the Debtor Parties and the Lenders and incorporates fully the terms of the Settlement and Sale Agreement, as summarized below.  The Plan does not substantively consolidate the nine Debtors and recognizes the corporate integrity of each Debtor.

As noted, under the Plan, the Debtors are transferring substantially all of their assets to the Lenders or Lender Designee(s) on account of the Prepetition Lender Secured Claims and the Lenders will own and continue to operate the Resort.  After the Effective Date, the Debtors' assets will consist primarily of the cash that has been provided by the Lenders, as further explained below, to wind down the estates and pay creditors.  The Debtors' primary function at that time will be to wind down their affairs, object to claims, and provide a distribution to creditors in accordance with the Plan.  Under the Plan, a Plan Administrator selected by the Lenders will be appointed to implement the terms of the Plan.  A more detailed description of the Plan Administrator's duties and powers is provided in Section VI(C) below.

The distributions to creditors under the Plan are possible due to the agreement between the Lenders and the Debtors pursuant to which the Lenders are to fund those distributions.  Thus, in connection with the transfer by the Debtors of the Debtor Purchased Assets pursuant to the terms of the Settlement and Sale Agreement, the Lenders have agreed to establish Cash Reserves in order to fund distributions to holders of Allowed Claims, and pay

7

administrative expenses associated with the implementation of the Plan.  Specifically, LCPI will fund four reserves:

1. <u>Plan Administration Cash Reserve</u> – the Plan Administrative Cash Reserve will be used to fund the payment of the Plan Administration Costs, which are generally costs, fees, and expenses of the Plan Administrator necessary to (a) meet the reasonable, necessary administrative expenses of the Post-Effective Date Debtors, (b) pay reasonable administrative expenses of the Debtors' estates that were incurred prior to the Effective Date and have not been paid or have not been Allowed as of the Effective Date but which are subsequently Allowed, (c) satisfy other liabilities incurred by the Post-Effective Date Debtors permitted in accordance with the Plan, and (d) otherwise perform the functions and take the actions provided for or permitted in the Plan in accordance with the budget for the Plan Administrator.  The Plan Administration Cash Reserve will be established in the amount of $154,040.00 (which is the Plan Administrator's estimate of the costs of winding down the estates post-Effective Date) plus the amount necessary to pay or satisfy costs that were incurred prior to the Effective Date and have not yet been paid or have not yet been Allowed as of the Effective Date, but which are subsequently Allowed, which amount will be agreed to by the Debtors and the Lenders in accordance with the terms of the Plan.

2. <u>General Unsecured Claims Cash Reserve</u> – the General Unsecured Claims Cash Reserve, established in the amount of $297,110.00, will be used to fund pro rata distributions to holders of Allowed General Unsecured Claims, which are general unsecured, non-priority Claims other than DIP Financing Claims, Administrative Expense Claims, Professional Compensation and Reimbursement Claims,  Priority Tax Claims, Priority Non-Tax Claims, Other Secured Claims, Prepetition Lender Secured Claims, Convenience Claims, or Claims that arise under executory contracts and unexpired leases that are assumed under the Plan.  For avoidance of doubt, no payments will be made from the General Unsecured Claims Cash Reserve to the Lenders on account of any deficiency Claim under the Prepetition Loan Documents or holders of any other Claim waived pursuant to Section 2.3 of the Plan.  The amount of Cash in the General Unsecured Claims Cash Reserve available for pro rata distributions to holders of Allowed General Unsecured shall increase or decrease depending on a variety of factors.  Specifically, the General Unsecured Claims Cash Reserve shall be reduced by (a) $10,000.00 for every holder of an Allowed General Unsecured Claim that elects to be treated as a Convenience Claim, with such funds instead being submitted by LCPI to the Convenience Claims Cash Reserve to satisfy such claim,[7] (b) the costs, fees, and expenses of the Plan Administrator, or any professional retained by the Plan Administrator, necessary for the Plan Administrator or such professional to object to, seek to subordinate, compromise, settle, or

---

[7] If all holders of Allowed General Unsecured Claims in an amount below $33,333.00 elect to be treated as holders of Allowed Convenience Claims by reducing their claims to $10,000.00 by an irrevocable written election on the timely submitted Ballot, the amount of the General Unsecured Claims Cash Reserve will decrease to $117,110.00; however, the aggregate amount of Cash in the General Unsecured Claims Cash Reserve and the Convenience Claims Cash Reserve ($555,295.00) will not be affected by such elections.

otherwise litigate any or all of the General Unsecured Claims against the Debtors, subject to receiving consent from the Lenders as set forth in the Plan (collectively, the "General Unsecured Claim Objection Costs") if any,[8] and (c) the Cure amount of each executory contract or unexpired lease, if any, that the Debtors, upon the request of the Lenders, add to Schedule 1 of the Plan after the date of this Disclosure Statement but on or prior to the Confirmation Date pursuant to Section 10.2 of the Plan (with such amount instead going to pay the cure costs to the respective executory contract or unexpired lease counterparty). Moreover, the General Unsecured Claims Cash Reserve shall be increased by the Cure amount of each executory contract or unexpired lease, if any, that the Debtors, solely upon obtained consent from the Lenders, delete from Schedule 1 of the Plan after the date of this Disclosure Statement but on or prior to the Confirmation Date pursuant to Section 10.2 of the Plan. Accordingly, the size of the General Unsecured Claims Cash Reserve available to satisfy Allowed General Unsecured Claims and the recovery to holders of General Unsecured Claims will vary depending on the number of holders of Allowed General Unsecured Claims that elect to be treated as holders of Convenience Claims; the aggregate General Unsecured Claim Objection Costs; and the aggregate Cure amounts in connection with executory contracts or unexpired leases added or deleted by the Debtors, upon the request of the Lenders, to Schedule 1 of the Plan.

3.   Convenience Claims Cash Reserve – the Convenience Claims Cash Reserve, established in the amount of $258,185.00, will be used to satisfy distributions to holders of Allowed Convenience Claims, which are non-priority Claims that would otherwise be General Unsecured Claims, but instead are "Convenience Claims" because such Claims are (a) Allowed in an amount equal to or less than $10,000.00 or (b) Allowed in an amount greater than $10,000.00 but are reduced to $10,000.00 by an irrevocable written election by the holder of such Allowed Claim on the timely submitted Ballot.[9]

4.   Professional Compensation and Reimbursement Claims Cash Reserve – the Professional Compensation and Reimbursement Claims Cash Reserve will be used to fund the payment of Allowed Professional Compensation and Reimbursement Claims, which are claims for an award by the Bankruptcy Court of compensation for services rendered or reimbursement of expenses incurred through and including the Effective Date. The amount of the Professional Compensation and Reimbursement Claims Cash Reserve will be agreed to by the Debtors and the Lenders at least 7 days prior to the Effective Date and with respect to each professional shall be calculated as follows: (a) for periods for which the professional has filed an interim fee

---

[8] The Debtors intend to begin shortly the process of objecting to claims. Such timing will minimize the amount of General Unsecured Claim Objection Costs and maximize the recoveries to holders of Allowed General Unsecured Claims.

[9] If all holders of Allowed General Unsecured Claims in an amount below $33,333.00 elect to be treated as holders of Allowed Convenience Claims by reducing their claims to $10,000.00 by an irrevocable written election on the timely submitted Ballot, the amount of the Convenience Claims Cash Reserve will increase to $438,185.00; however, the aggregate amount of Cash in the General Unsecured Claims Cash Reserve and the Convenience Claims Cash Reserve ($555,295.00) will not be affected by such elections.

application, an amount no greater than the amounts asserted in such interim fee application minus amounts received from the Debtors prior to the Effective Date in respect of such interim fee application and (b) for periods for which the professional has not filed an interim fee application, an estimate of the fees and expenses incurred by the professional in such periods through the Effective Date, which, in each case shall be no greater for any professional for any period than the amount set forth in the Budget.

The reserves each will be funded by Cash advanced to Moonlight Basin Ranch by LCPI under the DIP Loan Documents in recognition by the Lenders of the sacrifice and hardships endured by such creditors as a result of the financial problems of the Debtors. Absent LCPI's willingness to make payments under the Plan for the benefits of creditors, such Cash would be otherwise repaid to LCPI in its capacity as a holder of a DIP Financing Claim. Instead, such Cash shall be transferred to each of the Post-Effective Date Debtors to be used by the Plan Administrator in accordance with the terms of and subject to the conditions set forth in the Plan.

Because the Lenders' Claims against the Debtors based on the Prepetition Loan Documents are secured by all of the Debtors' assets and the aggregate value of the Debtors is insufficient to fully satisfy the total value of the Lenders' Claims against the Debtors, if the Prepetition Lender Secured Claim is an Allowed Claim, holders of claims against the Debtors, whether such claims are unsecured, administrative or of some other priority, would receive no recovery on account of such Claims. Accordingly, under the Plan, payments are only available to creditors because the Lenders have agreed to pay those creditors. Also, the distribution to holders of General Unsecured Claims will be much higher than straight pro rata distributions, because the Lenders, on account of any Prepetition Lender Deficiency Claim (which Claims, for the avoidance of doubt, are classified as Class 4 General Unsecured Claims), and the holders of Insider Claims have agreed to unconditionally, irrevocably, and forever waive all rights of distribution they would otherwise be entitled to on account of such Claims. Notwithstanding the foregoing and for the avoidance of doubt, each holder of an Insider Claim or a Prepetition Lender Deficiency Claim shall retain its right to vote on the Plan,[10] and each such party has agreed in the Settlement and Sale Agreement to vote to accept the Plan.

Although the Debtors' estates are not substantively consolidated, the unsecured creditors of each of the Debtors are similarly situated in the sense that the assets of all the Debtors are fully encumbered by the Lenders' liens and all unsecured creditors would therefore

---

[10]  The ability of a holder of a Prepetition Lender Deficiency Claim to retain its right to vote on the Plan despite having agreed to waive all rights of distribution they would otherwise be entitled to on account of such Claim is permitted under the Bankruptcy Code. Section 1126 of the Bankruptcy Code provides that holders of allowed claims or equity interests "impaired" by a plan of reorganization and entitled to receive a distribution under such plan are entitled to vote to accept or reject a proposed plan. The holders of Prepetition Lender Deficiency Claims, which are classified as Class 4 General Unsecured Claims, are both impaired and entitled to receive a distribution under the Plan. The holders of such Claims simply chose to waive all rights to such distribution. Such waiver does not, however, affect their ability to retain their right to vote on the Plan. The Debtors are unaware of any authority, in the Ninth Circuit or otherwise, to the contrary. Also, such waiver is not and shall not be deemed or construed in any way as a full or partial disallowance or reduction of the Prepetition Lender Deficiency Claims. Moreover, the classification of the Prepetition Lender Deficiency Claims in the class of General Unsecured Claims was proper. *See Barakat v. Life Ins. Co. of Virginia (In re Barakat)*, 99 F.3d 1520, 1526 (9th Cir. 1996) (finding the "absent legitimate business or economic justification, it is impermissible for Debtor to classify [creditor's] deficiency claim separately from general unsecured claims.").

not be entitled to a recovery in a straight priority waterfall. The Debtors and the Lenders determined, therefore, to treat creditors of the different Debtors in the same manner (i.e., to have them share in the same pots of money provided by the Lenders), as any different treatment to unsecured creditors of different Debtors would have been arbitrary and administratively burdensome with no real justification. This treatment of creditors under the Plan does not amount to a substantive consolidation of the Debtors' estates.

### B.   CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS

The following tables briefly summarize the classification and treatment of Claims and Equity Interests under the Plan for each of the Debtors. This summary is qualified in its entirety by reference to the provisions of the Plan. For a more detailed description of the classification and treatment of Claims and Equity Interests, see Section VI(B) below.[11]

Claims against and Equity Interests in the Debtors, other than DIP Financing Claims, Administrative Expense Claims, and Priority Tax Claims with respect to each Debtor are classified for all purposes, including voting and distribution pursuant to the Plan, as Class 1 Priority Non-Tax Claims, Class 2 Other Secured Claims, Class 3 Prepetition Lender Secured Claims, Class 4 General Unsecured Claims, Class 5 Convenience Claims, or Class 6 Equity Interests. Your ability to vote on the Plan and your distribution under the Plan, if any, depend on what kind of Claim or Interest you hold.

Claims arising out of executory contracts or unexpired leases that are being assumed and assigned to the applicable Lender Designee(s) under the Plan, as set forth on Schedule 1 to the Plan, are not considered General Unsecured Claims or Convenience Claims. Accordingly, such claims are not classified as either Moonlight Mezz Class 4 Claims, Subsidiary Debtor Class 4 Claims, Moonlight Mezz Class 5 Claims, or Subsidiary Debtor Class 5 Claims. Rather, those claims will be paid in full as "Cure" costs pursuant to Section 10.1 of the Plan. The Debtors reserve the right, however, as set forth in Section 10.2 of the Plan, after the date of this Disclosure Statement but on or prior to the Confirmation Date, to amend, solely upon obtaining consent from the Lenders, the Plan to delete any executory contract or unexpired lease from Schedule 1 to the Plan or, upon the request of the Lenders, add any executory contract or unexpired lease to Schedule 1 of the Plan, in which event such executory contract or unexpired lease shall be deemed to be, respectively, rejected or assumed. Any claims that may arise from the rejection of executory contracts or unexpired leases pursuant to the Plan will be treated as General Unsecured Claims or Convenience Claims, as applicable.[12] As such, to preserve its

---

[11]  The Debtors, based on their review of the Claims and after comparing such Claims to their books and records, are not aware of any Claims in Moonlight Mezz Class 1, Moonlight Mezz Class 2, each Subsidiary Debtor Class 1, Moonlight Lodge Class 2, Lone Mountain Class 2, Moonlight Spa Class 2, or Treeline Class 2. Also, the Debtors are not aware of any Claims in Moonlight Mezz Class 4, Lone Mountain Class 4, Moonlight Spa Class 4, Moonlight Golf Class 4, or Treeline Class 4 other than the Prepetition Lender Deficiency Claims, on which the Lenders have agreed to unconditionally, irrevocably, and forever waive all rights of distribution.

[12]  Claims arising out of the rejection of an executory contract or unexpired lease pursuant to the Plan must be filed with the Bankruptcy Court and served upon the relevant Debtor no later than 30 days after notice of entry of the Confirmation Order. All such Claims not filed within such time will be forever barred from assertion against the Debtors and their Estates or the Post-Effective Date Debtors and their property.

voting rights in the event that an executory contract or unexpired lease is ultimately rejected, any party to an executory contract or unexpired lease that believes it may have a Claim relating to such executory contract or unexpired lease if the contact or lease were to be rejected should submit a Ballot in accordance with the voting procedures set forth above whether or not such contract or lease is currently on Schedule 1 to the Plan.  For avoidance of doubt, the Debtors will send a Ballot to all parties to executory contracts or unexpired leases, including those that are currently contemplated to be assumed and assigned to the applicable Lender Designee(s) under the Plan, as set forth on Schedule 1 to the Plan.  The Ballot will only be counted as a vote on the Plan if it is submitted in accordance with the voting procedures and if the executory contract or unexpired lease is not on Schedule 1 to the Plan as of the Confirmation Date and is therefore an executory contract or unexpired leases that will be deemed rejected as of the Effective Date.

*[Remainder of page intentionally left blank]*

### 1. **Moonlight Mezz**

| Class | Claims and Interests | Treatment | Status | Voting Rights | Estimated Recovery Under the Plan |
|---|---|---|---|---|---|
| 1 | Priority Non-Tax Claims | Paid in full in Allowed amount of claim. | Unimpaired | Not Entitled to Vote, Deemed to Accept | 100% |
| 2 | Other Secured Claims | Satisfied by, at the election of Moonlight Mezz: (i) payment in Cash; (ii) the sale or disposition proceeds of collateral secured the claim; or (iii) such other treatment that leaves the holder's legal, equitable, and contractual rights unaltered. | Impaired | Entitled to Vote | 100% |
| 3 | Prepetition Lender Secured Claims | Satisfied by the transfer of the Debtor Purchased Assets. | Impaired | Entitled to Vote | see footnote[13] |
| 4 | General Unsecured Claims | Pro rata share of Cash from the General Unsecured Claims Cash Reserve. | Impaired | Entitled to Vote | up to 30%[14] |
| 5 | Convenience Claims | Paid in full in Allowed amount of claim. | Impaired | Entitled to Vote | 100% |
| 6 | Equity Interests | No recovery. | Impaired | Not Entitled to Vote, Deemed to Reject | 0% |

---

[13] The Prepetition Lender Secured Claims, which are Claims of the Lenders arising from the Prepetition Loan Documents including any Claims arising from a guarantee by a Debtor of any obligations thereunder, are satisfied by the transfer to the applicable Lender Designee(s) of the Debtor Purchased Assets held by Moonlight Mezz, as further provided in the Plan and Settlement and Sale Agreement. A portion of such recovery on account of the Prepetition Lender Secured Claims will be used by LCPI to fund the General Unsecured Claims Cash Reserve described above. The Lenders have agreed to unconditionally, irrevocably, and forever waive all rights of distribution they would otherwise be entitled to on account of their Prepetition Lender Deficiency Claims, which are substantial.

[14] The percentage recovery is a projected recovery only and assumes that Claims are ultimately allowed in the amount that the Debtors believe match their books and records and does not take into account rejection damage claims that may arise from the rejection of executory contracts or unexpired leases (which under the Plan must be filed with the Bankruptcy Court and served upon the Debtors no later than 30 days after notice of entry of the Confirmation Order), the General Unsecured Claim Objection Costs, or the Cure amount associated with an executory contract or unexpired lease that the Debtors, upon the request of the Lenders, add to Schedule 1 of the Plan after the date of this Disclosure Statement but on or prior to the Confirmation Date pursuant to Section 10.2 of the Plan, each of which will affect the size of the General Unsecured Claims Cash Reserve available to satisfy creditor claims. The largest effect on recovery will result from the claim of The Saddle Ridge Townhouse Owners Association ("Saddle Ridge"), which filed identical general unsecured Claims against Moonlight Basin Ranch and Mountain Top in the amount of $2,407,000.00 based on alleged design and construction defects in the Saddle Ridge condominiums. The Saddle Ridge Claims are classified under the Plan as General Unsecured Claims. The Debtors dispute the validity of the Saddle Ridge Claims and have filed an objection to such Claims, as discussed in Section V(K). The recovery available for holders of Moonlight Mezz Class 4 Claims may be less, for example, if (i) the Saddle Ridge claims are Allowed in any amount; (ii) there are any Allowed General Unsecured Claims under Section 10.6 of the Plan arising out of the rejection of executory contracts or unexpired leases pursuant the Plan; (iii) the Plan Administrator, or any professional retained by the Plan Administrator, incurs any General Unsecured Claim Objection Costs; (iv) there are any Cure amounts in connection with an executory contract or unexpired lease that the Debtors, upon the request of the Lenders, add to Schedule 1 of the Plan on or prior to the Confirmation Date pursuant to Section 10.2 of the Plan; or (v) any holder of an Allowed General Unsecured Claim elects to be treated as a holder of an Allowed Convenience Claim. Moreover, if all holders of Allowed General Unsecured Claims in an amount below $33,333.00 elect to be treated as holders of Allowed Convenience Claims (and assuming no other adjustments to the amount of the General Unsecured Claims Cash Reserve), each remaining holder of an Allowed General Unsecured Claim shall receive its Pro Rata share of $117,110.00, making the estimated recovery under the Plan up to 18%. The Debtors note that distributions to holders of Class 4 Claims reflect the fact that the Lenders, on account of any Prepetition Lender Deficiency Claim, and the holders of Insider Claims have agreed to unconditionally, irrevocably, and forever waive all rights of distribution they would otherwise be entitled to on account of such Claims.

Each of the Debtors, other than Moonlight Mezz, is a direct or indirect subsidiary of Moonlight Mezz.  Accordingly, Moonlight Basin Ranch, Lone Mountain, Moonlight Basin, Moonlight Golf, Moonlight Lodge, Moonlight Spa, Mountain Top, and Treeline are collectively referred to as the "Subsidiary Debtors."  For a more detailed description of the Debtors' corporate structure, see Section IV(B)(2)(b) of this Disclosure Statement.

## 2. Moonlight Basin Ranch

| Class | Claims and Interests | Treatment | Status | Voting Rights | Estimated Recovery Under the Plan |
|-------|----------------------|-----------|--------|---------------|-----------------------------------|
| 1 | Priority Non-Tax Claims | Paid in full in Allowed amount of claim. | Unimpaired | Not Entitled to Vote, Deemed to Accept | 100% |
| 2 | Other Secured Claims | Satisfied by, at the election of Moonlight Basin Ranch: (i) payment in Cash; (ii) the sale or disposition proceeds of collateral secured the claim; or (iii) such other treatment that leaves the holder's legal, equitable, and contractual rights unaltered. | Impaired | Entitled to Vote | 100% |
| 3 | Prepetition Lender Secured Claims | Satisfied by the transfer of the Debtor Purchased Assets. | Impaired | Entitled to Vote | see footnote[15] |
| 4 | General Unsecured Claims | Pro rata share of Cash from the General Unsecured Claims Cash Reserve. | Impaired | Entitled to Vote | up to 30%[16] |
| 5 | Convenience Claims | Paid in full in Allowed amount of claim. | Impaired | Entitled to Vote | 100% |
| 6 | Equity Interests | No recovery. | Impaired | Not Entitled to Vote, Deemed to Reject | 0% |

---

[15]  The Prepetition Lender Secured Claims, which are Claims of the Lenders arising from the Prepetition Loan Documents including any Claims arising from a guarantee by a Debtor of any obligations thereunder, are satisfied by the transfer to the applicable Lender Designee(s) of the Debtor Purchased Assets held by Moonlight Basin Ranch, as further provided in the Plan and Settlement and Sale Agreement.  A portion of such recovery on account of the Prepetition Lender Secured Claims will be used by LCPI to fund the General Unsecured Claims Cash Reserve described above.  The Lenders have agreed to unconditionally, irrevocably, and forever waive all rights of distribution they would otherwise be entitled to on account of their Prepetition Lender Deficiency Claims, which are substantial.

[16]  The recovery available for holders of Moonlight Basin Ranch Class 4 Claims may be less, for example, if (i) the Saddle Ridge claims are Allowed in any amount; (ii) there are any Allowed Claims arising out of the rejection of executory contracts or unexpired leases pursuant to the Plan; (iii) the Plan Administrator, or any professional retained by the Plan Administrator, incurs any General Unsecured Claim Objection Costs; (iv) there are any Cure amounts in connection with an executory contract or unexpired lease that the Debtors, upon the request of the Lenders, add to Schedule 1 of the Plan on or prior to the Confirmation Date pursuant to Section 10.2 of the Plan; or (v) any holder of an Allowed General Unsecured Claim elects to be treated as a holder of an Allowed Convenience Claim.  Moreover, if all holders of Allowed General Unsecured Claims in an amount below $33,333.00 elect to be treated as holders of Allowed Convenience Claims (and assuming no other adjustments to the amount of the General Unsecured Claims Cash Reserve), each remaining holder of an Allowed General Unsecured Claim shall receive its Pro Rata share of $117,110.00, making the estimated recovery under the Plan up to 18%.  The Debtors note that distributions to holders of Class 4 Claims reflect the fact that the Lenders, on account of any Prepetition Lender Deficiency Claim, and the holders of Insider Claims have agreed to unconditionally, irrevocably, and forever waive all rights of distribution they would otherwise be entitled to on account of such Claims.

### 3.   **Lone Mountain**

| Class | Claims and Interests | Treatment | Status | Voting Rights | Estimated Recovery Under the Plan |
|---|---|---|---|---|---|
| 1 | Priority Non-Tax Claims | Paid in full in Allowed amount of claim. | Unimpaired | Not Entitled to Vote, Deemed to Accept | 100% |
| 2 | Other Secured Claims | Satisfied by, at the election of Lone Mountain: (i) payment in Cash; (ii) the sale or disposition proceeds of collateral secured the claim; or (iii) such other treatment that leaves the holder's legal, equitable, and contractual rights unaltered. | Impaired | Entitled to Vote | 100% |
| 3 | Prepetition Lender Secured Claims | Satisfied by the transfer of the Debtor Purchased Assets. | Impaired | Entitled to Vote | see footnote[17] |
| 4 | General Unsecured Claims | Pro rata share of Cash from the General Unsecured Claims Cash Reserve. | Impaired | Entitled to Vote | up to 30%[18] |
| 5 | Convenience Claims | Paid in full in Allowed amount of claim. | Impaired | Entitled to Vote | 100% |
| 6 | Equity Interests | No recovery. | Impaired | Not Entitled to Vote, Deemed to Reject | 0% |

---

[17] The Prepetition Lender Secured Claims, which are Claims of the Lenders arising from the Prepetition Loan Documents including any Claims arising from a guarantee by a Debtor of any obligations thereunder, are satisfied by the transfer to the applicable Lender Designee(s) of the Debtor Purchased Assets held by Lone Mountain, as further provided in the Plan and Settlement and Sale Agreement.  A portion of such recovery on account of the Prepetition Lender Secured Claims will be used by LCPI to fund the General Unsecured Claims Cash Reserve described above.  The Lenders have agreed to unconditionally, irrevocably, and forever waive all rights of distribution they would otherwise be entitled to on account of their Prepetition Lender Deficiency Claims, which are substantial.

[18] The recovery available for holders of Lone Mountain Class 4 Claims may be less, for example, if (i) the Saddle Ridge claims are Allowed in any amount; (ii) there are any Allowed Claims arising out of the rejection of executory contracts or unexpired leases pursuant to the Plan; (iii) the Plan Administrator, or any professional retained by the Plan Administrator, incurs any General Unsecured Claim Objection Costs; (iv) there are any Cure amounts in connection with an executory contract or unexpired lease that the Debtors, upon the request of the Lenders, add to Schedule 1 of the Plan on or prior to the Confirmation Date pursuant to Section 10.2 of the Plan; or (v) any holder of an Allowed General Unsecured Claim elects to be treated as a holder of an Allowed Convenience Claim.  Moreover, if all holders of Allowed General Unsecured Claims in an amount below $33,333.00 elect to be treated as holders of Allowed Convenience Claims (and assuming no other adjustments to the amount of the General Unsecured Claims Cash Reserve), each remaining holder of an Allowed General Unsecured Claim shall receive its Pro Rata share of $117,110.00, making the estimated recovery under the Plan up to 18%.  The Debtors note that distributions to holders of Class 4 Claims reflect the fact that the Lenders, on account of any Prepetition Lender Deficiency Claim, and the holders of Insider Claims have agreed to unconditionally, irrevocably, and forever waive all rights of distribution they would otherwise be entitled to on account of such Claims.

### 4.   **Moonlight Basin**

| Class | Claims and Interests | Treatment | Status | Voting Rights | Estimated Recovery Under the Plan |
|---|---|---|---|---|---|
| 1 | Priority Non-Tax Claims | Paid in full in Allowed amount of claim. | Unimpaired | Not Entitled to Vote, Deemed to Accept | 100% |
| 2 | Other Secured Claims | Satisfied by, at the election of Moonlight Basin: (i) payment in Cash; (ii) the sale or disposition proceeds of collateral secured the claim; or (iii) such other treatment that leaves the holder's legal, equitable, and contractual rights unaltered. | Impaired | Entitled to Vote | 100% |
| 3 | Prepetition Lender Secured Claims | Satisfied by the transfer of the Debtor Purchased Assets. | Impaired | Entitled to Vote | see footnote[19] |
| 4 | General Unsecured Claims | Pro rata share of Cash from the General Unsecured Claims Cash Reserve. | Impaired | Entitled to Vote | up to 30%[20] |
| 5 | Convenience Claims | Paid in full in Allowed amount of claim. | Impaired | Entitled to Vote | 100% |
| 6 | Equity Interests | No recovery. | Impaired | Not Entitled to Vote, Deemed to Reject | 0% |

---

[19] The Prepetition Lender Secured Claims, which are Claims of the Lenders arising from the Prepetition Loan Documents including any Claims arising from a guarantee by a Debtor of any obligations thereunder, are satisfied by the transfer to the applicable Lender Designee(s) of the Debtor Purchased Assets held by Moonlight Basin, as further provided in the Plan and Settlement and Sale Agreement.  A portion of such recovery on account of the Prepetition Lender Secured Claims will be used by LCPI to fund the General Unsecured Claims Cash Reserve described above.  The Lenders have agreed to unconditionally, irrevocably, and forever waive all rights of distribution they would otherwise be entitled to on account of their Prepetition Lender Deficiency Claims, which are substantial.

[20] The recovery available for holders of Moonlight Basin Class 4 Claims may be less, for example, if (i) the Saddle Ridge claims are Allowed in any amount; (ii) there are any Allowed Claims arising out of the rejection of executory contracts or unexpired leases pursuant to the Plan; (iii) the Plan Administrator, or any professional retained by the Plan Administrator, incurs any General Unsecured Claim Objection Costs; (iv) there are any Cure amounts in connection with an executory contract or unexpired lease that the Debtors, upon the request of the Lenders, add to Schedule 1 of the Plan on or prior to the Confirmation Date pursuant to Section 10.2 of the Plan; or (v) any holder of an Allowed General Unsecured Claim elects to be treated as a holder of an Allowed Convenience Claim.  Moreover, if all holders of Allowed General Unsecured Claims in an amount below $33,333.00 elect to be treated as holders of Allowed Convenience Claims (and assuming no other adjustments to the amount of the General Unsecured Claims Cash Reserve), each remaining holder of an Allowed General Unsecured Claim shall receive its Pro Rata share of $117,110.00, making the estimated recovery under the Plan up to 18%.  The Debtors note that distributions to holders of Class 4 Claims reflect the fact that the Lenders, on account of any Prepetition Lender Deficiency Claim, and the holders of Insider Claims have agreed to unconditionally, irrevocably, and forever waive all rights of distribution they would otherwise be entitled to on account of such Claims.

## 5.   Moonlight Golf

| Class | Claims and Interests | Treatment | Status | Voting Rights | Estimated Recovery Under the Plan |
|---|---|---|---|---|---|
| 1 | Priority Non-Tax Claims | Paid in full in Allowed amount of claim. | Unimpaired | Not Entitled to Vote, Deemed to Accept | 100% |
| 2 | Other Secured Claims | Satisfied by, at the election of Moonlight Golf: (i) payment in Cash; (ii) the sale or disposition proceeds of collateral secured the claim; or (iii) such other treatment that leaves the holder's legal, equitable, and contractual rights unaltered. | Impaired | Entitled to Vote | 100% |
| 3 | Prepetition Lender Secured Claims | Satisfied by the transfer of the Debtor Purchased Assets. | Impaired | Entitled to Vote | see footnote[21] |
| 4 | General Unsecured Claims | Pro rata share of Cash from the General Unsecured Claims Cash Reserve. | Impaired | Entitled to Vote | up to 30%[22] |
| 5 | Convenience Claims | Paid in full in Allowed amount of claim. | Impaired | Entitled to Vote | 100% |
| 6 | Equity Interests | No recovery. | Impaired | Not Entitled to Vote, Deemed to Reject | 0% |

---

[21]  The Prepetition Lender Secured Claims, which are Claims of the Lenders arising from the Prepetition Loan Documents including any Claims arising from a guarantee by a Debtor of any obligations thereunder, are satisfied by the transfer to the applicable Lender Designee(s) of the Debtor Purchased Assets held by Moonlight Golf, as further provided in the Plan and Settlement and Sale Agreement.  A portion of such recovery on account of the Prepetition Lender Secured Claims will be used by LCPI to fund the General Unsecured Claims Cash Reserve described above.  The Lenders have agreed to unconditionally, irrevocably, and forever waive all rights of distribution they would otherwise be entitled to on account of their Prepetition Lender Deficiency Claims, which are substantial.

[22]  The recovery available for holders of Moonlight Golf Class 4 Claims may be less, for example, if (i) the Saddle Ridge claims are Allowed in any amount; (ii) there are any Allowed Claims arising out of the rejection of executory contracts or unexpired leases pursuant to the Plan; (iii) the Plan Administrator, or any professional retained by the Plan Administrator, incurs any General Unsecured Claim Objection Costs; (iv) there are any Cure amounts in connection with an executory contract or unexpired lease that the Debtors, upon the request of the Lenders, add to Schedule 1 of the Plan on or prior to the Confirmation Date pursuant to Section 10.2 of the Plan; or (v) any holder of an Allowed General Unsecured Claim elects to be treated as a holder of an Allowed Convenience Claim.  Moreover, if all holders of Allowed General Unsecured Claims in an amount below $33,333.00 elect to be treated as holders of Allowed Convenience Claims (and assuming no other adjustments to the amount of the General Unsecured Claims Cash Reserve), each remaining holder of an Allowed General Unsecured Claim shall receive its Pro Rata share of $117,110.00, making the estimated recovery under the Plan up to 18%.  The Debtors note that distributions to holders of Class 4 Claims reflect the fact that the Lenders, on account of any Prepetition Lender Deficiency Claim, and the holders of Insider Claims have agreed to unconditionally, irrevocably, and forever waive all rights of distribution they would otherwise be entitled to on account of such Claims.

### 6.   Moonlight Lodge

| Class | Claims and Interests | Treatment | Status | Voting Rights | Estimated Recovery Under the Plan |
|---|---|---|---|---|---|
| 1 | Priority Non-Tax Claims | Paid in full in Allowed amount of claim. | Unimpaired | Not Entitled to Vote, Deemed to Accept | 100% |
| 2 | Other Secured Claims | Satisfied by, at the election of Moonlight Lodge: (i) payment in Cash; (ii) the sale or disposition proceeds of collateral secured the claim; or (iii) such other treatment that leaves the holder's legal, equitable, and contractual rights unaltered. | Impaired | Entitled to Vote | 100% |
| 3 | Prepetition Lender Secured Claims | Satisfied by the transfer of the Debtor Purchased Assets. | Impaired | Entitled to Vote | see footnote[23] |
| 4 | General Unsecured Claims | Pro rata share of Cash from the General Unsecured Claims Cash Reserve. | Impaired | Entitled to Vote | up to 30%[24] |
| 5 | Convenience Claims | Paid in full in Allowed amount of claim. | Impaired | Entitled to Vote | 100% |
| 6 | Equity Interests | No recovery. | Impaired | Not Entitled to Vote, Deemed to Reject | 0% |

---

[23]  The Prepetition Lender Secured Claims, which are Claims of the Lenders arising from the Prepetition Loan Documents including any Claims arising from a guarantee by a Debtor of any obligations thereunder, are satisfied by the transfer to the applicable Lender Designee(s) of the Debtor Purchased Assets held by Moonlight Lodge, as further provided in the Plan and Settlement and Sale Agreement.  A portion of such recovery on account of the Prepetition Lender Secured Claims will be used by LCPI to fund the General Unsecured Claims Cash Reserve described above.  The Lenders have agreed to unconditionally, irrevocably, and forever waive all rights of distribution they would otherwise be entitled to on account of their Prepetition Lender Deficiency Claims, which are substantial.

[24]  The recovery available for holders of Moonlight Lodge Class 4 Claims may be less, for example, if (i) the Saddle Ridge claims are Allowed in any amount; (ii) there are any Allowed Claims arising out of the rejection of executory contracts or unexpired leases pursuant to the Plan; (iii) the Plan Administrator, or any professional retained by the Plan Administrator, incurs any General Unsecured Claim Objection Costs; (iv) there are any Cure amounts in connection with an executory contract or unexpired lease that the Debtors, upon the request of the Lenders, add to Schedule 1 of the Plan on or prior to the Confirmation Date pursuant to Section 10.2 of the Plan; or (v) any holder of an Allowed General Unsecured Claim elects to be treated as a holder of an Allowed Convenience Claim.  Moreover, if all holders of Allowed General Unsecured Claims in an amount below $33,333.00 elect to be treated as holders of Allowed Convenience Claims (and assuming no other adjustments to the amount of the General Unsecured Claims Cash Reserve), each remaining holder of an Allowed General Unsecured Claim shall receive its Pro Rata share of $117,110.00, making the estimated recovery under the Plan up to 18%. The Debtors note that distributions to holders of Class 4 Claims reflect the fact that the Lenders, on account of any Prepetition Lender Deficiency Claim, and the holders of Insider Claims have agreed to unconditionally, irrevocably, and forever waive all rights of distribution they would otherwise be entitled to on account of such Claims.

18

7.    **Moonlight Spa**

| Class | Claims and Interests | Treatment | Status | Voting Rights | Estimated Recovery Under the Plan |
|---|---|---|---|---|---|
| 1 | Priority Non-Tax Claims | Paid in full in Allowed amount of claim. | Unimpaired | Not Entitled to Vote, Deemed to Accept | 100% |
| 2 | Other Secured Claims | Satisfied by, at the election of Moonlight Spa: (i) payment in Cash; (ii) the sale or disposition proceeds of collateral secured the claim; or (iii) such other treatment that leaves the holder's legal, equitable, and contractual rights unaltered. | Impaired | Entitled to Vote | 100% |
| 3 | Prepetition Lender Secured Claims | Satisfied by the transfer of the Debtor Purchased Assets. | Impaired | Entitled to Vote | see footnote[25] |
| 4 | General Unsecured Claims | Pro rata share of Cash from the General Unsecured Claims Cash Reserve. | Impaired | Entitled to Vote | up to 30%[26] |
| 5 | Convenience Claims | Paid in full in Allowed amount of claim. | Impaired | Entitled to Vote | 100% |
| 6 | Equity Interests | No recovery. | Impaired | Not Entitled to Vote, Deemed to Reject | 0% |

---

[25]  The Prepetition Lender Secured Claims, which are Claims of the Lenders arising from the Prepetition Loan Documents including any Claims arising from a guarantee by a Debtor of any obligations thereunder, are satisfied by the transfer to the applicable Lender Designee(s) of the Debtor Purchased Assets held by Moonlight Spa, as further provided in the Plan and Settlement and Sale Agreement.  A portion of such recovery on account of the Prepetition Lender Secured Claims will be used by LCPI to fund the General Unsecured Claims Cash Reserve described above.  The Lenders have agreed to unconditionally, irrevocably, and forever waive all rights of distribution they would otherwise be entitled to on account of their Prepetition Lender Deficiency Claims, which are substantial.

[26]  The recovery available for holders of Moonlight Spa Class 4 Claims may be less, for example, if (i) the Saddle Ridge claims are Allowed in any amount; (ii) there are any Allowed Claims arising out of the rejection of executory contracts or unexpired leases pursuant to the Plan; (iii) the Plan Administrator, or any professional retained by the Plan Administrator, incurs any General Unsecured Claim Objection Costs; (iv) there are any Cure amounts in connection with an executory contract or unexpired lease that the Debtors, upon the request of the Lenders, add to Schedule 1 of the Plan on or prior to the Confirmation Date pursuant to Section 10.2 of the Plan; or (v) any holder of an Allowed General Unsecured Claim elects to be treated as a holder of an Allowed Convenience Claim.  Moreover, if all holders of Allowed General Unsecured Claims in an amount below $33,333.00 elect to be treated as holders of Allowed Convenience Claims (and assuming no other adjustments to the amount of the General Unsecured Claims Cash Reserve), each remaining holder of an Allowed General Unsecured Claim shall receive its Pro Rata share of $117,110.00, making the estimated recovery under the Plan up to 18%.  The Debtors note that distributions to holders of Class 4 Claims reflect the fact that the Lenders, on account of any Prepetition Lender Deficiency Claim, and the holders of Insider Claims have agreed to unconditionally, irrevocably, and forever waive all rights of distribution they would otherwise be entitled to on account of such Claims.

8.   **Mountain Top**

| Class | Claims and Interests | Treatment | Status | Voting Rights | Estimated Recovery Under the Plan |
|---|---|---|---|---|---|
| 1 | Priority Non-Tax Claims | Paid in full in Allowed amount of claim. | Unimpaired | Not Entitled to Vote, Deemed to Accept | 100% |
| 2 | Other Secured Claims | Satisfied by, at the election of Mountain Top: (i) payment in Cash; (ii) the sale or disposition proceeds of collateral secured the claim; or (iii) such other treatment that leaves the holder's legal, equitable, and contractual rights unaltered. | Impaired | Entitled to Vote | 100% |
| 3 | Prepetition Lender Secured Claims | Satisfied by the transfer of the Debtor Purchased Assets. | Impaired | Entitled to Vote | see footnote[27] |
| 4 | General Unsecured Claims | Pro rata share of Cash from the General Unsecured Claims Cash Reserve. | Impaired | Entitled to Vote | up to 30%[28] |
| 5 | Convenience Claims | Paid in full in Allowed amount of claim. | Impaired | Entitled to Vote | 100% |
| 6 | Equity Interests | No recovery. | Impaired | Not Entitled to Vote, Deemed to Reject | 0% |

---

[27] The Prepetition Lender Secured Claims, which are Claims of the Lenders arising from the Prepetition Loan Documents including any Claims arising from a guarantee by a Debtor of any obligations thereunder, are satisfied by the transfer to the applicable Lender Designee(s) of the Debtor Purchased Assets held by Mountain Top, as further provided in the Plan and Settlement and Sale Agreement. A portion of such recovery on account of the Prepetition Lender Secured Claims will be used by LCPI to fund the General Unsecured Claims Cash Reserve described above. The Lenders have agreed to unconditionally, irrevocably, and forever waive all rights of distribution they would otherwise be entitled to on account of their Prepetition Lender Deficiency Claims, which are substantial.

[28] The recovery available for holders of Mountain Top Class 4 Claims may be less, for example, if (i) the Saddle Ridge claims are Allowed in any amount; (ii) there are any Allowed Claims arising out of the rejection of executory contracts or unexpired leases pursuant to the Plan; (iii) the Plan Administrator, or any professional retained by the Plan Administrator, incurs any General Unsecured Claim Objection Costs; (iv) there are any Cure amounts in connection with an executory contract or unexpired lease that the Debtors, upon the request of the Lenders, add to Schedule 1 of the Plan on or prior to the Confirmation Date pursuant to Section 10.2 of the Plan; or (v) any holder of an Allowed General Unsecured Claim elects to be treated as a holder of an Allowed Convenience Claim. Moreover, if all holders of Allowed General Unsecured Claims in an amount below $33,333.00 elect to be treated as holders of Allowed Convenience Claims (and assuming no other adjustments to the amount of the General Unsecured Claims Cash Reserve), each remaining holder of an Allowed General Unsecured Claim shall receive its Pro Rata share of $117,110.00, making the estimated recovery under the Plan up to 18%. The Debtors note that distributions to holders of Class 4 Claims reflect the fact that the Lenders, on account of any Prepetition Lender Deficiency Claim, and the holders of Insider Claims have agreed to unconditionally, irrevocably, and forever waive all rights of distribution they would otherwise be entitled to on account of such Claims.

### 9. Treeline

| Class | Claims and Interests | Treatment | Status | Voting Rights | Estimated Recovery Under the Plan |
|---|---|---|---|---|---|
| 1 | Priority Non-Tax Claims | Paid in full in Allowed amount of claim. | Unimpaired | Not Entitled to Vote, Deemed to Accept | 100% |
| 2 | Other Secured Claims | Satisfied by, at the election of Treeline: (i) payment in Cash; (ii) the sale or disposition proceeds of collateral secured the claim; or (iii) such other treatment that leaves the holder's legal, equitable, and contractual rights unaltered. | Impaired | Entitled to Vote | 100% |
| 3 | Prepetition Lender Secured Claims | Satisfied by the transfer of the Debtor Purchased Assets. | Impaired | Entitled to Vote | see footnote[29] |
| 4 | General Unsecured Claims | Pro rata share of Cash from the General Unsecured Claims Cash Reserve. | Impaired | Entitled to Vote | up to 30%[30] |
| 5 | Convenience Claims | Paid in full in Allowed amount of claim. | Impaired | Entitled to Vote | 100% |
| 6 | Equity Interests | No recovery. | Impaired | Not Entitled to Vote, Deemed to Reject | 0% |

## III.   THE SETTLEMENT AND SALE AGREEMENT

The terms of the Plan are based upon a settlement by and among the Debtor Parties and the Lenders of disputes among such parties regarding the validity of the Prepetition Loan Documents (pursuant to which the Lenders loaned more than $170 million to the Debtors), the validity of the Lenders' alleged liens against substantially all of the assets of the Debtors pursuant to such Prepetition Loan Documents, the Lenders' rights to recover the aggregate

---

[29] The Prepetition Lender Secured Claims, which are Claims of the Lenders arising from the Prepetition Loan Documents including any Claims arising from a guarantee by a Debtor of any obligations thereunder, are satisfied by the transfer to the applicable Lender Designee(s) of the Debtor Purchased Assets held by Treeline, as further provided in the Plan and Settlement and Sale Agreement.  A portion of such recovery on account of the Prepetition Lender Secured Claims will be used by LCPI to fund the General Unsecured Claims Cash Reserve described above.  The Lenders have agreed to unconditionally, irrevocably, and forever waive all rights of distribution they would otherwise be entitled to on account of their Prepetition Lender Deficiency Claims, which are substantial.

[30] The recovery available for holders of Treeline Class 4 Claims may be less, for example, if (i) the Saddle Ridge claims are Allowed in any amount; (ii) there are any Allowed Claims arising out of the rejection of executory contracts or unexpired leases pursuant to the Plan; (iii) the Plan Administrator, or any professional retained by the Plan Administrator, incurs any General Unsecured Claim Objection Costs; (iv) there are any Cure amounts in connection with an executory contract or unexpired lease that the Debtors, upon the request of the Lenders, add to Schedule 1 of the Plan on or prior to the Confirmation Date pursuant to Section 10.2 of the Plan; or (v) any holder of an Allowed General Unsecured Claim elects to be treated as a holder of an Allowed Convenience Claim.  Moreover, if all holders of Allowed General Unsecured Claims in an amount below $33,333.00 elect to be treated as holders of Allowed Convenience Claims (and assuming no other adjustments to the amount of the General Unsecured Claims Cash Reserve), each remaining holder of an Allowed General Unsecured Claim shall receive its Pro Rata share of $117,110.00, making the estimated recovery under the Plan up to 18%.  The Debtors note that distributions to holders of Class 4 Claims reflect the fact that the Lenders, on account of any Prepetition Lender Deficiency Claim, and the holders of Insider Claims have agreed to unconditionally, irrevocably, and forever waive all rights of distribution they would otherwise be entitled to on account of such Claims.

outstanding balance under the Prepetition Loan Documents of more than $180 million, and the Lenders' rights against certain guarantors that are Insiders.

As discussed in more detail in Section V(F) below, such disputes are the subject of the Adversary Proceeding, which was commenced by the Lenders against the Debtors and certain of the Insiders. The Debtors have vigorously challenged the Lenders' claims throughout the Adversary Proceeding in an attempt to subordinate, disallow, or otherwise invalidate the Lenders' Claims and asserted liens. The Debtors and certain Insiders have also asserted counterclaims and third party claims against the Lenders and others.

The Adversary Proceeding was originally set for trial to commence in April 2011. The Bankruptcy Court has issued several rulings against the Debtors in the Adversary Proceeding, which would likely make it more difficult for the Debtors to prevail at the trial. If the Bankruptcy Court ruled in favor of the Lenders, it is likely that no unsecured creditors of the Debtors would receive any recovery because the Lenders' Claims are secured by substantially all of the Debtors' assets. In other words, the Debtors would have to prevail fully on all their claims against the Lenders and successfully defeat the Lenders' Claims before unsecured creditors or even administrative priority creditors would receive any recovery.

Prior to the trial, the Lenders approached the Debtors regarding a potential settlement and offered settlement terms to the Debtors for their consideration. Significantly, and as described below in more detail, the terms offered by the Lenders contemplated a continuation of the Debtors' businesses and significant payments to holders of allowed general unsecured claims. The recovery offered by the Lenders to unsecured creditors exceeded the recovery such creditors would have received (likely zero) had the Lenders prevailed in the Adversary Proceeding. Moreover, even a partial victory for the Debtors in the Adversary Proceeding would likely have been insufficient to leave value for unsecured creditors, as such a victory might have simply reduced the Lenders' claims. Only a complete victory for the Debtors that completely eliminated the Lenders' claims and security interests would have had a chance of providing creditors a better recovery than they are receiving under the Plan. Even if the Debtors had fully prevailed in the Adversary Proceeding, they would still have been required to find financing to provide unsecured creditors with a recovery, which could delay satisfaction of the unsecured creditors' claims. Thus, given the uncertainty and risk associated with litigation, the Debtors believed that the settlement offered by the Lenders, subject to agreement upon other material terms, likely provided the best recovery to the Debtors' creditors under the circumstances.

From the Lenders' perspective, it was important that a global settlement be reached not just with the Debtors, but with all Insiders so that they could resolve all litigation relating to Moonlight Basin Ranch, ensure that they received all assets relating to the Resort, and obtain representations and warranties that were critical to understanding the company's assets, liabilities, and operations. For purposes of the Settlement and Sale Agreement, the Insiders include: Lee Poole, Lathrop Poole, Tracy Poole, Leesa Anderson, The Tracy Poole Trust, The Leesa Anderson Trust, Poole Holdings LLC, Moonlight Basin Holdings LLC, JVLP, LLC, Six Shooter, LLC, Tim William Anderson, Aardvark, LLC, Moonlight Basin Ranch, Inc., Northwest Equipment Leasing, LLC, Lodestar, Inc., Madison Investments, a Delaware Trust, any insider (as defined pursuant to section 101(31) of the Bankruptcy Code) of a Debtor (other than another

22

Debtor), and any other entity of which such an insider is a partner, general partner, managing partner, limited partner, director, officer, or person in control of such entity (other than Montana Real Estate Company, L.L.C. or LPA Real Estate, P.C.). The following provides a brief description of each Insider's relationship to the Debtors or other Insiders:

- Lee Poole – President of Moonlight Basin Ranch, Inc., a nondebtor, which holds a 1% general partner interest in Moonlight Basin Ranch; managing member and holder of a 50% interest in Poole Holdings LLC, which in turn wholly owns Moonlight Basin Holdings LLC, a nondebtor, which in turn wholly owns Moonlight Mezz.
- Lathrop Poole – wife of Lee Poole; holds a 50% interest in Poole Holdings LLC, which in turn wholly owns Moonlight Basin Holdings LLC, a nondebtor, which in turn wholly owns Moonlight Mezz.
- Tracy Poole – son of Lee and Lathrop Poole.
- Leesa Anderson – daughter of Lee and Lathrop Poole; owner of LPA Real Estate, P.C., which holds a 50% interest in Montana Real Estate Company, L.L.C.
- The Tracy Poole Trust – previously held an interest in Poole Holdings LLC.
- The Leesa Anderson Trust – previously held an interest in Poole Holdings LLC.
- Poole Holdings LLC – a Delaware limited liability company which wholly owns Moonlight Basin Holdings LLC, a nondebtor, which in turn wholly owns Moonlight Mezz.
- Moonlight Basin Holdings LLC – a Delaware limited liability company and nondebtor which wholly owns Moonlight Mezz.
- JVLP, LLC – a Montana limited liability company owned by Lee Poole that holds beverage licenses utilized in connection with operation of the Resort.
- Six Shooter, LLC – a Montana limited liability company owned by Lee Poole that holds beverage licenses utilized in connection with operation of the Resort.
- Tim William Anderson – husband of Leesa Anderson; son-in-law of Lee and Lathrop Poole; owner of Aadvark LLC.
- Aadvark LLC – Montana limited liability company owned by Tim William Anderson that holds beverage licenses utilized in connection with operation of the Resort.
- Moonlight Basin Ranch, Inc. – an Ohio corporation and nondebtor which holds a 1% general partner interest in Moonlight Basin Ranch.
- Northwest Equipment Leasing, LLC – a limited liability company wholly owned by Lee Poole created in connection with operation of the golf course at the Resort.
- Lodestar, Inc. – an entity wholly owned by Lee Poole and hired by Moonlight Basin Ranch to provide consulting services.
- Madison Investments – a Delaware Trust that previously held an interest in Poole Holdings.

Following the Lenders' settlement offer, the Debtor Parties and the Lenders engaged in extensive negotiations and, ultimately, reached a settlement in principle, although all parties acknowledged that no party would be bound to the settlement in any manner until approved by the Bankruptcy Court. The settlement, which would entail a full, final, and complete compromise, settlement, and release of the issues in dispute among the Debtor Parties and the Lenders, including, among other issues, resolution of the Adversary Proceeding and the Foreclosure Action, would be consummated through a chapter 11 plan (the Plan), under which

23

substantially all of the assets of the Debtors would be transferred to the Lenders or Lender Designee(s)[31] and the Lenders would provide sufficient funds to wind down the Debtors' estates and make payments to creditors.

The settlement also includes a Settlement Payment of $3,500,000.00 by the Lenders to Poole under the Settlement and Sale Agreement in consideration for the transfer of certain Insider Assets, settlement of Poole's claims against the Lenders, Poole's cooperation in ensuring the smooth transfer of assets, the representations and warranties Poole provides in the Settlement and Sale Agreement, and certain releases granted by the Insiders to the Lenders. Poole's cooperation was of critical importance to the Lenders, as it was only through his efforts that the Lenders were able to secure the remaining Insiders' execution of the Settlement and Sale Agreement, such execution being a condition of the Lenders to their own execution of the agreement. Moreover, it is through Poole's cooperation in providing information and documentation that the smooth transition of the Debtors' businesses to the Lenders or Lender Designee(s) may be facilitated. Such cooperation, which has included, among other things, a recent infusion of capital into JVLP, LLC, a Montana limited liability company that holds certain beverage licenses used in connection with the operation of the Resort, has helped and will help maximize value and minimize disruptions and costs during the transition of ownership, which will ensure the Resort's operations continue uninterrupted. Poole's assistance has allowed for a continuity of the Debtors' businesses that could only be achieved through a consensual transfer of the assets. If the Lenders had been required to complete the foreclosure process, on the other hand, costs and expenses would have continued to incur for the Debtors' estates and the Lenders would not have had the benefit of Poole's cooperation and assistance. Additionally, if the Lenders had foreclosed and the Resort was sold at a foreclosure sale, the real property would have been subject to a one year right of redemption, which would have delayed resolution of the litigation with the Lenders and may have detrimentally affected the value and operation of the Resort. Similarly, if the Lenders had sought to lift the automatic stay to take the Resort, there would have been a loss of value as the transition of ownership and operation would not have been smooth.[32]

After reaching a settlement in principle, the parties agreed to an immediate standstill of the litigation in order to allow the parties time to finalize and document the terms of the settlement and to obtain the necessary approvals thereof.

On July 22, 2011 (the "Execution Date"), the Debtor Parties and the Lenders memorialized the terms of their agreement by entering into the Settlement and Sale Agreement (the "Settlement and Sale Agreement"). The Settlement and Sale Agreement, which was substantially the same as the version attached to the original Disclosure Statement filed on July 12, 2011, is attached hereto as executed and with all schedules and exhibits as Exhibit 2.

---

[31]  The Debtors have been advised that it is the Lenders' intention to create an entity structure somewhat similar to the current corporate structure of the Debtors, described herein in Section IV(B)(2)(b), the ultimate parent entity of which is to be directly or indirectly owned by LBHI. The entities are not expected to hold any assets other than the Purchased Assets (as defined herein) and assets relating to the Resort that are acquired post-closing.

[32] For reasons discussed below, the Settlement Payment from the Lenders to Poole does not implicate the Bankruptcy Code's priority scheme.

The Plan fully incorporates and is premised upon the terms of the Settlement and Sale Agreement.  Pursuant to the Settlement and Sale Agreement, the parties thereto each agreed to support the Plan, subject to any necessary consents and approvals of the Bankruptcy Court, including Bankruptcy Court approval of the Disclosure Statement.

On July 22, 2011, the Debtors filed a motion (the "Settlement Motion") for approval of the Settlement and Sale Agreement pursuant to Bankruptcy Rule 9019 and section 105 of the Bankruptcy Code [Docket No. 690].  An executed copy of the Settlement and Sale Agreement, as well as all schedules and exhibits thereto, was also attached as Exhibit A to the Settlement Motion.  On July 25, 2011, the Bankruptcy Court entered an Order [Docket No. 704] setting August 29, 2011 as the deadline to file objections to the Settlement Motion and scheduling a hearing on the Settlement Motion for September 7, 2011.  Upon entry of an order approving the Settlement and Sale Agreement and entry of the Disclosure Statement Order, the Settlement and Sale Agreement will become effective (the "Settlement Effective Date").  As described below, however, the ultimate settlement is conditioned on confirmation of the Plan and the occurrence of the Effective Date of the Plan.

The material terms of the Settlement and Sale Agreement are as follows (capitalized terms used in this section and not otherwise defined herein have the meanings ascribed to such terms in the Settlement and Sale Agreement):[33]

- **Transfer of Purchased Assets**.  Subject to the terms and conditions of the Settlement and Sale Agreement and the Plan, and provided the Plan Effective Date occurs, (i) each of the Debtors, at Closing, will Transfer, in each case free and clear of all liens, encumbrances or other charges of any kind whatsoever other than certain permitted encumbrances acceptable to the Lenders, to the Lender Designee(s) all of its respective assets and property of any kind or character (collectively, the "Debtor Purchased Assets")[34] and (ii) the Insiders, including Lee Poole, will transfer, or cause the transfer of, any assets owned by them or their Affiliates related to or used in connection with Moonlight Basin Resort, other than certain excluded assets acceptable to the Lenders (the "Insider Purchased Assets," and together with the Debtor Purchased Assets, the "Purchased Assets").  The Purchased Assets include, without limitation, all real, personal, intangible, or other property related to the Moonlight Basin Resort, all of the Debtors' cash on hand, and all rights, licenses, franchises, and permits required for operation of the Moonlight Basin Resort.

---

[33]  This summary (the "Summary") of the Settlement and Sale Agreement is qualified in its entirety by the terms and conditions of the Settlement and Sale Agreement, attached hereto as Exhibit 2.  The Summary is intended to be used for information purposes only and shall not in any way affect the meaning or interpretation of the Settlement and Sale Agreement, which, in the event of any inconsistency, shall govern.

[34]  Subject to the terms and conditions of the Settlement and Sale Agreement and the Plan, and provided the Plan Effective Date occurs, the Treeline Assets (as such term is defined in the Settlement and Sale Agreement) will not be Transferred until and unless the Montana Public Service Commission determines that it does not have jurisdiction over the Transfer or approves of the Transfer.

- **Purchase Price**.  Provided that the Closing occurs, the purchase price payable for the Purchased Assets shall be an amount equal to $43,200,000.00 (the "<u>Purchase Price</u>").[35] The Lenders shall pay the Purchase Price by crediting a portion of the Prepetition Indebtedness in the amount of the Purchase Price pursuant to section 363(k) of the Bankruptcy Code at Closing.

- **Settlement Payment**.  The Settlement and Sale Agreement provides that upon Closing and subject to the terms and conditions set forth in the Plan and the Settlement and Sale Agreement, the Lenders shall pay or cause to be paid to Lee Poole the amount of $3,500,000.00 in consideration for the transfer of the Insider Purchased Assets, the settlement of his claims against the Lenders, his cooperation in ensuring the smooth transfer of assets, the representations and warranties he provides in the Settlement and Sale Agreement, and the releases granted by the Insiders to the Lenders in the Settlement and Sale Agreement.

- **Fiduciary Duties.**  At any time prior to the Confirmation Date, and subject to the conditions set forth in the Settlement and Sale Agreement, each of the Debtors and any director or officer thereof, in such person's capacity as a director or officer of any such Debtor, is entitled to take any action, or to refrain from taking any action, inconsistent or contrary to the terms of the Settlement and Sale Agreement, including, but not limited to, a decision to terminate the Settlement and Sale Agreement, that such person determines in good faith, after consultation with counsel, it is obligated or advised to take in the exercise of its fiduciary obligations under applicable law.

- **Termination Rights**.  The Settlement and Sale Agreement provides termination rights to the Lenders and the Debtor Parties upon the occurrence of certain specified events or the failure to occur of certain specified events.  Such termination rights include, among others, that the (i) Lenders and Debtor Parties may terminate based on the failure to meet any of the Plan Milestones, including that the Plan Effective Date occur no later than November 15, 2011 and (ii) the Debtor Parties may terminate if a Fiduciary Out arises.

- **Plan Support**.  Pursuant to the Settlement and Sale Agreement, each Party agrees that the terms and conditions set forth in the Plan are acceptable in all respects to it and its counsel.  In addition, the Debtor Parties agree to use commercially reasonable efforts to obtain confirmation and consummation of the Plan, and each Party agrees to use its commercially reasonable efforts to support confirmation and consummation of the Plan.

- **Assumed Liabilities**.  Provided that the Plan Effective Date and Closing occur, the applicable Lender Designee(s) shall, on the Closing Date, assume any liabilities directly related to executory contracts or unexpired leases expressly assumed by the Lenders and/or the Lender Designee(s) pursuant to the Settlement and Sale Agreement.

---

[35] The Purchase Price is based on negotiations between the parties and is consistent with a recent appraisal of the assets.

- **Reasonable Efforts**.  Pursuant to the Settlement and Sale Agreement, each Party agrees that it will not object to confirmation of the Plan or commence any proceeding to oppose, alter, delay or impede or take any other action, directly or indirectly, to interfere with the entry of any orders approving the Plan.  Each Party also agrees that it will cooperate with each other Party in good faith and shall coordinate its activities (to the extent practicable) in respect of all matters concerning the implementation and consummation of the Settlement and Sale Agreement and the Plan.  Furthermore, each Party agrees to take such action as may be reasonably necessary to carry out the purposes and intent of the Settlement and Sale Agreement.

- **Representations and Warranties**.  Pursuant to the Settlement and Sale Agreement, the Debtor Parties have made certain representations and warranties, which include, among others, the following:

  - a representation that the assets being transferred by the Debtor Parties constitute all property, rights and/or assets that are or have ever been: (i) held by the Debtors in connection with the operation of their respective businesses from and after September 1, 2007; (ii) owned by any of the Debtor Parties or any of their Affiliates with respect to the Real Property or Moonlight Basin Resort from and after September 1, 2007; or (iii) used in connection with the ownership, use, operation, development, construction, management, repair, and/or maintenance of the Purchased Assets from and after September 1, 2007;

  - a representation that the Purchased Assets will be transferred free and clear of any and all liens, encumbrances or other charges of any kind or nature other than certain permitted encumbrances;

  - a covenant that, through the Effective Date, the Debtors will continue to operate in a good and workmanlike manner Moonlight Basin Resort and its underlying real property and Debtors' respective businesses; and/or

  - various additional representations regarding Moonlight Basin Resort and its underlying real property to provide information to the Lenders and the Lender Designee(s) in order to facilitate the transition of Moonlight Basin Resort from the Debtor Parties to the Lenders and the Lender Designee(s).

- **Releases and Dismissals**.  Pursuant to the Settlement and Sale Agreement, the Lenders and the Debtor Parties agree to exchange mutual releases releasing each other from all claims at the closing of the Settlement and Sale Agreement.  Additionally, at the Closing, the Parties shall dismiss, with prejudice, the Adversary Proceeding, the Foreclosure Action, and all other litigations currently or then pending among any of them.

- **Extension of Litigation Standstill**.  The Parties agree to an extension of an existing standstill of the Adversary Proceeding to the Plan Effective Date, or, if the Settlement and Sale Agreement is terminated in accordance with its terms, the date of such termination and further agree, during the extended standstill period, to refrain from

27

acting, causing, encouraging, or facilitating the prosecution of the Adversary Proceeding or any new litigations, and to refrain from cooperating with any entities attempting to so prosecute; provided, however, (i) that any Party shall have the right to object to any filing filed in any existing litigation or otherwise in the Chapter 11 Cases, (ii) if the Settlement and Sale Agreement is terminated in accordance with its terms, the extended standstill shall automatically cease and be of no further force and/or effect, and each Party shall have the right to take any action to file and/or prosecute any litigations, and (iii) in the event the Closing does not occur on or before the date that is sixty-three days prior to the new trial date in the Adversary Proceeding, either Party shall have the right in its sole discretion to terminate the extended standstill and have the right to take any action to file and/or prosecute any litigations.

- **Termination of Insider Ski Passes**.  As set forth on Schedule 47 to the Settlement and Sale Agreement, at Closing, any ski passes provided by Moonlight Basin Ranch to Lee Poole, Lathrop Poole, Tracy Poole, or Leesa Anderson will be terminated.  For the avoidance of doubt, no Insiders are receiving ski passes, lifetime or otherwise, in connection with the Settlement and Sale Agreement.

## IV.   GENERAL INFORMATION

### A.   OVERVIEW OF CHAPTER 11

Under chapter 11 of the Bankruptcy Code, a debtor may propose to reorganize or liquidate its business and assets subject to the provisions of the Bankruptcy Code.

In general, a chapter 11 plan (i) divides claims and equity interests into separate classes, (ii) specifies the consideration that each class is to receive under the plan, and (iii) contains other provisions necessary to implement the plan.  Under the Bankruptcy Code, "claims" and "equity interests," rather than "creditors" and "shareholders," are classified because creditors and shareholders may hold claims and equity interests in more than one class.  Under section 1124 of the Bankruptcy Code, a class of claims is "impaired" under a plan unless the plan (i) leaves unaltered the legal, equitable, and contractual rights of each holder of a claim in that class, or (ii) to the extent defaults exist, provides for the cure of existing defaults, reinstatement of the maturity of claims in that class, compensates each holder of a claim for any damages incurred as a result of reasonable reliance upon the default, and does not otherwise alter the legal, equitable or contractual rights of each holder of a claim in that class.

The consummation of a plan is a principal objective of a chapter 11 case.  A chapter 11 plan sets forth the means for satisfying claims against and interests in a debtor and, if appropriate, the future conduct of the debtor's business, the sale of the debtor's assets, and/or the liquidation of the debtor's remaining assets.  Confirmation of a plan by the bankruptcy court binds the debtor, any person acquiring property under the plan, and any creditor or equity interest holder of a debtor to the terms and provisions of the plan as of the effective date of the plan.

B.  THE DEBTORS' PREPETITION BUSINESS OPERATIONS

1.  **The Moonlight Basin Resort**

    a.  *The Resort*

    The Debtors, together with their nondebtor affiliates, operate the Resort, a ski and golf community situated on more than 8,000 acres of land at the north face of Lone Mountain in Big Sky, Montana, approximately 50 miles from Bozeman, Montana.  The Resort, which opened in 2003, offers approximately 1,900 acres of skiable terrain with more than 90 trails, 7 lifts, and a 2,270 foot vertical drop.  The Resort is adjacent to Big Sky Resort, and the two resorts have joined together to offer joint lift tickets, creating a combined area totaling over 5,300 acres of interconnected trails and lifts.  The overall development plan for the Resort also contemplates a total of approximately 1,650 residential dwellings.  As of the date hereof, approximately 340 units/lots have been sold.

    b.  *Golf Course and Clubhouse*

    In addition to skiing operations, the Resort offers restaurants, spa services, a business center, exercise facilities, a ski and golf shop, retail and office space, and a partially completed Jack Nicklaus Signature Golf Course.  In September 2004, Debtor Moonlight Golf, the owner and operator of the golf course, adopted a Membership Plan (as amended and restated as of March 2006, the "Membership Plan") governing the relationship between Moonlight Golf and its members and the members' use of the recreational amenities and facilities, including a club house.  At the time the Membership Plan was adopted, it was anticipated that the golf course would be completed and open for play in late summer of 2009[36] although neither the Membership Plan nor any of the Membership Agreements (as defined herein) contained deadlines by which the golf course or related facilities would have to be completed.  The Membership Plan is attached hereto as Exhibit 3.  To date, there are over one hundred members (collectively, the "Golf Members").  Each Golf Member was required to sign a membership agreement (collectively, and together with any addendums thereto, the "Membership Agreements"), such agreement governing, among other things, the respective Golf Member's payment of dues, fees and charges, resignation rights, termination rights, and privileges with respect to the golf course, clubhouse, and related facilities.  Neither the Membership Plan nor the Membership Agreements sets forth a deadline by which the golf course or clubhouse must be started or completed.

    Moreover, the majority of Golf Members were required to pay a deposit, the amount of which varied depending on the category and time of membership (collectively, the "Deposits").  The Deposits, which total approximately $3,375,857.00, are currently being held in escrow, such escrow account governed by that certain Escrow Agreement (the "Escrow Agreement") dated as of September 4, 2007 between Moonlight Golf and Security Title Company, as Escrow Agent.  The Deposits will remain in escrow in accordance with the terms

---

[36] The Membership Plan explicitly provides that neither The Reserve at Moonlight Basin, which was owned and operated by Moonlight Golf, nor any of its affiliates "shall have any liability whatsoever to the members in the event the [recreational amenities and facilities] are not constructed."  *See* Membership Plan at Section 5.2.

and conditions set forth in the Escrow Agreement.  Notwithstanding any claim of the Golf Members, it is the Debtors' position that there has not been any breach of the Membership Plan, the Membership Agreements, or the Escrow Agreement.

In April 2011, the Golf Members made a proposal regarding the completion of the construction of the golf course.  The Lenders are currently reviewing such proposal and have not yet made any decisions with respect to the golf course and clubhouse, including whether to complete the construction of the golf course and clubhouse after the Lenders or the Lender Designee(s) take control of the assets.  The Lenders intend to engage in discussions with the Golf Members post-closing to develop a plan for the golf course and clubhouse and it is the Lenders' intention to announce their plan in connection therewith no later than December 31, 2012.[37]  If the Lenders have not announced a plan with respect to the golf course and clubhouse by December 31, 2012, it is the Lenders' intention, upon the request of a Golf Member, to cause such Golf Member's Deposit to be released from the escrow account by the Escrow Agent and returned to the Golf Member.

## 2.   Corporate Structure and Current Officers

### a.   *Background*

In 1992, Poole and two of his business partners (together, the "Partners") acquired a 25,000 acre parcel of undeveloped land in an area known as "Jack Creek Drainage" in Madison County, Montana.

In 2007, Poole became the sole owner of the Resort by purchasing the equity interests of his Partners.  Such purchase was funded, at least in part, through funds made available to Poole under the Prepetition Credit Agreement and/or the Prepetition Mezzanine Loan Agreement, each as described below.

### b.   *Corporate Structure*

An updated organizational chart of Moonlight is attached hereto as Exhibit 4.

Moonlight Basin Ranch, an Ohio limited partnership, holds a 100% membership interest in Moonlight Lodge, Moonlight Basin, Lone Mountain, Moonlight Golf, Moonlight Spa, Mountain Top, and Treeline (collectively, the "Subsidiary Debtors"), each of which is a Montana limited liability company.  Moonlight Basin Ranch also holds a 50% membership interest in Montana Real Estate Company of Big Sky, LLC ("Montana Real Estate Co."), a Montana limited liability company, and Sagebrush Property, LLC ("Sagebrush"), a Delaware limited liability company.  Mountain Top holds a 50% membership interest in Frontier Stone LLC ("Frontier Stone"), a Montana limited liability company.

---

[37]  For the avoidance of doubt, the Lenders are not required or obligated, by contract or otherwise, to announce their plan in connection with the golf course or clubhouse by any specific date under the Membership Plan, the Membership Agreements, the Escrow Agreement, or any other document.

Moonlight Mezz, a Delaware limited liability company, holds a 99% limited partnership interest in Moonlight Basin Ranch and Moonlight Basin Ranch, Inc. ("Moonlight Inc.") an Ohio corporation, holds 1% general partner interest in Moonlight Basin Ranch. Moonlight Mezz holds a 100% interest in Moonlight Inc.

Moonlight Mezz is a wholly-owned subsidiary of Moonlight Basin Holdings LLC ("Moonlight Holdings"), a Delaware limited liability company, which in turn is a wholly-owned subsidiary of Poole Holdings LLC ("Poole Holdings"), a Delaware limited liability company. Moonlight Mezz, Moonlight Holdings, and Poole Holdings are each holding companies with no operating assets.

Originally, Poole and Lathrop Poole each held a 50% ownership interest in Poole Holdings.  On September 5, 2007, the following transfers of interest occurred:  the Tracy Poole Trust and Leesa Anderson Trust each acquired a 7.5% membership interest in Poole Holdings from Poole and a 7.5% membership interest in Poole Holdings from Lathrop Poole; Madison Investments, a Delaware Trust (collectively with the Tracy Poole Trust and Leesa Anderson Trust, the "Trusts"), acquired a 5% membership interest in Poole Holdings from Poole and a 5% membership interest in Poole Holdings from Lathrop Poole.  Following these transfers, Poole, Lathrop Poole, the Tracy Poole Trust, the Leesa Anderson Trust, and Madison Investments held the following membership interests in Poole Holdings:

- Poole:  30% (managing membership interest)

- Lathrop Poole:  30%

- Tracy Poole Trust:  15%

- Leesa Anderson Trust:  15%

- Madison Investments:  10%

The Trusts executed promissory notes in favor of Poole and Lathrop Poole as payment for the acquisition of those interests.  The Trust were unable to pay the notes and defaulted.  The Trusts, Poole, and Lathrop Poole rescinded the purchases and cancelled the promissory notes in settlement of the defaults in 2010.  At this time, the Trusts no longer have any interest in Poole Holdings.

In addition to his interests in Poole Holdings, Poole also holds a 100% membership interest in JVLP, LLC ("JVLP") and Six Shooter, LLC ("Six Shooter"), each a Montana limited liability company.  JVLP and Six Shooter, as well as Aardvark, LLC ("Aardvark"), a Montana limited liability company, each hold certain Beverage Licenses used in connection with the Debtors' businesses.  Tim Anderson ("Anderson") holds a 100% interest in Aardvark.

Montana Real Estate Co., Sagebrush, Frontier Stone, Moonlight Inc., Moonlight Holdings, Poole Holdings, JVLP, Six Shooter, Aardvark, Poole, Lathrop Poole, the Tracy Poole

31

Trust, the Leesa Anderson Trust, Madison Investments, and Anderson are not debtors in these Chapter 11 Cases.

<h3 style="text-align:center"><b>c.   <i>Current Principal Executive Officers and Directors of Moonlight Inc.</i></b></h3>

President – Lee Poole.

Vice Presidents – Lee Poole, Kevin Germain, Russ McElyea, and Gerrit Cormany.

Secretary – Russ McElyea.

Chief Financial Officer – Gerrit Cormany.

Sole Director – Lee Poole.

The Debtors themselves do not have officers and/or directors. The officers of Moonlight Inc. have signatory authorizations for each of the Debtors.

### 3.   <u>The Debtors' Businesses</u>

The following is a brief description of the businesses of Moonlight Basin Ranch and each Subsidiary Debtor.

- *Moonlight Basin Ranch* is the owner of all of the property that constitutes the Resort except the lodge. Moonlight Basin Ranch leases the ground underlying the ski facilities to Moonlight Basin and the ground underlying the golf course and related facilities to Moonlight Golf. Moonlight Basin Ranch is the developer of various subdivisions and real estate developments at the Resort.

- *Moonlight Basin* operates the ski operations of the Resort on ground leased from Moonlight Basin Ranch.

- *Moonlight Golf* is the owner and operator of the golf course, The Reserve at Moonlight Basin.

- *Moonlight Lodge* is the owner of certain property, including a lodge located at the Resort. Moonlight Lodge leases commercial units of the lodge to various Debtors and nondebtors, among others, including Moonlight Spa, Moonlight Basin, and JVLP.

- *Moonlight Spa* provides spa services in the lodge.

- *Lone Mountain* operates the food and beverage services at the lodge, the ski base area, and the golf course.

- *Mountain Top* is not an operating company.  It previously operated a construction business.

- *Treeline* provides certain water and sewer services to most residents and businesses at the Resort.  Treeline is regulated by the Montana Public Service Commission.

### 4. Prepetition Indebtedness

#### a. *The Prepetition Credit Agreement*

Moonlight Basin Ranch is a party to that certain Credit Agreement, dated September 7, 2007 (the "Prepetition Credit Agreement"), with LCPI's predecessor in interest, Lehman Brothers Commercial Bank ("LBCB"),[38] as administrative agent and lender, pursuant to which LCPI agreed to loan to Moonlight Basin Ranch $100 million (the "Prepetition Senior Loan").  Certain of Moonlight Basin Ranch's subsidiaries and Poole entered into agreements providing guaranties of the Prepetition Senior Loan.[39]

The Prepetition Credit Agreement is secured by, among other things, a first lien on substantially all of the assets of the Debtors, as well as certain pledges in property, pursuant to, among other things, the following:

- that certain Montana Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Filing, dated September 7, 2007, in the amount of $100,00,000, which is duly recorded as Document No. 121938, in the records of Madison County, Montana, given by Moonlight Basin Ranch to LBCB (and assigned to LCPI), encumbering the majority of the real property comprising the Resort that is owned by Moonlight Basin Ranch (the "Moonlight Basin Ranch Mortgage"), pursuant to which Moonlight Basin Ranch pledged to LCPI all right, title, and interest in and to the subject property, all rights to the profits of the subject property, as well as a first and priority security interest on all personal property used in connection with such property, as more fully set forth in the Moonlight Basin Ranch Mortgage;

- that certain Montana Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Filing, dated September 7, 2007, in the amount of $100,00,000, which is duly recorded as Document No. 121935, in the records of Madison County, Montana, given by Moonlight Lodge to LBCB (and assigned to LCPI), encumbering certain

---

[38] LBCB's interests under the Prepetition Senior Loan Documents were assigned to LCPI pursuant to that certain Agent Resignation and Appointment Agreement, dated as of September 7, 2007, by and between LBCB and LCPI.

[39] The following guaranties were executed and delivered to LCPI in connection with the Prepetition Senior Loan:  (i) a guaranty of all obligations under the Prepetition Senior Loan pursuant to a subsidiary guarantee, dated September 7, 2007, provided by the Subsidiary Debtors; (ii) a guaranty of specified losses in connection with the Prepetition Senior Loan and the entire Prepetition Senior Loan itself upon certain contingencies, including a bankruptcy filing by Moonlight Basin Ranch, pursuant to that certain Sponsor Carve Out Guaranty, dated September 7, 2007, provided by Poole; and (iii) an Environmental Indemnity Agreement, dated September 7, 2007, provided by Moonlight Basin Ranch and Poole.

33

real property at the Resort that is owned by Lodge (the "Lodge Mortgage"), pursuant to which   Moonlight Lodge pledged to LCPI all right, title, and interest in and to the subject property, all rights to the profits of the subject property, as well as a first and priority security interest on all personal property used in connection with the subject property, as more fully set forth in the Lodge Mortgage;

- that certain Security Agreement, dated as of September 7, 2007, by and among LCPI and Moonlight Basin Ranch, each Subsidiary Debtor, Aardvark, Six Shooter and JVLP (collectively, the "Grantor"), pursuant to which Grantor granted LCPI a security interest in and to all of Grantor's right, title, and interest in and to all of the personal property of Grantor, including certain Beverage Licenses; and

- several pledge agreements, each dated September 7, 2007, pursuant to which the equity interests of (i) Moonlight Basin Ranch in each the Subsidiary Debtors, (ii) Mountain Top of its ownership in Frontier Stone, (iii) Poole of his ownership interests in Six Shooter and JVLP, and (iv) Anderson of his ownership interests in Aardvark, were pledged to LCPI.

In June 2008, LCPI, Moonlight Basin Ranch, Poole, and the Subsidiary Debtors entered into that certain Agreement Regarding Extension of Loan and Amendment to Credit Agreement, dated June 5, 2008, pursuant to which the initial maturity date of the Prepetition Senior Loan was extended to September 7, 2008.  In exchange for LCPI's agreement to such extension, Moonlight Basin Ranch, Poole, and the Subsidiary Debtors executed documents releasing all claims against LCPI relating to the Prepetition Senior Loan and acknowledged that they have no defenses, counterclaims, offsets or setoff rights against any obligations under the Prepetition Senior Loan Documents.  The Debtors have challenged the validity of these releases in the Adversary Proceeding.

Moonlight Basin Ranch did not repay the Prepetition Senior Loan by the maturity date.  As of the Commencement Date, the outstanding balance on the Prepetition Senior Loan was approximately $95,780,309.

### b.    *The Prepetition Mezzanine Loan Agreement*

Moonlight Mezz is a party to that certain Mezzanine Loan Agreement, dated as of September 7, 2007 ("Prepetition Mezzanine Loan Agreement"), with LBHI, as lender, pursuant to which LBHI agreed to loan to Moonlight Mezz $70 million (the "Prepetition Mezzanine Loan").  Poole and Moonlight Mezz entered into agreements providing guaranties of the Prepetition Mezzanine Loan.[40]  As collateral security for payments due under the Prepetition Mezzanine Loan Agreement, several pledge agreements, each dated as of September 7, 2007, were executed and delivered to LBHI as follows:  (i) Moonlight Mezz of its interests in Moonlight Basin Ranch and Moonlight Inc., (ii) Moonlight Holdings of its interests in Moonlight

---

[40]  The following guaranties were executed and delivered to LBHI in connection with the Prepetition Mezzanine Loan: (i) a guaranty of specified losses in connection with the Prepetition Mezzanine Loan and the entire Prepetition Mezzanine Loan itself upon certain contingencies, including a bankruptcy filing by the Moonlight Mezz, pursuant to that certain Sponsor Carve Out Guaranty, dated September 7, 2007, provided by Poole, and (ii) an Environmental Indemnity Agreement, dated September 7, 2007, provided by Moonlight Mezz and Poole.

Mezz, (iii) Poole of his ownership interests in Six Shooter and JVLP, and (iv) Anderson of his ownership interests in Aardvark.

In June 2008, LBHI, Moonlight Mezz, Poole, Anderson, Moonlight Holdings, Moonlight Inc., Moonlight Basin Ranch, Six Shooter, JVLP and Aardvark entered into that Certain Ratification Agreement and First Amendment to Mezzanine Loan Agreement and Other Loan Documents (the "Mezzanine Amendment"), pursuant to which LBHI increased its commitment to Moonlight Mezz to $78 million and the maturity date of the Mezzanine Loan was changed to September 7, 2008.  In consideration of LBHI's agreement to the Mezzanine Amendment, Moonlight Mezz, Poole, Anderson, Moonlight Holdings, Moonlight Inc., Moonlight Basin Ranch, Six Shooter, JVLP, and Aardvark executed documents releasing all claims against LBHI and, among others, its subsidiaries and affiliates, relating to the Prepetition Mezzanine Loan.  The Debtors have challenged the validity of these releases in the Adversary Proceeding.

Moonlight Mezz did not repay the Prepetition Mezzanine Loan by the maturity date.  As of the Commencement Date, the outstanding balance on the Prepetition Mezzanine Loan was approximately $103,303,205.

### c.   *Other Significant Prepetition Debt*

In connection with the development and operation of the Resort, the Debtors entered into agreements with numerous contractors and/or subcontractors for the performance of various services on and around the Resort.  Under applicable state law, such contractors and/or subcontractors may assert liens against the Debtors' property until they receive payment in full for their work.  As of the Commencement Date, the entities listed below had asserted construction liens against the Debtors in connection with materials and services provided to the Debtors.  Except with respect to Towsley Welding, which holds a disputed and defective construction lien, the Debtors have paid such entities in the following amounts from proceeds the Debtors received postpetition from the Lenders under the DIP Loan Documents and, as a result, the constructions liens have been released.

| Creditor | Amount ($) | Date Lien Alleged |
|----------|------------|-------------------|
| Tom Roe & Son | 51,106.66 | 09/10/2009 |
| Portable Inc. | 1,332.80 | 10/24/2008 |
| Towsley Welding | 0 | 08/20/2009 |
| Kim Winters | 13,285.00 | 01/29/2009 |
| Bozeman Construction Co. | 3,234.02 | 10/24/2008 |
| Kenyon-Noble | 3,366.94 | 10/24/2008 |
| Apex Engineering | 14,914.30 | 12/09/2008 |

35

| | | |
|---|---|---|
| Highway Technologies | 22,440.15 | 10/18/2008 |
| Potts Drilling | 0 | 10/10/2008 |
| Madison Lumber Company | 3,301.20 | 01/04/2010 |
| Sime Construction | 538,268.97 | 12/23/2008 |
| Craig F. Sorensen Construction Inc. | 17,426.38 | 1/15/2010 |
| Williams Plumbing | 58,955.90 | 09/26/2008 and 02/27/2009 |
| Stahly Engineering | 17,832.67 | 03/03/2009 |
| **Total:** | 745,464.99 | |

During the pendency of these Chapter 11 Cases, the Debtors have, with Bankruptcy Court approval, provided adequate protection to nearly all of the equipment financing creditors.  Further, during the pendency of these Chapter 11 Cases, the Debtors have, pursuant to section 365(a) of the Bankruptcy Code and upon order of the Bankruptcy Court, assumed certain executory contracts or unexpired leases and cured any and all undisputed defaults, including monetary defaults, in connection therewith.

## C.   SIGNIFICANT EVENTS LEADING TO THE CHAPTER 11 CASES

### 1.   Downturn in the Real Estate Market

In 2007, Poole began marketing efforts to sell the Resort, which included, among others, entry into a letter agreement with Lehman Brothers Inc. ("LBI")[41] that gave LBI the exclusive right to provide financial advisory services in connection with an attempted sale of the Resort.  Poole initiated such efforts with the hope that an eventual sale of the Resort would allow Moonlight Basin Ranch and Moonlight Mezz to pay off a portion of the balance of the Prepetition Senior Loan and Prepetition Mezzanine Loan, respectively, and generate a profit for Poole.  Throughout 2008 and beyond, the real estate market in the United States suffered an unprecedented and historic downturn.  The Lenders have argued in the Adversary Proceeding that as a result of this downturn as well as the global recession, financing options for the purchase of the Resort became virtually nonexistent.  Notwithstanding efforts to market the Resort for sale, the Resort was not sold.

### 2.   The Forbearance Agreements

Because of the inability to sell the Resort or obtain additional or replacement financing in the turbulent real estate market of 2007-2008, Moonlight Basin Ranch was unable to

---

[41]  LBI is the subject of a liquidation proceeding pursuant to the Securities Investor Protection Act of 1970 (the "SIPA Liquidation") and James W. Giddens has been appointed the Trustee for the liquidation.  The SIPA Liquidation is pending before the United States Bankruptcy Court for the Southern District of New York.

repay the Prepetition Senior Loan by its maturity date.  Notwithstanding such failure to repay, from approximately December 2008 to November 2009, LCPI continued to authorize protective advances to Moonlight Basin Ranch and released to it certain collateral sales proceeds. Thereafter, LCPI on the one hand and Moonlight Basin Ranch, Poole, Anderson, and Mountain Top on the other hand entered into a Forbearance Agreement, dated June 19, 2009, pursuant to which LCPI agreed, among other things, to forbear from exercising certain rights and/or remedies under the Prepetition Senior Loan Documents for a certain period of time.

Similarly, upon Moonlight Mezz's failure to repay the Prepetition Mezzanine Loan by its maturity date, LBHI on the one hand and Moonlight Mezz, Poole, Anderson, and Moonlight Holdings on the other hand entered into a Forbearance Agreement, dated June 19, 2009, pursuant to which LBHI agreed to, among other things, forbear from exercising certain rights and/or remedies under the Prepetition Mezzanine Loan Documents for a certain period of time.

In consideration of such forbearance agreements, Moonlight Basin Ranch, Poole, Anderson, Mountain Top, Moonlight Mezz, and Moonlight Holdings executed documents releasing all claims against the Lenders relating to, among other things, the Prepetition Senior Loan, the Prepetition Mezzanine Loan, and the Prepetition Loan Documents.  The Debtors have challenged the validity of these releases in the Adversary Proceeding.

Moonlight Basin Ranch and Moonlight Mezz failed to repay the Prepetition Senior Loan and the Prepetition Mezzanine Loan, respectively, during the forbearance periods.

### 3.   The Foreclosure Action

Following the expiration of the forbearance periods, on September 11, 2009, LCPI filed the Foreclosure Action in Montana State Court against Moonlight Basin Ranch, as borrower under the Prepetition Senior Loan, and Poole, as guarantor, among others, for foreclosure and for appointment of a receiver.  The Debtors and Poole filed various counterclaims against the Lenders in the Foreclosure Action.

On November 18, 2009, Lone Mountain, Moonlight Basin, Moonlight Golf, Moonlight Lodge, Moonlight Mezz, Moonlight Basin Ranch and Moonlight Spa each filed chapter 11 cases with the Bankruptcy Court.  Mountain Top Construction and Treeline filed for chapter 11 on November 23, 2009.  The Foreclosure Action was stayed as a result of the Debtors' bankruptcy cases.

## V.   THE CHAPTER 11 CASES

The following is a brief description of some of the significant events that have occurred during the Debtors' Chapter 11 Cases.

### A.   RETENTION AND COMPENSATION OF THE DEBTORS' PROFESSIONALS

Prior to the Commencement Date, the Debtors retained James A. Patten and his firm Patten, Peterman, Bekkedahl & Green, PLLC as their bankruptcy counsel, to provide advice regarding various bankruptcy and restructuring matters.  Following the Commencement Date,

37

the Debtors retained William Henrich and Getzler Henrich & Associates LLC as Chief Restructuring Officer to provide assistance to the Debtors in connection with these Chapter 11 Cases.  The Debtors have also periodically retained other law firms to serve as special counsel, including, Browning, Kaleczyc, Berry & Hoven, P.C., Brouse McDowell L.P.A., as well as certain other professionals.  The Bankruptcy Court has approved the retention of all these professionals.  As of May 31, 2011, the Debtors incurred approximately $3,032,390.17 in professional fees and expenses in connection with the Chapter 11 Cases, including professional fees and expenses incurred in connection with the Adversary Proceeding.

> ### B.   DIP FINANCING

> Upon the commencement of the Chapter 11 Cases, the Debtors had an immediate and critical need to obtain postpetition financing to continue the operation of their businesses.  Thus, on the Commencement Date, the Debtors filed a motion for authorization to obtain postpetition financing from Trilogy Capital (the "Trilogy Financing").  The Lenders presented the Debtors with a competing offer for postpetition financing, which, after a period of negotiations, the Debtors accepted.

> On December 8, 2009, after notice and a hearing, the Bankruptcy Court entered the DIP Order which, among other things, permitted Moonlight Basin Ranch and certain of its affiliates to obtain postpetition financing from LCPI or its affiliate or subsidiary (the "DIP Lender") up to the aggregate amount of $24,000,000 (the "DIP Financing"), at a fixed rate of 5% per annum, pursuant to the DIP Loan Documents, solely for the purposes of funding the operating expenses of the Debtors.

> The DIP Order granted the DIP Lender (i) super-priority administrative expensive claims against the Debtors over any and all administrative expenses of the kind specified in sections 503(b) or 507(b) of the Bankruptcy Code and (ii) fully and automatically perfected first priority, valid, binding, enforceable, non-avoidable security interests in and priming liens upon all property of the Debtors' estates, including property that had previously been unencumbered by the Prepetition Senior Loan and the Prepetition Mezzanine Loan, and property of Aardvark, JVLP, and Six Shooter, all as more fully described in the DIP Order.

> The DIP Order also authorized the Debtors to use cash collateral (as defined in section 363(a) of the Bankruptcy Code) of (a) LCPI, in its capacity as prepetition lender under the Prepetition Credit Agreement, and (b) LBHI, in its capacity as prepetition lender under the Prepetition Mezzanine Loan Agreement, through and including the term of the DIP Financing in a manner consistent with an operating agreement Budget agreed upon by the Debtors and the DIP Lender.

> The Maturity Date of the DIP Financing was extended to September 15, 2011 pursuant to that certain Amendment No. 2 to Credit Agreement, which was filed on February 2, 2011 [Docket No. 564].  The Maturity Date of the DIP Financing has been further extended to a date mutually agreed upon by the parties pursuant to that certain Amendment No. 3 to Credit Agreement.

As of the date of this Disclosure Statement, approximately $10,884,000.48 has been advanced to Moonlight Basin Ranch under the DIP Loan Documents.

### C.   SALES OF DESIGNATED PROPERTIES

Pursuant to the DIP Loan Documents and the DIP Order, none of the proceeds of the Loans made to the Debtors, any prepetition collateral, or any collateral securing the DIP Financing, was permitted to be applied to fund any challenge against the claims or liens of the Lenders; provided, however, that, the Debtors were able to use up to an aggregate amount not to exceed $1,127,500 of proceeds received from the sale or disposition of certain designated properties and/or incur postpetition debt secured by such properties, or any combination thereof, to fund any challenges against the claims or liens of the Lenders or their affiliates.

Pursuant to the orders listed below, the Debtors sold certain designated properties and incurred postpetition debt secured by certain other designated properties in the aggregate amount of $1,130,711.

- Order, dated January 11, 2010 [Docket No. 140] (authorizing Debtors to sell certain designated property for a total sales price of $850,000 which was to be paid $300,000 in cash and $550,000 in seller financing);
- Amended Order Authorizing Debtor to Sell Designated Property Outside Ordinary Course of Business, dated July 6, 2010 [Docket No. 400] (authorizing Debtors to sell certain designated property for $120,000);
- Order Authorizing Debtor to Sell Designated Property Outside Ordinary Course of Business, dated July 6, 2010 [Docket No. 401] (authorizing Debtors to sell designated property financing for $466,711); and
- Order Authorizing Debtor to Obtain Post-Petition Financing, dated February 15, 2011 [Docket No. 570] (authorizing Debtors to incur postpetition debt in the amount of $244,000 secured by certain designated property).

The Debtors have applied the $1,130,711 to fund, among other things, the Adversary Proceeding in accordance with the terms of the DIP Loan Documents and DIP Order.  As of May 31, 2011, the Debtors had used approximately $872,7889 of proceeds from the sale of designated properties.

### D.   NO APPOINTMENT OF A COMMITTEE OF UNSECURED CREDITORS

On December 11, 2009, the U.S. Trustee filed a statement [Docket No. 118] with the Bankruptcy Court indicating that, because the U.S. Trustee did not receive sufficient indications of willingness to serve on a committee of unsecured creditors from persons eligible to serve on such a committee, the U.S. Trustee was unable to appoint a committee pursuant to section 1102(a) of the Bankruptcy Code.  As of the date of this Disclosure Statement, an unsecured creditors committee has not been appointed.

### E.   NO SUBSTANTIVE CONSOLIDATION

Substantive consolidation is a unique equitable remedy that a bankruptcy court may be asked to apply to a debtor and its affiliates.  Substantive consolidation results in the pooling of the assets and liabilities of the affected entities and the making of distributions on allowed claims against the entities from a common fund.  All of the entities in a substantively consolidated group are merged and treated as if they were a single corporate and economic entity and intercompany claims, subsidiary equity or ownership interests, joint and several liability claims, and guarantee claims are disregarded.

On the Commencement Date, the Debtors filed a motion (the "SubCon Motion") [Docket No. 6] for substantive consolidation of certain of the Debtors' Chapter 11 Cases into the Chapter 11 Case of Moonlight Basin Ranch.  The Lenders objected to the SubCon Motion [Docket Nos. 34, 201], arguing that the Debtors did not meet their burden of proof.  After notice and a hearing to consider the SubCon Motion, on March 3, 2010, the Bankruptcy Court entered an order [Docket No. 205] denying the SubCon Motion because of the Debtors' failure to establish a sufficient basis to order substantive consolidation at such time.

### F.   THE ADVERSARY PROCEEDING[42]

On February 2, 2010, the Lenders commenced the Adversary Proceeding against the Debtors and the Nondebtors by filing a single-count complaint seeking a declaration that the Prepetition Loan Documents were valid and enforceable and that the Lenders have valid, enforceable, liquidated, and non-contingent claims against Defendants for all amounts due under the Loan Documents.

In response to the complaint, the Debtors and Nondebtors each filed an answer and affirmative defenses, generally denying any liability under the Prepetition Loan Documents. The Debtors also raised fifteen counterclaims against the Lenders and the Third Party Defendants – three former employees of the Lenders and Woodlands Commercial Bank. Through their counterclaims and affirmative defenses, the Moonlight Parties raised, among other things, claims and defenses of fraud, negligent misrepresentation, and breach of contract, and they sought a full setoff of all amounts owed to the Lenders.  The Moonlight Parties based such claims on, among other things, allegations that the Lenders induced the Moonlight Parties to enter into the Loans by promising to either sell the Resort within 10 to 12 weeks of the closing date of the Loans, or offer long-term financing that would meet the Moonlight Parties' future needs.  Further, the Debtors claimed that they were fraudulently induced into entering the forbearance agreements based on the Lenders' promise to negotiate in good faith during the forbearance period.

Numerous motions have been filed since the commencement of the Adversary Proceeding, including (i) the Lenders' motion for summary judgment based on the five releases

---

[42]   For purposes of this section only, (i) the "Debtors" are Moonlight Basin Ranch, Moonlight Lodge, Moonlight Spa, Moonlight Golf, Moonlight Basin, Treeline, , Mountain Top, Lone Mountain, and Moonlight Mezz and (ii) the "Nondebtors" are Poole, Six Shooter, JVLP, Anderson, Aardvark, Frontier Stone, Moonlight Holdings, and Moonlight Inc.  The Debtors and the Nondebtors, together, are the "Moonlight Parties."

executed by the Moonlight Parties which the Lenders argued released them from any and all liability relating to the Prepetition Loan Documents; (ii) the Lenders' and Third Party Defendants' motions to dismiss the counterclaims of the Debtors; and (iii) the Lenders' and Third Party Defendants' second motions for summary judgment, pursuant to which the Lenders requested that the Bankruptcy Court grant the declaration outlined in their complaint and the Third Party Defendants requested the Bankruptcy Court to dismiss them from the litigation.

In response to the various motions, the Bankruptcy Court: (i) ruled that the releases executed by the Moonlight Parties are valid, binding, and enforceable [Adv. Pro. Docket No. 81]; (ii) dismissed thirteen of the fifteen counterclaims against the Lenders, holding that the releases are valid and enforceable and the Moonlight Parties failed to timely file claims in LCPI and LBHI's Chapter 11 bankruptcy cases [Adv. Pro. Docket No. 146]; and (iii) dismissed Woodlands Commercial Bank from the Adversary Proceeding [Adv. Pro. Docket No. 146]. The Bankruptcy Court has not yet ruled or heard oral argument on the Lenders and Third Party Defendants' second motion for summary judgment, however, because the Adversary Proceeding was stayed after the parties agreed in principle on the terms of a settlement to provide the parties with time to document, and seek Bankruptcy Court approval of, all necessary agreements and other documents.

In connection with such standstill, upon the request of the parties, on March 11, 2011, the Bankruptcy Court entered an order [Adv. Pro. Docket No. 255] vacating the trial of the Adversary Proceeding that was set to begin on April 18, 2011 and resetting it to begin on June 22, 2011, or as soon thereafter as the parties can be heard. Upon further request of the parties, on May 2, 2011, the Bankruptcy Court entered an order [Adv. Pro. Docket No. 266] vacating the June trial of the Adversary Proceeding and resetting it to begin on October 11, 2011, or as soon thereafter as the parties can be heard. The October trial date was reserved in case the parties did not reach an agreement on the terms of the settlement and/or the Bankruptcy Court did not approve such settlement. However, on the Effective Date, pursuant to the Plan and Settlement and Sale Agreement, the Adversary Proceeding will be deemed automatically dismissed, with prejudice, by all parties thereto.

## G.   CLAIMS PROCESS AND BAR DATE

On their respective Commencement Date, each of the Debtors filed Statements of Financial Affairs and Schedules (together, the "Schedules and Statements"), as amended and supplemented. The Schedules and Statements reflect all of the Debtors' known assets and liabilities at the time of preparation based on the books and records available at that time.

On April 8, 2010, the Bankruptcy Court entered an order (the "Bar Date Order") [Docket No. 261] establishing May 28, 2010 as the deadline (the "Bar Date") for filing proofs of claim against any of the Debtors. In accordance with the Bar Date Order, written notices of the Bar Dates were mailed to all known creditors. The time within which to file claims against the Debtors has expired.

As of the Bar Date, over 220 proofs of claim asserting claims against the Debtors had been filed with the Bankruptcy Court. A schedule of the claims against each Debtor is

41

annexed hereto as Exhibit 5.[43]   The Debtors have reviewed the proofs of claim that have been filed.  The Debtors intend to file objections to late-filed claims and other claims in an effort to resolve the Allowed amount of Claims in the Classes 4 and 5.  The following table summarizes the Debtors' estimate of the number and aggregate amount of Allowed Claims in Class 4 General Unsecured Claims (other than the Prepetition Lender Deficiency Claims and Insider Claims) and Class 5 Convenience Claims for each of the Debtors based on the Debtors' review and analysis of the Claims.[44]   For avoidance of doubt, the information that appears in the below table assumes that the claims are ultimately allowed in the amount that the Debtors believe match their books and records[45] and does not represent the aggregate value of the proofs of claim filed against the Debtors in the Chapter 11 Cases.

| Class | Moonlight Mezz | Moonlight Basin Ranch | Lone Mountain | Moonlight Basin | Moonlight Golf | Moonlight Lodge | Moonlight Spa | Mountain Top | Treeline |
|-------|----------------|-----------------------|---------------|-----------------|----------------|-----------------|---------------|--------------|----------|
| 4 | $0 | $795,979.75 (20 claims) | $0 | $21,769.22 (2 claims) | $0 | $140,552.95 (1 claim) | $0 | $32,058.43 (1 claim) | $0 |
| 5 | $0 | $256,653.60 (172 claims) | $0 | $1,528.45 (2 claims) | $0 | $0 | $0 | $0 | $0 |

## H.   EXTENSIONS OF EXCLUSIVE PERIODS

Pursuant to section 1121 of the Bankruptcy Code, only a debtor may file a plan of reorganization during the 120-day period following the commencement of a chapter 11 case.  If a debtor files a plan of reorganization during such time, the debtor will have an additional 60 days to solicit acceptances of its plan, during which time no other party in interest may file a plan.  Pursuant to section 1121(d) of the Bankruptcy Code, on request of a party in interest, a bankruptcy court may for cause reduce or increase the exclusive periods to file a chapter 11 plan and solicit acceptances thereof; provided, however, that such periods may not be extended beyond 18 months and 20 months, respectively, after the date of commencement of the debtor's chapter 11 case.

By Order of the Bankruptcy Court dated September 30, 2010 [Docket No. 474], the Debtors' exclusive periods under section 1122 of the Bankruptcy Code to file a chapter 11 plan and solicit acceptances thereof were extended through and including, May 16, 2011 and August 15, 2011, respectively.

---

[43]  Exhibit 4 is intended to be used for information purposes only and shall not in any way be deemed an admission as to the validity or Allowed amount of any Claim or as a waiver of any objection thereto by the Debtors, Lender Designee(s) or Plan Administrator.

[44]  The table does not reflect that holders of General Unsecured Claims can elect to be in the Convenience Claims Class.  If any such elections are made, the total amount of estimated Class 4 Claims will decrease and the total amount of estimated Class 5 Claims will increase, and the aggregate amount of estimated claims will also decrease as those making the election will be voluntarily agreeing to reduce their claims.  The table also does not reflect claims under executory contracts and unexpired leases that are being assumed under the Plan, as such claims are being paid in full as cure costs.

[45]  For example, although Saddle Ridge filed identical general unsecured claims against Moonlight Basin Ranch and Mountain Top in the amount of $2,407,000.00 (as discussed in footnote 12), the Debtors estimate, and the information in the above table assumes, that the unsecured claims of Saddle Ridge will be allowed at $0.

## I.    APPOINTMENT OF EXAMINER

On July 27, 2011, the U.S. Trustee filed a motion (the "Examiner Motion") [Docket No. 734] seeking the appointment of an examiner pursuant to section 1104(c) of the Bankruptcy Code.  On August 2, 2011, the U.S. Trustee and the Debtors filed a joint stipulation (the "Examiner Stipulation") [Docket No. 753] with the Bankruptcy Court regarding the scope of duties and budget of the examiner (the "Examiner").  The Examiner Stipulation provides that the Examiner's duties are limited to:  (i) evaluating the litigation that is referenced in the Settlement and Sale Agreement and determining whether or not any improprieties were committed by the Debtor Parties in the negotiations underlying or the execution of the Settlement and Sale Agreement, including whether the provision for the Settlement Amount to Poole in the manner provided for in the Settlement and Sale Agreement was proper, or whether those funds should have been allocated to the payment of general unsecured claims of the Debtors; and (ii) determining whether or not the Debtors might have potential claims against any of their equity owners, management, professionals, agents or others.  Furthermore, pursuant to the Examiner Stipulation, the Examiner was provided a budget of $40,000.  On August 3, 2011, the Bankruptcy Court entered an Order [Docket No. 754] granting the Examiner Motion and approving the Examiner Stipulation.

By Order of the Bankruptcy Court dated August 4, 2011 [Docket No. 760], John L. Amsden was appointed to serve as Examiner.  On August [--], 2011, the Examiner filed his report (the "Examiner's Report") [Docket No. ---] with the Bankruptcy Court.  The Examiner's Report is attached in its entirety as Exhibit 6.  The Debtors will file a formal response to the Examiner's Report with the Bankruptcy Court at a later date, and such response will be mailed to creditors with the Disclosure Statement, Disclosure Statement Order, Plan, and other documents when the Debtors commence solicitation of acceptances and rejections with respect to the Plan.

## J.    MOTION OF AD HOC GOLF COMMITTEE AND THE DEBTORS' OBJECTION

On July 28, 2011, an *ad hoc* committee of Golf Members (the "Ad Hoc Golf Committee") filed a motion (the "Golf Motion") seeking that the Bankruptcy Court set the estimated value of the Ad Hoc Golf Committee's allowed, unsecured claims; temporarily allow such claims for the purposes of accepting or rejecting the Plan; and classify the Ad Hoc Golf Committee's claims as a separate class of unsecured claims.  On August 5, 2011, the Debtors filed an objection (the "Golf Objection") to the Golf Motion asserting, among other things, that because the Plan provides for the assumption and assignment to the applicable Lender Designee(s) of the Membership Plan, the Membership Agreements, and the Escrow Agreement, as further described in Section VII of this Disclosure Statement, any claims arising out of such documents are not considered to be, or classified as, General Unsecured Claims or Convenience Claims.  Rather, those claims, if any, will be paid as "Cure" costs pursuant to the Plan.  As stated above, it is the Debtors' position that there has not been any default under the Membership Plan, the Membership Agreement, or the Escrow Agreement and thus, no Cure amount is required to be paid.  To the extent the Ad Hoc Golf Committee disagrees with the Debtors' proposed Cure amount, it is provided a mechanism to object to the proposed Cure amount in the Plan.  Moreover, only a few Golf Members filed proofs of claim by the Bar Date for prepetition claims arising out of or in connection with the Membership Plan, the Membership Agreements, or the Escrow Agreement.  As explained above, these documents are executory contracts that are

43

currently expected to be assumed and assigned to the applicable Lender Designee(s) under the Plan and any claims associated therewith will be paid as Cure costs. Accordingly, neither the Golf Members nor the Ad Hoc Golf Committee has allowed, unsecured claims of which the Bankruptcy Court may estimate the value, separately classify, or temporarily allow for purposes of accepting or rejecting the Plan. Nevertheless, as explained above in Section II(B), to preserve their voting rights in the event that the Membership Plan, the Membership Agreements, and/or the Escrow Agreement is/are ultimately rejected, any Golf Member that believes it may have a Claim relating to such documents if the documents were to be rejected should submit a Ballot in accordance with the voting procedures set forth above in Section I(B). Moreover, as further described in Section VI(F)(6)(b) of this Disclosure Statement, in the event that the Membership Plan, the Membership Agreements, and/or the Escrow Agreement is/are ultimately rejected, claims arising out of such rejection must be filed with the Bankruptcy Court and served upon the relevant Debtor no later than 30 days after notice of entry of the Confirmation Order.

The Golf Motion and the Golf Objection are set for hearing on September 7, 2011.

### K. SADDLE RIDGE

#### 1. Saddle Ridge Claims and the Debtors' Objection and Motion for Summary Judgment

As described above, Saddle Ridge filed identical unsecured Claims (together, the "Saddle Ridge Claims") against Moonlight Basin Ranch and Mountain Top in the amount of $2,407,000 based on alleged design and construction defects in the Saddle Ridge condominiums. On July 27, 2011, the Debtors filed an objection to the Saddle Ridge Claims (the "Saddle Ridge Claims Objection") [Docket No. 741] seeking to disallow the Saddle Ridge Claims in their entirety. In the Saddle Ridge Claims Objection, the Debtors assert, among other things, that because Saddle Ridge failed to attach any documentation supporting its claims, the claims fail to comply with the Bankruptcy Rules and the Local Bankruptcy Rules and should be disallowed. Also, Saddle Ridge lacks standing to assert claims against the Debtors with respect to the condominiums, as Saddle Ridge did not purchase any of the condominiums from any of the Debtors; Saddle Ridge does not own any of the condominiums, real property, or improvements at issue; and under its bylaws, the Board of Directors of Saddle Ridge does not have authority to assert and prosecute tort claims for alleged design or construction defects related to the condominiums owned by the individual owners. Furthermore, assuming *arguendo*, that Saddle Ridge does have standing to assert tort claims against the Debtors, such claims are barred by both: (i) the three year statute of limitations in Montana Code Annotated § 27-2-204 because the condominiums were completed and sold between September, 1997 and May, 2002; and (ii) the ten year statute of repose in Montana Code Annotated § 27-2-208 because construction of nearly all of the condominiums was completed more than ten years prior to the Commencement Date. Similarly, any claims or causes of action that Saddle Ridge may assert against the Debtors based upon theories of fraud and/or mistake are barred by the two year statute of limitations in Montana Code Annotated § 27-2-203. The Debtors also argue in the Saddle Ridge Claims Objection that the Saddle Ridge Claims are not based upon any instrument in writing and, for various reasons, are purely speculative. The Saddle Ridge Claims Objection is set for hearing on

44

September 7, 2011.

On August 12, 2011, Saddle Ridge filed a supplemental objection [Docket No. 770] to the Disclosure Statement asserting, among other things, that the Disclosure Statement fails to address the pre-confirmation timing of the filing of the Debtors' Saddle Ridge Claims Objection and that such timing results in Saddle Ridge becoming not entitled to vote on behalf of its claims. As explained in Section I(B) of this Disclosure Statement, in the Solicitation Procedures Order, the Bankruptcy Court approved certain Voting Procedures which provide a mechanism by which a creditor may challenge the allowance of its claims for voting purposes. Specifically, such creditor must serve on the Debtors and file with the Bankruptcy Court a Rule 3018 Motion, which seeks temporary allowance of the creditor's claim for purposes of voting to accept or reject the Plan, on or before the tenth day after service of notice of the objection to such claim.

On August 23, 2011, the Debtors filed a motion for summary disposition of the Saddle Ridge Claims (the "Saddle Ridge Claims Disposition Motion") [Docket No. 794] seeking full dismissal of the claims based on the fact that such claims are legally and factual unenforceable. In the Saddle Ridge Claims Disposition Motion, the Debtors make the following assertions, among others, supporting dismissal of the Saddle Ridge Claims: any claims by Saddle Ridge against the Debtors for design and construction defects and warranty are barred by the applicable statutes of limitation; the Debtors are not liable for claims arising out of the design, construction, and planning of the Saddle Ridge condominiums based on the statute of repose, which did not extend the statute of limitations and was not tolled by the Debtors' chapter 11 filing; and any claims by Saddle Ridge against the Debtors that may still be viable are barred based on the equitable doctrine of laches because Saddle Ridge's unreasonable delay or negligence in bringing claims has prejudiced the Debtors. The deadline to file objections to the Saddle Ridge Claims Disposition Motion is September 6, 2011.

The Debtors estimate, and the projected percentage recoveries listed in Section II(B) and information contained in Section V(G) assume, that the Saddle Ridge Claims will be Allowed at $0. The recovery available for holders of Moonlight Mezz Class 4 Claims and/or Subsidiary Debtor Class 4 Claims may be less if the Saddle Ridge Claims are Allowed in any amount.

## 2.    The Debtors' Claims Against Saddle Ridge

Additionally, the Debtors believe that they have claims against Saddle Ridge totaling approximately $76,895.25 for pre- and postpetition services provided by the Debtors to Saddle Ridge. Such services include: (i) snow removal and road maintenance for the common access roads providing ingress and egress to the Saddle Ridge subdivision; (ii) community bridge and trail maintenance for the ski easements, lifts, and bridges, which provide ski-in/ski-out access to the Saddle Ridge subdivision, and maintenance of the summer trail network; (iii) waste disposal and recycling in connection with the aforementioned maintenance services; (iv) Resort access services related to the entryway building to the Resort, including, but not limited to, concierge services, management of commercial traffic to and from the Resort, and general information services in connection with ski lift operation status, Resort directions, and Resort events and activities; and (v) administrative services including research, billing, tracking,

database management, and mailing fees.  These claims and any Causes of Action arising from, related to, or in connection therewith are explicitly and unequivocally retained by the Debtors, as explained in Section VI(I)(5) of this Disclosure Statement regarding the retention of all Causes of Action, and will be transferred to the Lender Designee(s) pursuant to and subject to the terms and conditions of the Settlement and Sale Agreement.

## VI.     THE CHAPTER 11 PLAN

The Plan is annexed hereto as Exhibit 1 and forms a part of this Disclosure Statement.  Statements as to the rationale underlying the treatment of Claims and Equity Interests under the Plan and the description of the Debtors' businesses and financial affairs are not intended to, and shall not, waive, compromise or limit any rights, claims or causes of action or bind any persons in the event the Plan is not confirmed.

### A.     CONSIDERATIONS REGARDING THE PLAN

The primary focus of the Chapter 11 Cases to date has been the disputes between the Debtors and the Lenders over the validity of the Lenders' Claims and Liens.  Significantly, if the Lenders were to win the Adversary Proceeding and, as a result, the Prepetition Lender Secured Claims were Allowed, holders of Allowed general, unsecured non-priority claims would not recover on account of such Claims.  Given the Bankruptcy Court's rulings in the Adversary Proceeding to date, it is questionable at best that the Debtors would successfully defeat the Lenders' Claims in the Adversary Proceeding.

The Debtors believe that the Lenders' settlement offer ensures that their creditors would receive a distribution on their Claims notwithstanding the fact that the Lenders are undersecured and would serve to avoid the risk associated with continued litigation.  The Debtors recognize that they now have an assured path for their businesses to exit bankruptcy and continue to thrive without the overhang of the bankruptcy.

The cornerstones of the Plan are (i) the Settlement and Sale Agreement, substantially in the form attached hereto as Exhibit 2, that resolves all claims between the Debtor Parties and the Lenders and provides for a transfer of assets to the Lenders and (ii) the Lenders' agreement to fund distributions under the Plan, including providing funds sufficient to pay administrative expense claims and the expense of the wind-down, and to fund distributions to general unsecured creditors.  Specifically, through the Plan and the Lenders' agreements with respect thereto, the Debtors are now able to provide their creditors with a significantly greater recovery than would otherwise be available if the Prepetition Lender Secured Claims were allowed, as the Plan provides (i) for a Cash distribution to each holder of an Allowed Convenience Claim in an amount equal to the full amount of such Claim from the Convenience Claims Cash Reserve, and (ii) that each holder of an Allowed General Unsecured Claim will receive its Pro Rata share of Cash from the General Unsecured Claims Cash Reserve.  In addition, the Lenders have agreed that any cure amounts owed under executory contracts and unexpired leases that are being assumed by the Debtors and assigned to the Lenders or the Lender Designee(s) under the Plan will be paid by the Lenders or the Lender Designee(s).

As explained in Section II(A) above, the General Unsecured Claims Cash Reserve, Convenience Claims Cash Reserve, Plan Administration Cash Reserve, and Professional Compensation and Reimbursement Claims Cash Reserve will be funded by LCPI despite the fact that the Prepetition Lender Deficiency Claim will not be satisfied in full under the Plan as the Lenders have agreed to waive their rights to any distributions on account of such Claims. Thus, the Debtors believe that through the Plan, holders of Allowed Claims are assured a greater recovery than the recovery they would receive if the Lenders had prevailed in the Adversary Proceeding or in a liquidation under chapter 7 of the Bankruptcy Code.

The proposed payment to general unsecured creditors under the Plan is significantly greater than what such creditors would have received if the Debtors had filed chapter 7 liquidation cases. In November of 2009, the Debtors alleged that the Resort had a value of approximately $127,572,000. At the same time, the Lenders claimed that the Resort had a value of approximately $50 million based upon a recent appraisal. Based upon these values, the Lenders held a Prepetition Lender Deficiency Claim in an amount ranging from approximately $80 million to $150 million. If the Debtors filed chapter 7 cases, any distribution to unsecured creditors (which, as explained in the next paragraph, would have been minimal in any case) would have gone primarily to the Lenders because of the sheer size of their Prepetition Lender Deficiency Claims. In other words, in a liquidation scenario under chapter 7 of the Bankruptcy Code, the Lenders would not waive their rights to any distributions on account of the Prepetition Lender Deficiency Claims, and such Claims would substantially dilute the recoveries to holders of general unsecured claims. As a result, payment to unsecured creditors other than the Lenders would have been de minimis. The current Plan benefits unsecured creditors by paying them substantially more than they would have received if the Debtors had filed chapter 7 bankruptcy cases in 2009.

Furthermore, as of the Commencement Date of the Chapter 11 Cases, the only unsecured assets of the Debtors of any significance were a few parcels of real estate owned by Moonlight Basin Ranch. The assets of the other Debtors were all subject to first liens of the Lenders and liens of other secured creditors. The Debtors estimate that the unsecured real property owned by Moonlight Basin Ranch had a value of approximately $2,463,702.00. If those parcels of real estate had been liquidated in a chapter 7 bankruptcy, the distribution to unsecured creditors, after deducting the professional fees paid to a chapter 7 trustee to administer the liquidation proceedings, would have been approximately $2,204,082.00. Nearly all of this amount would have been paid to the Lenders on account of their Prepetition Lender Deficiency Claims. Indeed, because the unsecured claims as of the Commencement Date totaled $1,346,298.00 (as estimated by the Debtors), the holders of such claims would have only been entitled to a recovery of 1.66% (if the value of the Prepetition Lender Deficiency Claims was $80,000,000.00) or 0.89% (if the value of the Prepetition Lender Deficiency Claims was $150,000,000.00). The most the holders of unsecured claims would have received in total had the Debtors been liquidated would have been $36,588.00 or $19,616.00, depending on the size of the deficiency claim. Thus, it is clear that the amounts being paid to unsecured creditors under the Plan substantially exceed what would have been available for payment to such creditors under a chapter 7 liquidation. As such, the Debtors believe that the chapter 11 process has created substantial value for unsecured creditors in this case, as it led to the settlement with the

47

Lenders, the Lenders' agreement to provide recoveries to unsecured creditors, and the Lenders' agreement to waive their substantial Prepetition Lender Deficiency Claims.

**B.     CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS**

The following summarizes the classification and treatment of Claims and Equity Interests under the Plan:

**1.     Treatment of DIP Financing Claims, Administrative Expense Claims, and Priority Tax Claims**

**a.     *DIP Financing Claims*.**  Except to the extent that a holder of a DIP Financing Claim agrees to less favorable treatment prior to the Effective Date and as otherwise set forth in the Plan, on the Effective Date the Debtors shall pay or cause the payment of all Cash remaining in the Debtors' Estates other than the Cash Reserves to pay down the amount outstanding under the DIP Loan Documents.  The remainder of the obligations under the DIP Loan Documents shall be repaid from any amounts remaining in the Professional Compensation and Reimbursement Claims Cash Reserve, the Convenience Claims Cash Reserve, and the Plan Administration Cash Reserve as set forth in Sections 8.5(c), 8.5(e) and 8.15 of the Plan, respectively, the proceeds from the liquidation of Debtor Excluded Assets pursuant to Section 8.5(f) of the Plan, and any unclaimed, undeliverable distributions to holders of Allowed Claims pursuant to Section 8.8(b) of the Plan, and any other Cash that may be recovered by the Debtors or Post-Effective Date Debtors after the Effective Date.  After all of the foregoing amounts have been distributed to LCPI in accordance with the Plan, the DIP Loan Documents shall terminate, other than with respect to the provisions thereof that expressly survive termination.  On the Effective Date all unfunded commitments of LCPI under the DIP Loan Documents shall terminate, subject to payment of the Cash Reserves and other amounts in accordance with the terms of Section 3.1 of the Plan.

**b.     *Administrative Expense Claims*.**  Except to the extent that a holder of an Allowed Administrative Expense Claim agrees to less favorable treatment or an Allowed Administrative Expense Claim, each holder of an Allowed Administrative Expense Claim shall receive Cash from the Debtor or the Post-Effective Date Debtor, as applicable, obligated for the payment of such Allowed Administrative Expense Claim in an amount equal to the full amount of such Allowed Administrative Expense Claim on the later of the Effective Date and the date such Administrative Expense Claim becomes an Allowed Administrative Expense Claim, or as soon thereafter as is practicable; provided, however, that Allowed Administrative Expense Claims representing liabilities incurred in the ordinary course of business, consistent with past practice, by such Debtor or Post-Effective Date Debtor and other obligations incurred by such Debtor or Post-Effective Date Debtor shall be paid in full and performed by the Debtor or Post-Effective Date Debtor, as applicable, in the ordinary course of business in accordance with the terms and subject to the conditions of any agreements governing, instruments evidencing, or other documents relating to such transactions.

**c.     *Professional Compensation and Reimbursement Claims*.**  Any entity seeking an award of the Bankruptcy Court of a Professional Compensation and Reimbursement Claim shall (i) file its final application for allowance of such Claim by no later than the date that

48

is [30] days after the Effective Date or such other date as may be fixed by the Bankruptcy Court, and (ii) to the extent such entity has not already been paid in full on account of such Claim, be paid by or on behalf of the Post-Effective Date Debtor in full and in Cash from the Professional Compensation and Reimbursement Claims Cash Reserve in the amounts Allowed upon (x) the date the order granting such award becomes a Final Order, or as soon thereafter as practicable, or (y) such other terms as may be mutually agreed upon by the claimant and the Debtor obligated for the payment of such Allowed Claim.  The Post-Effective Date Debtors are authorized to pay compensation for professional services rendered and reimburse expenses incurred after the Effective Date in the ordinary course and without Bankruptcy Court approval.

        d.     ***Priority Tax Claims***.  Except to the extent that a holder of an Allowed Priority Tax Claim has been paid by a Debtor prior to the Effective Date or agrees to less favorable treatment, each holder of an Allowed Priority Tax Claim shall receive from the Debtor or Post-Effective Date Debtor obligated for the payment of such Allowed Priority Tax Claim, as applicable, and at the sole option of such Debtor or Post-Effective Date Debtor, (i) Cash in an amount equal to such Allowed Priority Tax Claim on the later of the Effective Date and the date such Priority Tax Claim becomes an Allowed Priority Tax Claim, or as soon thereafter as is practicable, or (ii) equal Cash payments to be made initially on the Effective Date or as soon thereafter as is practicable and semi-annually thereafter in an amount equal to such Allowed Priority Tax Claim, together with interest at a fixed annual rate determined under applicable non-bankruptcy law, over a period from the Effective Date through the fifth (5th) anniversary after the Commencement Date; <u>provided</u>, <u>however</u>, that such election shall be without prejudice to the right of a Debtor or Post-Effective Date Debtor to prepay such Allowed Priority Tax Claim in full or in part without penalty.

      **2.**     **<u>Treatment of Claims Against and Equity Interests In Moonlight Mezz</u>**

      a.     ***Moonlight Mezz Class 1 – Priority Non-Tax Claims***

      i.  *Impairment and Voting*.  Moonlight Mezz Class 1 is unimpaired by the Plan.  To the extent there are any holders of an Allowed Priority Non-Tax Claim in Moonlight Mezz Class 1, each of such holders is not entitled to vote to accept or reject the Plan and shall be conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.[46]

      ii.  *Distributions*.  Except to the extent that the holder of an Allowed Priority Non-Tax Claim in Moonlight Mezz Class 1 agrees to less favorable treatment or has been paid by or on behalf of Moonlight Mezz on account of such Priority Non-Tax Claim prior to the Effective Date, on the later of the Effective Date and the date such Priority Non-Tax Claim becomes an Allowed Priority Non-Tax Claim, or as soon thereafter as is practicable, each holder, if any, of an Allowed Priority Non-Tax Claim in Moonlight Mezz Class 1 shall be paid by Moonlight Mezz in Cash in an amount equal to the Allowed amount of such Priority Non-Tax Claim.

---

[46] The Debtors are not aware of any Claims in Moonlight Mezz Class 1.

### b.   *Moonlight Mezz Class 2 – Other Secured Claims*

i.   *Impairment and Voting.*  Moonlight Mezz Class 2 is impaired by the Plan. To the extent there are any holders of an Allowed Secured Claim in Moonlight Mezz Class 2, each of such holders is entitled to vote to accept or reject the Plan.[47]

ii.   *Distributions.*  Except to the extent that the holder of an Allowed Other Secured Claim agrees to less favorable treatment, each holder, if any, of an Allowed Secured Claim in Moonlight Mezz Class 2 shall be satisfied by, at the option of the applicable Debtor: (1) payment in Cash by Moonlight Mezz in an amount equal to the Allowed amount of such Secured Claim on the later of the Effective Date and the date such Secured Claim becomes an Allowed Secured Claim; (2) the sale or disposition proceeds of the Collateral securing such Allowed Secured Claim to the extent of the value of the Collateral securing such Allowed Secured Claim; or (3) such treatment that leaves unaltered the legal, equitable, and contractual rights to which the holder of the Allowed Secured Claim is entitled.  In the event an Allowed Secured Claim is treated under clause (1) or (2) above, the Liens securing such Claim shall be deemed released and extinguished without further order of the Bankruptcy Court.

### c.   *Moonlight Mezz Class 3 – Prepetition Lender Secured Claims*

i.   *Impairment and Voting*.  Moonlight Mezz Class 3 is impaired by the Plan. Each holder of a Prepetition Lender Secured Claim in Moonlight Mezz Class 3 is entitled to vote to accept or reject the Plan.

ii.   *Distributions.*  Except to the extent that the holder of an Allowed Prepetition Lender Secured Claim in Moonlight Mezz Class 3 agrees to less favorable treatment prior to the Effective Date, each holder of an Allowed Prepetition Lender Secured Claim in Moonlight Mezz Class 3 shall be satisfied by the transfer to the applicable Lender Designee(s) of the Debtor Purchased Assets held by Moonlight Mezz, as further provided in Section 2.5 of the Plan and in the Settlement and Sale Agreement.

### d.   *Moonlight Mezz Class 4 – General Unsecured Claims*

i.   *Impairment and Voting.*  Moonlight Mezz Class 4 is impaired by the Plan. To the extent there are any holders of an Allowed General Unsecured Claim in Moonlight Mezz Class 4, each of such holders is entitled to vote to accept or reject the Plan.[48]

ii.   *Distributions.*  Except to the extent that the holder of an Allowed General Unsecured Claim in Moonlight Mezz Class 4 agrees to less favorable treatment or has been paid by or on behalf of Moonlight Mezz on account of such General Unsecured Claim prior to the Effective Date, each holder, if any, of an Allowed General Unsecured Claim in Moonlight Mezz

---

[47]  The Debtors are not aware of any Claims in Moonlight Mezz Class 2.

[48]  The Debtors are not aware of any Claims in Moonlight Mezz Class 4 other than the Prepetition Lender Deficiency Claims, on which the Lenders have agreed to unconditionally, irrevocably, and forever waive all rights of distribution.

Class 4 shall receive its Pro Rata share of Cash from the General Unsecured Claims Cash Reserve on the Initial Distribution Date.

### e.   *Moonlight Mezz Class 5 – Convenience Claims*

i.   *Impairment and Voting*.  Moonlight Mezz Class 5 is impaired by the Plan. To the extent there are any holders of an Allowed Convenience Claim in Moonlight Mezz Class 5, each of such holders is entitled to vote to accept or reject the Plan.

ii.   *Distributions*.  Except to the extent that the holder of an Allowed Convenience Claim in Moonlight Mezz Class 5 agrees to less favorable treatment or has been paid by or on behalf of Moonlight Mezz on account of such Convenience Claim prior to the Effective Date, each holder, if any, of an Allowed Convenience Claim shall receive Cash from the Convenience Claims Cash Reserve in an amount equal to such Allowed Convenience Claim on the later of the Effective Date and the date such Convenience Claim becomes an Allowed Convenience Claim, or as soon thereafter as is practicable..

iii.   *Convenience Claim Election*.  Each holder of a Claim Allowed in an amount greater than $10,000.00, which Claim would otherwise be a General Unsecured Claim in Moonlight Mezz Class 4, may elect to voluntarily reduce such Claim to $10,000.00 and be treated as the holder of an Allowed Convenience Claim for purposes of the Plan.  Such election must be made on the Ballot and be received by the Debtors on or prior to the Voting Deadline. Any election made after the Voting Deadline shall not be binding upon the Debtors unless the Voting Deadline is expressly waived, in writing, by the Debtors with the consent of the Lenders; provided, however, that, under no circumstance may such waiver by the Debtors occur on or after the Effective Date.

### f.   *Moonlight Mezz Class 6 – Equity Interests*

i.   *Impairment and Voting*.  Moonlight Mezz Class 6 is impaired by the Plan. Each holder of an Equity Interest is not entitled to vote to accept or reject the Plan and is conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.

ii.   *Distributions*.  On the Effective Date, all Equity Interests in Moonlight Mezz shall be cancelled and deemed of no force and effect, and new equity in Moonlight Mezz shall be issued to the Plan Administrator or its designee in accordance with Sections 8.4(b) and 8.4(c) of the Plan.  Each holder of an Equity Interest in Moonlight Mezz shall neither receive nor retain any property or interest in property on account of such Equity Interests.  The rights of the holders of former Equity Interests in Moonlight Mezz shall be nontransferable.

### 3.   Treatment of Claims Against and Equity Interests in the Subsidiary Debtors

### a.   *Subsidiary Debtor Class 1 – Priority Non-Tax Claims*

i.   *Impairment and Voting*.  Each Subsidiary Debtor Class 1 is unimpaired by the Plan. Each holder of an Allowed Priority Non-Tax Claim in each Subsidiary Debtor Class 1

51

is not entitled to vote to accept or reject the Plan and shall be conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.[49]

   ii. *Distributions.* Except to the extent that the holder of an Allowed Priority Non-Tax Claim in each Subsidiary Debtor Class 1 agrees to less favorable treatment or has been paid by or on behalf of the applicable Subsidiary Debtor on account of such Priority Non-Tax Claim prior to the Effective Date, on the later of the Effective Date and the date such Priority Non-Tax Claim becomes an Allowed Priority Non-Tax Claim, or as soon thereafter as is practicable, each holder, if any, of an Allowed Priority Non-Tax Claim in each Subsidiary Debtor Class 1 shall be paid by the applicable Subsidiary Debtor in Cash in an amount equal to the Allowed amount of such Priority Non-Tax Claim.

   **b.** ***Subsidiary Debtor Class 2 – Other Secured Claims***

   i. *Impairment and Voting.* Each Subsidiary Debtor Class 2 is impaired by the Plan.  Each holder of an Allowed Secured Claim in each Subsidiary Debtor Class 2 is entitled to vote to accept or reject the Plan.[50]

   ii. *Distributions.* Except to the extent that the holder of an Allowed Other Secured Claim agrees to less favorable treatment, each holder, if any, of an Allowed Secured Claim in each Subsidiary Debtor Class 2 shall be satisfied by, at the option of the applicable Subsidiary Debtor: (1) payment in Cash by such Subsidiary Debtor in an amount equal to the Allowed amount of such Secured Claim on the later of the Effective Date and the date such Secured Claim becomes an Allowed Secured Claim; (2) the sale or disposition proceeds of the Collateral securing such Allowed Secured Claim to the extent of the value of the Collateral securing such Allowed Secured Claim; or (3) such treatment that leaves unaltered the legal, equitable, and contractual rights to which the holder of the Allowed Secured Claim is entitled.  In the event an Allowed Secured Claim is treated under clause (1) or (2) above, the Liens securing such Claim shall be deemed released and extinguished without further order of the Bankruptcy Court.

   **c.** ***Subsidiary Debtor Class 3 – Prepetition Lender Secured Claims***

   i. *Impairment and Voting.* Each Subsidiary Debtor Class 3 is impaired by the Plan.  Each holder of a Prepetition Lender Secured Claim in each Subsidiary Debtor Class 3 is entitled to vote to accept or reject the Plan.

   ii. *Distributions.* Except to the extent that the holder of an Allowed Prepetition Lender Secured Claim in each Subsidiary Debtor Class 3 agrees to less favorable treatment or has been paid by or on behalf of the applicable Subsidiary Debtor on account of such Prepetition Lender Secured Claim prior to the Effective Date, each holder of an Allowed Prepetition Lender Secured Claim in each Subsidiary Debtor Class 3 shall be satisfied by the

---

[49]  The Debtors are not aware of any Claims in Subsidiary Debtor Class 1.

[50]  The Debtors are not aware of any Claims in Moonlight Lodge Class 2, Lone Mountain Class 2, Moonlight Spa Class 2, or Treeline Class 2.

transfer to the applicable Lender Designee(s) of the Debtor Purchased Assets held by such Subsidiary Debtor, as further provided in Section 2.5 of the Plan and in the Settlement and Sale Agreement.

### d.   *Subsidiary Debtor Class 4 – General Unsecured Claims*

i.   *Impairment and Voting.*  Each Subsidiary Debtor Class 4 is impaired by the Plan.  Each holder of an Allowed General Unsecured Claim in each Subsidiary Debtor Class 4 is entitled to vote to accept or reject the Plan.[51]

ii.   *Distributions.*  Except to the extent that the holder of an Allowed General Unsecured Claim in each Subsidiary Debtor Class 4 agrees to less favorable treatment or has been paid by or on behalf of the applicable Subsidiary Debtor on account of such General Unsecured Claim prior to the Effective Date, each holder, if any, of an Allowed General Unsecured Claim in each Subsidiary Debtor Class 4 shall receive its Pro Rata share of Cash from the General Unsecured Claims Cash Reserve on the Initial Distribution Date.[52]

### e.   *Subsidiary Debtor Class 5 – Convenience Claims*

i.   *Impairment and Voting.*  Each Subsidiary Debtor Class 5 is impaired by the Plan. To the extent there are any holders of an Allowed Convenience Claim in Subsidiary Debtor Class 5, each of such holders is entitled to vote to accept or reject the Plan.

ii.   *Distributions.*  Except to the extent that the holder of an Allowed Convenience Claim in each Subsidiary Debtor Class 5 agrees to less favorable treatment or has been paid by or on behalf of the applicable Subsidiary Debtor on account of such Convenience Claim prior to the Effective Date, each holder, if any, of an Allowed Convenience Claim shall receive Cash from the Convenience Claims Cash Reserve in an amount equal to such Allowed Convenience Claim on the later of the Effective Date and the date such Convenience Claim becomes an Allowed Convenience Claim, or as soon thereafter as is practicable.

iii.   *Convenience Claim Election.*  Each holder of a Claim Allowed in an amount greater than $10,000.00, which Claim would otherwise be a General Unsecured Claim in Subsidiary Debtor Class 4, may elect to voluntarily reduce such Claim to $10,000.00 and be treated as the holder of an Allowed Convenience Claim for purposes of the Plan.  Such election must be made on the Ballot and be received by the Debtors on or prior to the Voting Deadline. Any election made after the Voting Deadline shall not be binding upon the Debtors unless the Voting Deadline is expressly waived, in writing, by the Debtors with the consent of the Lenders; provided, however, that, under no circumstance may such waiver by the Debtors occur on or after the Effective Date.

---

[51]  The Debtors are not aware of any Claims in Lone Mountain Class 4, Moonlight Spa Class 4, Moonlight Golf Class 4, or Treeline Class 4 other than the Prepetition Lender Deficiency Claims, on which the Lenders have agreed to unconditionally, irrevocably, and forever waive all rights of distribution.

[52]  See Section 10.1 of the Plan for treatment of Claims arising under executory contracts and unexpired leases that are being assumed and assigned under the Plan, as set forth on Schedule 1 to the Plan.

f.   *Subsidiary Debtor Class 6 – Equity Interests*

i.   *Impairment and Voting*.  Each Subsidiary Debtor Class 6 is impaired by the Plan.  Each holder of an Equity Interest is not entitled to vote to accept or reject the Plan and is conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.

ii.   *Distributions*.  On the Effective Date, all Equity Interests in each Subsidiary Debtor shall be cancelled and deemed of no force and effect, and new equity in each Reorganized Subsidiary Debtor shall be issued to the Plan Administrator or its designee in accordance with Sections 8.4(b) and 8.4(c) of the Plan.  Each holder of an Equity Interest in any of the Subsidiary Debtors shall neither receive nor retain any property or interest in property on account of such Equity Interests.  The rights of the holders of former Equity Interests in the Subsidiary Debtors shall be nontransferable.

C.   **IMPLEMENTATION OF THE PLAN**

1.   **Establishment of the Cash Reserves.**  Each Cash Reserve shall consist of Cash advanced to Moonlight Basin Ranch by LCPI under the DIP Loan Documents that, absent LCPI's willingness to make payments for the benefit of creditors, would be otherwise repaid to LCPI in its capacity as a holder of a DIP Financing Claim and that instead shall be transferred to each of the Post-Effective Date Debtors to be used by the Plan Administrator in accordance with the terms of and subject to the conditions set forth in the Plan.

2.   **Plan Administrator.**

a.   The Confirmation Order shall name the Plan Administrator to implement the terms of the Plan.

b.   The Plan Administrator shall be designated by the Lenders in consultation with the Debtors.

c.   The salient terms of the Plan Administrator's employment, including the Plan Administrator's duties and compensation (which compensation shall be negotiated by the Plan Administrator, the Debtors, and the Lenders), to the extent not set forth in the Plan, shall be set forth in the Confirmation Order.  The Plan Administrator shall be entitled to reasonable compensation in an amount consistent with that of similar functionaries in similar types of bankruptcy proceedings.

d.   The Plan Administrator's duties shall be subject to a budget in a form reasonably acceptable to the Debtors and the Lenders.  The Plan Administrator shall periodically check the budget and if the Plan Administrator, in its judgment, believes that it is unlikely that the funds allocated to a particular line item will be used in full, such remaining funds shall be promptly returned to LCPI.

e.   The Lenders may terminate the Plan Administrator for cause.  In the event the Plan Administrator  is terminated for cause by the Lenders, dies (if applicable), or resigns for any reason, the Lenders shall designate a successor.  The Plan Administrator shall be required to

54

disclose its connections, if any, with the Debtors, their creditors, any other party in interest, and the U.S. Trustee.

      **3.**    **Duties and Powers of the Plan Administrator.**  The Plan Administrator, together with its representatives and professionals, shall administer the Plan with respect to the Debtors.  The duties and powers of the Plan Administrator shall include all powers necessary to implement the Plan and administrate and liquidate the assets of the Debtors, including, without limitation, the duties and powers listed herein.

      **a.**    *Authority*.  The Plan Administrator may exercise all power and authority that may be or could have been exercised, commence all proceedings that may be or could have been commenced, and take all actions that may be or could have been taken by an officer, director, partner, or member, as applicable, of each Debtor with like effect as if authorized, exercised, and taken by unanimous action, without need for additional approval, including, without limitation, amendment of the organizational documents and operating agreements of such Debtor and the dissolution of such Debtor.  For the avoidance of doubt, to the extent there is any transaction contemplated under the Settlement and Sale Agreement, including without limitation, the transfer of all Beverage Licenses, and all other Debtor Purchased Assets, including, without limitation, the Debtor Purchased Assets of Treeline, to the applicable Lender Designee(s), that have not been fully consummated on the Effective Date, the Plan Administrator shall, and shall have the authority to, execute, deliver, implement and fully perform any and all obligations, instruments, documents and papers that may be necessary or appropriate to consummate such transaction.

      **b.**    *Claims*.  The Plan Administrator may object to, seek to subordinate, compromise, or settle any or all Claims against the Debtors, subject to receiving consent from the Lenders.

      **c.**    *Liquidation of Assets*.  The Plan Administrator shall, on behalf of the Post-Effective Date Debtors, in an expeditious but orderly manner, liquidate and convert to cash the Debtor Excluded Assets, make timely distributions, and not unduly prolong the duration of the Debtors.  In so doing, the Plan Administrator shall exercise its reasonable business judgment in liquidating the Debtor Excluded Assets of the Post-Effective Date Debtors to maximize recoveries; provided, however, in the event the Lenders elect to treat the Sagebrush Assets or the Treeline Assets as an Excluded Asset at Closing, the Plan Administrator shall adhere to the treatment of the Sagebrush Assets and the Sagebrush Interests and/or the Treeline Assets, respectively, set forth in Settlement and Sale Agreement.  The liquidation of the Debtor Excluded Assets may be accomplished through the sale of such assets (in whole or in combination, and including the sale of any Causes of Action), through the prosecution, compromise and settlement, abandonment, or dismissal of any or all claims or Causes of Action, or otherwise; provided, however, that the proceeds of such liquidation shall be distributed in accordance with Section 8.5(e) of the Plan.

      **d.**    *Abandoning Assets*.  The Plan Administrator may abandon in any commercially reasonably manner, including abandonment or donation to a charitable organization of its choice, any Debtor Excluded Assets, if it concludes that they are of no benefit to the applicable Debtor's Estate.

        **e.**    ***Retention of Professionals***.  The Plan Administrator, with the Lenders' consent, may retain professionals to assist it in performing its duties hereunder.

        **f.**    ***Books and Records***.  The Plan Administrator shall maintain the Debtors' books and records, maintain accounts, make distributions, and take other actions consistent with the Plan and the implementation hereof.

        **g.**    ***Agreements***.  The Plan Administrator, with the Lenders' consent, may enter into any agreement or execute any document required by or consistent with the Plan and perform all of the Debtors' obligations thereunder.

        **h.**    ***Investment Power***.  The right and power of the Plan Administrator to invest any of the Debtors' Cash, including cash proceeds from the liquidation of any Debtor Excluded Assets of the Debtors and the realization or disposition of any Causes of Action, and any income earned by the Debtors shall be limited to the right and power to invest such Cash in United States Treasury Bills, interest-bearing certificates of deposit, tax exempt securities having at the time of acquisition an investment grade credit rating as assigned by a nationally recognized credit rating service or investments permitted by section 345 of the Bankruptcy Code or otherwise authorized by the Bankruptcy Court, using prudent efforts to enhance the rates of interest earned on such Cash without inordinate credit risk or interest rate risk; <u>provided</u>, <u>however</u>, that the Plan Administrator may expend the Cash of the Debtors to effectuate the provisions of the Plan.

        **i.**    ***Tax Obligations***.  The Plan Administrator shall have the powers of administration regarding all of the Debtors' tax obligations, including filing of returns.  The Plan Administrator shall (i) endeavor to complete and file within 90 days after the dissolution of the Debtors' final federal, state and local tax returns, (ii) request, if necessary, an expedited determination of any unpaid tax liability of the Debtors or their Estates under Bankruptcy Code section 505(b) for all taxable periods of the Debtors ending after the Commencement Date through the dissolution of such respective Debtors as determined under applicable tax laws and (iii) represent the interest and account of the Debtors or their Estates before any taxing authority in all matters including, without limitation, any action, suit, proceeding or audit.

        **j.**    ***Reporting Duties***.  The Plan Administrator shall be responsible for filing informational returns on behalf of the Debtors and paying any tax liability of the Debtors.  The Plan Administrator shall file (or cause to be filed) any other statements, returns or disclosures relating to the Debtors that are required by any governmental unit or applicable law.

        **k.**    ***Other Actions***.  The Plan Administrator may take all other actions not inconsistent with the provisions of the Plan which the Plan Administrator deems reasonably necessary or desirable with respect to administering the Plan.

        **4.**    <u>**Directors/Officers/Equity/Assets of the Debtors on the Effective Date.**</u>

        **a.**    On the Effective Date, the authority, power and incumbency of the persons then acting as directors and officers of the Debtors shall be terminated and such directors and officers shall be deemed to have resigned.

56

       **b.**     On the Effective Date, all the then Equity Interests in the Debtors (including all instruments evidencing such Equity Interests) shall be canceled and extinguished without further action under any applicable agreement, law, regulation, or rule.

       **c.**     On the Effective Date, the Plan Administrator and/or its designee(s), which designee(s) shall be determined with consent of the Lenders, shall be deemed to hold, collectively (as applicable), 100% of the equity interests in each of the Debtors; provided, however, the Plan Administrator and its designee(s), shall have voting power only, and shall retain no economic benefit from their equity interests in the Debtors.

       **d.**     On the Effective Date, the Plan Administrator shall be appointed as and become, and shall succeed to such powers as would have been applicable to, each Debtor's officers, directors, managing member, and/or general partner, as applicable.

       **e.**     Notwithstanding anything to the contrary herein, all assets of the Debtors shall remain assets of the Debtors until they are transferred or distributed by the Plan Administrator pursuant to the terms of the Plan and/or the Settlement and Sale Agreement.

       **f.**     After the Effective Date, the Plan Administrator may decide, in its sole discretion, to maintain each Debtor as a partnership or limited liability company in good standing until such time as all aspects of the Plan pertaining to such Debtor have been completed (provided, however, that each Debtor shall conduct no business except as necessary or appropriate to implement the Plan) or at such time as the Plan Administrator considers appropriate and consistent with the implementation of the Plan pertaining to such Debtor may dissolve such Debtor and complete the winding up of such Debtor in accordance with applicable law.  In connection with the liquidation of each Debtor, the Plan Administrator may act as liquidating agent for such Debtor or transfer all assets of such Debtor to a trust or other entity created to make distributions to holders of Allowed Claims against such Debtor.  The Plan Administrator may act as trustee of such a trust if and as permitted by law or in the capacity of management of any other entity created to make such distributions.  As soon as practicable after all aspects of the Plan pertaining to a Debtor has been completed, such Debtor shall be dissolved and wound up in accordance with applicable law.

       **g.**     As of the Effective Date, the organizational documents and operating agreements of each Debtor shall be amended to the extent necessary to carry out the provisions of the Plan.

    **D.**     **PLAN PROVISIONS GOVERNING DISTRIBUTIONS**

       Distributions to holders of Claims against the Debtors shall be made by the Plan Administrator in accordance with the terms of the Plan.

    **1.**    **Method of Distributions under the Plan.**

       **a.**     All distributions to holders of Allowed Claims (other than Prepetition Lender Secured Claims and Claims assumed by the applicable Lender Designee(s)) against the Debtors shall be made by the Plan Administrator in accordance with the terms of the Plan.

**b.**     As Administrative Expense Claims, Priority Tax Claims, and Other Priority Claims become Allowed, the Plan Administrator shall pay the holders of such Allowed Claims in Cash as provided hereunder.

**c.**     As Professional Compensation and Reimbursement Claims become Allowed, the Plan Administrator shall pay the holders of such Allowed Claims in accordance with Section 3.3 of the Plan.  In the event that all holders of Allowed Professional Compensation and Reimbursement Claims have been paid in full on account of such Claims after all final applications for allowance of such Claims have been resolved and there is remaining Cash in the Professional Compensation and Reimbursement Claims Reserve, then the Plan Administrator shall distribute all remaining Cash from the Professional Compensation and Reimbursement Claims Cash Reserve to LCPI on account of its DIP Financing Claim.

**d.**     On the Initial Distribution Date, the Plan Administrator shall make payments to holders of Allowed General Unsecured Claims in accordance with Sections 5.4 and 6.4 of the Plan.

**e.**     On the Effective Date or as soon thereafter as is possible as determined by the Plan Administrator, in its sole discretion, the Plan Administrator shall make payments to holders of Allowed Convenience Claims in accordance with Sections 5.5 and 6.5 of the Plan, but in no event shall the first distribution occur later than the Initial Distribution Date.  In the event all holders of Allowed Convenience Claims have received payment in full on account of their Claims after the resolution of all Disputed Claims and there is remaining cash in the Convenience Claims Cash Reserve, then the Plan Administrator shall distribute all remaining Cash from the Convenience Claims Cash Reserve to LCPI on account of its DIP Financing Claim.

**f.**     The net proceeds of any Debtor Excluded Assets liquidated on or after the Effective Date by the Plan Administrator pursuant to Section 8.3(c) of the Plan or any other recoveries by the Debtors or Post-Effective Date Debtors after the Effective Date for any reason shall be distributed to LCPI on account of its DIP Financing Claim as soon as practicable thereafter.

**g.**     All amounts paid to and received by the holders of Prepetition Lender Secured Claims pursuant to the Plan shall not be subject to avoidance, disallowance, disgorgement, recharacterization, or subordination (whether equitable or otherwise) pursuant to the Bankruptcy Code or applicable non-bankruptcy law.

**2.**     **Distributions Free and Clear**.  Except as otherwise provided herein, any distributions under the Plan shall be free and clear of any and all interests Liens, Claims and encumbrances, and no other entity, including the Debtors or the Plan Administrator, shall have any interest, legal, beneficial or otherwise, in assets transferred pursuant to the Plan.

**3.**     **Delivery of Distributions.**  Subject to Bankruptcy Rule 9010, all distributions to any holder of an Allowed Claim shall be made at the address of such holder as set forth on the Schedules filed with the Bankruptcy Court or on the books and records of the Debtors or its agents, as applicable, unless the Debtors or Post-Effective Date Debtors have been notified in

writing of a change of address, including, without limitation, by the filing of a proof of Claim by such holder that contains an address for such holder different than the address of such holder as set forth on the Schedules. Payment shall be made to the holder of the Allowed Claim on the Distribution Record Date, unless the holder of such Allowed Claim has directed the Debtors or the Post-Effective Date Debtors, in writing, to make payment to a third party (including through the filing of a proof of Claim instructing the Debtors to make payment to a third party thereon). A holder of an Allowed Claim shall not receive a distribution under the Plan unless it provides to the Plan Administrator a tax identification number. Nothing in the Plan shall require the Post-Effective Date Debtors or the Plan Administrator to attempt to locate any holder of an Allowed Claim.

      **4.**    **Undeliverable Distributions.**

        **a.**    ***Holding of Undeliverable Distributions***. If any distribution to any holder is returned to the Post-Effective Date Debtor as undeliverable, no further distributions shall be made to such holder unless and until the Post-Effective Date Debtor is notified, in writing, of such holder's then-current address. Undeliverable distributions shall remain in the possession of the Post-Effective Date Debtor until such time as a distribution becomes deliverable. All entities ultimately receiving undeliverable Cash shall not be entitled to any interest or other accruals of any kind. Nothing contained in the Plan shall require the Post-Effective Date Debtor to attempt to locate any holder of an Allowed Claim.

        **b.**    ***Failure to Claim Undeliverable Distributions***. On or about the six month anniversary of the Effective Date, the Post-Effective Date Debtors shall file a list with the Bankruptcy Court setting forth the names of those Entities for which distributions have been made hereunder and have been returned as undeliverable as of the date thereof. Any holder of an Allowed Claim that does not assert its rights pursuant to the Plan to receive a distribution within one year from and after the Effective Date shall have its entitlement to such undeliverable distribution discharged and shall be forever barred from asserting any entitlement pursuant to the Plan against the Post-Effective Date Debtors or the property of the Post-Effective Date Debtors or the Lenders. In such case, any consideration held for distribution on account of such Claim shall revert to the Post-Effective Date Debtor for redistribution to LCPI on account of its DIP Financing Claim.

      **5.**    **Withholding and Reporting Requirements.** In connection with the Plan and all instruments issued in connection therewith and distributed thereon, the Plan Administrator shall comply with all applicable withholding and reporting requirements imposed by any federal, state, or local taxing authority, and all distributions under the Plan shall be subject to any such withholding or reporting requirements. Notwithstanding the above, each holder of an Allowed Claim that is to receive a distribution under the Plan shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any governmental unit, including income, withholding, and other tax obligations, on account of such distribution. The Plan Administrator has the right, but not the obligation, to not make a distribution until such holder has made arrangements satisfactory to such issuing or disbursing party for payment of any such tax obligations. The Plan Administrator may require, as a condition to receipt of a distribution, that the holder of an Allowed Claim complete and return a Form W-8 or W-9, as applicable to each such holder. If the Plan Administrator makes such a

request and the holder fails to comply before the date that is 180 days after the request is made, the amount of such distribution shall irrevocably revert to the applicable Post-Effective Date Debtor and any Claim in respect of such distribution shall be discharged and forever barred from assertion against such Post-Effective Date Debtor or its respective property.

6.    **Time Bar to Cash Payment Rights.**  Checks issued in respect of Allowed Claims shall be null and void if not negotiated within 90 days after the date of issuance thereof. Requests for reissuance of any check shall be made to the Plan Administrator by the holder of the Allowed Claim to whom such check originally was issued.  Any claim in respect of such a voided check shall be made on or before 90 days after the expiration of the 90 day period following the date of issuance of such check.  Thereafter, the amount represented by such voided check shall irrevocably revert to the Debtor and any Claim in respect of such voided check shall be discharged and forever barred from assertion against such Debtor and its  property.

7.    **Distribution Record Date.**  On the Distribution Record Date, the Claims register shall be closed and any transfer of any Claim therein shall be prohibited.  The Debtors and the Plan Administrator shall have no obligation to recognize any transfer of any such Claims occurring after the close of business on the Distribution Record Date.

8.    **Allocation of Distributions.**  Distributions to any holder of an Allowed Claim shall be allocated first to the principal portion of any such Allowed Claim (as determined for federal income tax purposes), and, only after the principal portion of any such Allowed Claim is satisfied in full, to any other portion of such Allowed Claim (but solely to the extent that such other portion is an allowable portion of such Allowed Claim).

9.    **Maximum Distribution.**  In no event shall any holder of any Allowed Claim receive distributions under the Plan in excess of the Allowed amount of such Claim.

10.    **Setoffs and Recoupment.**  The Debtors may, but shall not be required to, setoff against or recoup from any Claim and the payments to be made pursuant to the Plan in respect of such Claim any Claims of any nature whatsoever that the Debtors may have against the claimant, but neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtors of any such Claim the Debtors may have against such claimant.

11.    **Closing of Chapter 11 Cases.**  When all Disputed Claims filed against a Debtor have become Allowed Claims or have been disallowed by Final Order and all remaining Debtor Excluded Assets of such Debtor have been liquidated and converted into Cash or abandoned and such Cash has been distributed in accordance with the Plan, the Plan Administrator shall seek authority from the Bankruptcy Court to close such Debtor's Chapter 11 Case in accordance with the Bankruptcy Code and the Bankruptcy Rules.  If, upon the closing of the Debtors' Chapter 11 Cases, there is a greater amount of Cash remaining in the Plan Administration Reserve than will be required for the Plan Administrator to dissolve each of the Debtors, the Plan Administrator shall distribute the Cash in excess of such dissolution expenses to LCPI on account of its DIP Financing Claim.

60

**12. Pre-Effective Date Injunctions or Stays.** All injunctions or stays, whether by operation of law or by order of the Bankruptcy Court, provided for in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or otherwise that are in effect on the Confirmation Date shall remain in full force and effect until the Effective Date.

**13. Exemption From Certain Transfer Taxes.** Pursuant to section 1146 of the Bankruptcy Code, (a) the issuance, transfer or exchange of any securities, instruments or documents, (b) the creation of any Lien, mortgage, deed of trust or other security interest, (c) the making or assignment of any lease or sublease or the making or delivery of any deed or other instrument of transfer under, pursuant to, or in connection with the Plan, including, without limitation, any deeds, bills of sale or assignments executed in connection with any of the transactions contemplated under the Plan or the reinvesting, transfer or sale of any real or personal property of the Debtors pursuant to, in implementation of, or as contemplated in the Plan (whether to one or more of the Post-Effective Date Debtors or otherwise) and (d) the issuance, renewal, modification or securing of indebtedness by such means, and the making, delivery or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including, without limitation, the Confirmation Order, shall not be subject to any document recording tax, stamp tax, conveyance fee or other similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, sales tax, use tax or other similar tax or governmental assessment, in each case, including with respect to the transfer of Debtor Purchased Assets pursuant to the Settlement and Sale Agreement, as applicable. Consistent with the foregoing, each recorder of deeds or similar official for any county, city or governmental unit in which any instrument hereunder is to be recorded shall, pursuant to the Confirmation Order, be ordered and directed to accept such instrument without requiring the payment of any filing fees, documentary stamp tax, deed stamps, stamp tax, transfer tax, intangible tax or similar tax.

**14. Further Approval.** The transactions contemplated in Section 8 of the Plan shall be approved and effective as of the Effective Date without the need for any further state or local regulatory approvals, and without any requirement of further action by the Debtors, Post-Effective Date Debtors, or any entity created to effectuate the provisions of the Plan, subject to all conditions precedent set forth in the Settlement and Sale Agreement.

**E.  PROCEDURES FOR TREATMENT OF DISPUTED CLAIMS**

**1. Objections to Claims; Prosecution of Disputed Claims.** Upon obtaining consent from and as directed by the Lenders, the Plan Administrator shall cause each Post-Effective Date Debtor to object to the allowance of Claims or Equity Interests filed with the Bankruptcy Court with respect to which it disputes liability, priority, or amount, and the assertion of the doctrine of equitable subordination with respect thereto. Unless otherwise ordered by the Bankruptcy Court, the Post-Effective Date Debtor shall file and serve all objections to Claims as soon as practicable, but, in each instance, not later than 90 days following the Effective Date or such later date as may be approved by the Bankruptcy Court.

**2. Estimation of Claims.** Unless otherwise limited by an order of the Bankruptcy Court, the Post-Effective Date Debtor may, upon consultation with the Lenders, at any time request the Bankruptcy Court to estimate for final distribution purposes any contingent, unliquidated or Disputed Claim pursuant to section 502(c) of the Bankruptcy Code regardless of

whether the Debtor or the Post-Effective Date Debtor previously objected to such Claim, and the Bankruptcy Court will retain jurisdiction to consider any request to estimate any Claim at any time during litigation concerning any objection to any Claim, including, without limitation, during the pendency of any appeal relating to any such objection.  Unless otherwise provided in an order of the Bankruptcy Court, in the event that the Bankruptcy Court estimates any contingent, unliquidated or Disputed Claim, the estimated amount shall constitute either the allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court; provided, however, that, if the estimate constitutes the maximum limitation on such Claim, the Debtor or the Post-Effective Date Debtor, as the case may be, may elect to pursue supplemental proceedings to object to any ultimate allowance of such Claim; and, provided, further, that the foregoing is not intended to limit the rights granted by section 502(j) of the Bankruptcy Code.  All of the aforementioned Claims objection, estimation, and resolution procedures are cumulative and not necessarily exclusive of one another.

      **3.**    **Allowance of Disputed Claims.**  At such time as a Disputed Claim becomes, in whole or in part, an Allowed Claim, the Plan Administrator shall distribute to the holder thereof the distributions, if any, to which such holder is then entitled under the Plan.  Such distribution, if any, shall be made as soon as practicable after the date that the order or judgment of the Bankruptcy Court allowing such Disputed Claim becomes a Final Order but in no event more than 60 days thereafter.

      **4.**    **Interest.**  To the extent that a Disputed Claim becomes an Allowed Claim after the Effective Date, the holder of such Claim shall not be entitled to any interest thereon that accrued after the Effective Date.

     **F.**    TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

      **1.**    **Assumption and Assignment of Executory Contracts and Unexpired Leases.**  On the Effective Date, pursuant to sections 365(a), 365(b), 363(f), and 1123(b)(2) of the Bankruptcy Code, the Debtors shall assume and assign to the Lender Designee(s) all executory contracts and unexpired leases specifically designated on Schedule 1 to the Plan, which schedule may be amended in accordance with Section 10.2 of the Plan.  The listing of a document on Schedule 1 shall not constitute an admission by the Debtors that such document is an executory contract or an unexpired lease or that the Debtors have any liability thereunder.  Except as may otherwise be agreed to by the parties, within 60 days after the Effective Date, the applicable Lender Designee(s) shall Cure any and all undisputed defaults under the executory contracts and unexpired leases on Schedule 1 to the Plan by paying the cure amount set forth next to such contract or lease on Schedule 1 to the Plan.  All disputed defaults that are required to be Cured shall be Cured either within 60 days of the entry of a Final Order determining the amount, if any, of such Post-Effective Date Debtor's liability with respect thereto, or as may otherwise be agreed to by the parties.

      **2.**    **Rejection of Executory Contracts and Unexpired Leases.**  Pursuant to sections 365(a) and 1123(b)(2) of the Bankruptcy Code, all executory contracts and unexpired leases that exist between the Debtors and any person or entity shall be deemed rejected by the Debtors, as of the Effective Date, except for any executory contract or unexpired lease (i) that has been assumed pursuant to an order of the Bankruptcy Court entered prior to the Effective

Date and for which the motion was filed prior to the Confirmation Date, (ii) as to which a motion for approval of the assumption or rejection of such executory contract or unexpired lease has been filed prior to the Confirmation Date, or (iii) that is specifically designated on Schedule 1 to the Plan; provided, however, that the Debtors reserve the right, on or prior to the Confirmation Date, to amend, solely upon obtaining consent from the Lenders, the Plan to delete any executory contract or unexpired lease from Schedule 1 or, upon the request of the Lenders, add any executory contract or unexpired lease to Schedule 1, in which event such executory contract(s) or unexpired lease(s) shall be deemed to be, respectively, rejected or assumed; provided further, however, that the respective party or parties to such executory contract(s) shall be given notice of such amendment and shall be provided an opportunity to object to such amendment; provided further, however, nothing herein shall prejudice the Debtors' or the Lenders' rights to argue that any of the Debtors' unexpired leases should be recharacterized as a secured financing. The Debtors shall amend the Plan as requested by the Lenders. The Debtors shall provide notice of any amendments to the Plan to the parties to the executory contracts and unexpired leases affected thereby.

**3.   Insurance Policies.**  To the extent that any of the Debtors' insurance policies and any agreements, documents, or instruments relating thereto constitute executory contracts, such contracts shall be deemed rejected under the Plan unless otherwise indicated on Schedule 1 to the Plan. To the extent the Debtors elect to assume any insurance policies and any agreements, documents, or instruments relating thereto in accordance with Section 10.3 of the Plan, nothing contained therein shall constitute or be deemed a waiver of any cause of action that the Debtors may hold against any entity, including, without limitation, the insurer, under any of the Debtors' policies of insurance.

**4.   Approval of Assumption and Assignment and Rejection of Executory Contracts and Unexpired Leases.**  Entry of the Confirmation Order shall, subject to and upon the occurrence of the Effective Date, constitute the approval, pursuant to sections 365(a), 365(f) and 1123(b)(2) of the Bankruptcy Code, (i) of the assumption and assignment to the applicable Lender Designee(s) of the executory contracts and unexpired leases assumed or assumed and assigned pursuant to the Plan, and (ii) of the rejection of the executory contracts and unexpired leases rejected pursuant to the Plan; provided, however, to the extent any provision of an executory contract or unexpired lease to be assumed by any of the Debtors under the Plan limits such Debtor's ability to assume or assume and assign such executory contract or unexpired lease, the effectiveness of such provision shall be limited or nullified to the full extent provided in section 365(f) of the Bankruptcy Code.

**5.   Objections.**  Any party wishing to object to the assumption or assumption and assignment of any executory contract or unexpired lease under the Plan must follow the instructions described in the Solicitation Procedures Order and include a copy of the executory contract or unexpired lease to which any such objection relates or contain information sufficient to identify the executory contract or unexpired lease to which any such objection relates. Any counterparty that does not object to the assumption or assumption and assignment of its executory contract or unexpired lease by the Debtors under the Plan shall be deemed to have consented to such assumption or assumption and assignment.

**6.** **Claims Relating to Executory Contracts and Unexpired Leases Rejected Pursuant to the Plan.**

**a.** *Treatment*.  Any Claim arising out of the rejection of an executory contract or unexpired lease pursuant to the Plan shall be classified as a General Unsecured Claim or Convenience Claim, as applicable, against the Debtor that is a party to such executory contract or unexpired lease.

**b.** *Rejection Bar Date*.  Claims arising out of the rejection of an executory contract or unexpired lease pursuant to the Plan must be filed with the Bankruptcy Court and served upon the relevant Debtor no later than 30 days after notice of entry of the Confirmation Order.  All such Claims not filed within such time will be forever barred from assertion against the Debtors and their Estates or the Post-Effective Date Debtors and their property.

**G.** **ADMINISTRATIVE EXPENSE CLAIM BAR DATE**

All Administrative Expense Claims must be filed with the Bankruptcy Court and served upon the relevant Debtor no later than the first Business Day that is 30 days after the Effective Date or such other date as approved by order of the Bankruptcy Court.

**H.** **CONDITIONS PRECEDENT TO EFFECTIVE DATE OF THE PLAN**

**1.** The following are conditions precedent to the Effective Date of the Plan:

**a.** No stay of the Confirmation Order or the Settlement and Sale Agreement Order shall then be in effect, and the Confirmation Order and the Settlement and Sale Agreement Order shall each be a Final Order.

**b.** The Closing of the Settlement and Sale Agreement shall have occurred.

**c.** All of the payments, transfers, and conveyances to be made by the Debtors by or on the Closing Date shall have been made or will be made on the Closing Date; including, for the avoidance of doubt, the payment, transfer, and conveyance of the Debtor Purchased Assets to the applicable Lender Designee(s) pursuant to the terms of the Settlement and Sale Agreement.

**d.** All of the payments, transfers, and conveyances to be made by the Insiders to the applicable Lender Designee(s) by or on the Closing Date shall have been made; including the payment, transfer and/or conveyance of the Insider Purchased Assets to the applicable Lender Designee(s) pursuant to the terms of the Settlement and Sale Agreement.

**e.** The transfer of all Beverage Licenses controlled by the Debtors or the Insiders that are, or have ever been, part of, previously used in connection with, useful to or otherwise related in any way to the ownership, use, occupancy, maintenance, operation or development of the Debtor Purchased Assets to the applicable Lender Designee(s) or such other entity as designated by the Lenders, abandonment of the such beverage licenses or consummation of any other agreement with respect to such beverage licenses, in each case as

64

elected and determined by the Lenders, shall have been effectuated upon the terms and conditions set forth in the Settlement and Sale Agreement.

**f.** All authorizations, consents, and approvals determined by the Lenders and the Debtors to be necessary to implement to terms of the Settlement and Sale Agreement and the plan shall have been obtained.

**g.** The Plan Administration Cash Reserve shall not exceed $154,040.00 plus Cash in the amount agreed to by the Debtors and the Lenders at least 7 days prior to the Effective Date, based on historical account payables as well as outstanding invoices, as necessary to pay or satisfy, as applicable, Plan Administration Costs that were incurred prior to the Effective Date and have not been paid or have not been Allowed as of the Effective Date, but which are subsequently Allowed.

**h.** The General Unsecured Claims Cash Reserve together with the aggregate Cure payments shall not exceed $357,372.00.

**i.** All Conditions Precedent to the effective date of the Settlement and Sale Agreement shall have been met.

**2.** <u>Waiver of Conditions.</u> Notwithstanding the foregoing, each Debtor reserves its right, solely upon obtaining the consent of the Lenders, to waive the occurrence of the conditions precedent to the Effective Date set forth in the Plan; <u>provided</u>, <u>however</u>, that notwithstanding the forgoing, only the Lenders shall have the right to waive the conditions to the Effective Date set forth in Sections 11.2(a), 11.2(c), 11.2(d), 11.2(e) and 11.2(g) of the Plan, and the conditions to the Effective Date set forth in Sections 11.2(a), 11.2(c), 11.2(d), 11.2(e) and 11.2(g) shall be waived upon the election of the Lenders without the necessity to obtain consent from the Debtors or any other party. Any such waiver may be effected at any time, without notice, without leave or order of the Bankruptcy Court, and without any formal action other than proceeding to consummate the Plan. Any actions required to be taken on the Effective Date shall take place and shall be deemed to have occurred simultaneously, and no such action shall be deemed to have occurred prior to the taking of any other such action. If any of the Debtors decides, upon obtaining consent from the Lenders, that one of the conditions precedent to the Effective Date of its Plan cannot be satisfied and the occurrence of such condition is not waived or cannot be waived, then the Debtor shall file a notice of the inability to satisfy such condition to the Effective Date with the Bankruptcy Court.

**3.** <u>Substantial Consummation.</u> Substantial consummation of the Plan under section 1101(2) of the Bankruptcy Code shall be deemed to occur on the Effective Date.

**I.** EFFECTS OF CONFIRMATION

**1.** <u>Vesting of Assets.</u>

**a.** As of the Effective Date, the property of each Debtor's Estate shall vest in the applicable Post-Effective Date Debtor or such other entity as provided in the Plan.

**b.** From and after the Effective Date, each Post-Effective Date Debtor may dispose of its assets free of any restrictions of the Bankruptcy Code, but in accordance with the provisions of the Plan.

**c.** As of the Effective Date, all assets of the Debtors shall be free and clear of all Claims, liens, encumbrances, charges, and other interests, except as provided in the Plan or the Confirmation Order.

**2. Binding Effect.** Except as otherwise provided in section 1141(d)(3) of the Bankruptcy Code, on and after the Confirmation Date, the provisions of the Plan shall bind any holder of a Claim against, or Equity Interest in, the Debtors and their respective successors and assigns, whether or not the Claim or Equity Interest of such holder is impaired under the Plan and whether or not such holder has accepted the Plan.

**3. Discharge of Claims.** To the extent that a Debtor is entitled to a discharge, except as otherwise expressly provided herein, each holder (as well as any trustees and agents on behalf of each holder) of a Claim or Equity Interest and any affiliate of such holder shall be deemed to have forever waived, released, and discharged each Post-Effective Date Debtor, to the fullest extent permitted by section 1141 of the Bankruptcy Code, of and from any and all Claims, Equity Interests, rights, and liabilities that arose prior to the Confirmation Date and, upon the Effective Date, all such persons shall be forever precluded and enjoined, pursuant to section 524 of the Bankruptcy Code, from prosecuting or asserting any such discharged Claim against or Equity Interest in the Debtors.

**4. Exculpation.** To the extent permitted under applicable law, the Released Parties, including, for the avoidance of doubt, the Debtors, and any property of or professionals retained by such parties, including, for the avoidance of doubt, Getzler, or direct or indirect predecessor in interest to any of the foregoing persons, shall not have or incur any liability to any person for any act taken or omission, after the Commencement Date, in connection with or related to the Chapter 11 Cases or the operations of the Debtors' businesses during the Chapter 11 Cases, including but not limited to (i) formulating, preparing, disseminating, implementing, confirming, consummating or administrating the Plan (including soliciting acceptances or rejections thereof); (ii) the Disclosure Statement or any contract, instrument, release or other agreement or document entered into or any action taken or omitted to be taken in connection with the Plan; or (iii) any distributions made pursuant to the Plan, except for acts constituting willful misconduct or gross negligence, and in all respects such parties shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under the Plan.

**5. Retention of Causes of Action/Reservation of Rights.** Except as expressly provided in the Plan or the Settlement and Sale Agreement, nothing contained in the Plan or the Confirmation Order shall be deemed to be a waiver or the relinquishment of any rights or Causes of Action that the Debtors may have or choose to assert on behalf of their respective Estates under any provision of the Bankruptcy Code or any applicable nonbankruptcy law, including, without limitation, (i) any and all Claims against any person or entity, to the extent such person or entity asserts a crossclaim, counterclaim, and/or Claim for setoff which seeks affirmative relief against the Debtors, their officers, directors, or representatives and (ii) the turnover of any property of the Debtors' Estates.

66

6.    **Releases of Released Parties.**  Unless otherwise agreed to in a writing executed by the Released Party, on the Effective Date, each of the (i) Debtors and their Estates, (ii) the Lenders, and (iii) the Insiders, each of their present or former directors, officers, members, managers, partners, employees, affiliates, agents, financial advisors, restructuring advisors, attorneys and representatives and their respective affiliates, each as applicable, (iv) each holder of a Claim or Equity Interest that votes to accept the Plan or who is deemed to accept the Plan, and (v) to the fullest extent permitted by law, each holder of an Allowed Claim or Equity Interest who does not vote to accept the Plan but receives a distribution or is entitled to a distribution under the Plan, shall unconditionally, irrevocably and forever release each of the Released Parties from any and all Claims, losses, interests, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity or otherwise, that such entity or person would have been legally entitled to assert (whether individually or collectively), relating to any act, omission, transaction, event or other occurrence taking place on or prior to the Effective Date in any way relating to the Debtors, the Chapter 11 Cases, any Claims or Interests against the Debtors, or the Plan.

7.    **Injunction.**  All persons or entities who have held, hold, or may hold Claims against or Equity Interests in any or all of the Debtors and other parties in interest, along with their respective present or former employees, agents, officers, directors, or principals, are permanently enjoined, on and after the Effective Date, with respect to Claims released under the Plan, all Claims against any of the Debtors, and all Equity Interests in any of the Debtors, from (i) commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action, or other proceeding of any kind (including, without limitation, any proceeding in a judicial, arbitral, administrative or other forum) against or affecting the Debtors, the Post-Effective Date Debtors, the Released Parties, or their property, (ii) enforcing, levying attaching (including, without limitation, any prejudgment attachment), collecting, or otherwise recovering by any manner or means, whether directly or indirectly, any judgment, award, decree, or order against the Debtors, the Post-Effective Date Debtors, the Released Parties, or their property, (iii) creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind against the Debtors, the Post-Effective Date Debtors, the Released Parties, or against the property or interests in property of the Debtors, (iv) asserting any right of setoff, directly or indirectly, against any obligation due the Debtors, the Released Parties, or any of their property, except as contemplated or allowed by the Plan; (v) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan; (vi) commencing, continuing or asserting in any manner any action or other proceeding of any kind with respect to any Claims and Causes of Action which are extinguished or released pursuant to the Plan, and (vii) taking any actions to interfere with the implementation or consummation of the Plan.

8.    **Terms of Injunctions or Stays.**  Unless otherwise provided in the Plan, the Confirmation Order, or a separate order of the Bankruptcy Court, all injunctions or stays arising under or entered during the Chapter 11 Cases under section 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the later of the Effective Date and the date indicated in such applicable order.

J.     **RETENTION OF JURISDICTION**

**1.     Jurisdiction of Bankruptcy Court.**  The Bankruptcy Court shall retain exclusive jurisdiction of all matters arising under, arising out of, or related to, the Chapter 11 Cases and the Plan pursuant to, and for the purposes of, sections 105(a) and 1142 of the Bankruptcy Code and for, among other things, the following purposes:

**a.**     To hear and determine any motions for the assumption, assumption and assignment or rejection of executory contracts or unexpired leases and the allowance of any Claims resulting therefrom;

**b.**     To determine any and all pending adversary proceedings, applications and contested matters relating to the Chapter 11 Cases;

**c.**     To hear and determine any objection to any Claims;

**d.**     To enter and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified, or vacated;

**e.**     To issue such orders in aid of execution of the Plan to the extent authorized by section 1142 of the Bankruptcy Code;

**f.**     To consider any modifications of the Plan, to cure any defect or omission or reconcile any inconsistency in any order of the Bankruptcy Court, including, without limitation, the Confirmation Order;

**g.**     To hear and determine all applications for compensation and reimbursement of expenses of professionals under sections 330, 331 and 503(b) of the Bankruptcy Code;

**h.**     To hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan; the Confirmation Order, the Settlement and Sale Agreement, or any agreement, instrument, or other document governing or relating to any of the foregoing;

**i.**     To hear and determine all disputes involving the existence, scope, nature or otherwise of the releases, discharges, injunctions, and exculpations granted under the Plan, the Confirmation Order, the Settlement and Sale Agreement, or the Bankruptcy Code;

**j.**     To recover all assets of the Debtors and property of the Estates wherever located;

**k.**     To hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code (including any requests for expedited determinations under section 505(b) of the Bankruptcy Code filed, or to be filed, with respect to tax returns for any and all taxable periods ending after the Commencement Date);

     **l.**     To hear all matters relating to Article XII of the Plan, including but not limited to all matters relating to the releases, exculpation, and injunction granted thereunder;

     **m.**     To hear any other matter consistent with the provisions of the Bankruptcy Code;

     **n.**     To issue injunctions and effect any other actions that may be necessary or desirable to restrain interference by any entity with the consummation or implementation of the Plan; and

     **o.**     To enter a final decree closing the Chapter 11 Cases.

### K.   MISCELLANEOUS PROVISIONS

     **1.**     **Modification of Plan.**  The Debtors reserve the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules to amend or modify the Plan at any time prior to the entry of the Confirmation Order.  After the entry of the Confirmation Order, the Debtors may, upon order of the Bankruptcy Court, amend or modify the Plan, in accordance with section 1127(b) of the Bankruptcy Code or remedy any defect or omission or reconcile any inconsistency in the Plan in such manner as may be necessary to carry out the purpose and intent of the Plan.  A holder of an Allowed Claim or Equity Interest that is deemed to have accepted the Plan shall be deemed to have accepted the Plan as modified if the proposed modification does not materially and adversely change the treatment of the Claim or Equity Interest of such holder.

     **2.**     **Payment of Statutory Fees.**  All fees payable under section 1930, chapter 123, title 28, United States Code, as determined by the Bankruptcy Court at the Confirmation Hearing, shall be paid on the Effective Date.

     **3.**     **Withdrawal or Revocation.**  The Debtors may withdraw or revoke the Plan at any time prior to the Confirmation Date, subject to the conditions set forth in the Settlement and Sale Agreement.  If the Debtors revoke or withdraw the Plan prior to the Confirmation Date, or if the Confirmation Date does not occur, then the Plan shall be deemed null and void.  In such event, nothing contained herein shall be deemed to constitute a waiver or release of any Claim by or against the Debtors or any other person or to prejudice in any manner the rights of the Debtors or any other person in any further proceedings involving the Debtors.

     **4.**     **Courts of Competent Jurisdiction.**  If the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter arising out of the Plan, such abstention, refusal, or failure of jurisdiction shall have no effect upon and shall not control, prohibit, or limit the exercise of jurisdiction by any other court having competent jurisdiction with respect to such matter.

     **5.**     **Notices.**  Any notices to or requests of the Debtors by parties in interest under or in connection with the Plan shall be in writing and served either by (a) certified mail, return receipt requested, postage prepaid, (b) hand delivery, or (c) reputable overnight delivery service, all charges prepaid, and shall be deemed to have been given when received by the following parties:

Moonlight Basin Ranch, L.P.
Attention: Plan Administrator, at the address and telephone number to be set forth in the
          Confirmation Order

Patten, Peterman, Bekkedahl & Green, P.L.L.C.
2817 Second Ave. North, Suite 300
Billings, MT 59101
Attention: James A. Patten
(406) 252-8500

   **6.**   **Severability.** In the event that the Bankruptcy Court determines, prior to the Confirmation Date, that any provision of the Plan is invalid, void, or unenforceable, the Bankruptcy Court shall, with the consent of the Debtors and the Lenders, have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan shall remain in full force and effect and shall in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

   **7.**   **Governing Law.** Except to the extent the Bankruptcy Code or Bankruptcy Rules are applicable, the rights and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of Montana without giving effect to the principles of conflicts of law thereof.

   **8.**   **Successors and Assigns.** All the rights, benefits, and obligations of any person named or referred to in the Plan shall be binding on, and shall inure to the benefit of, the heirs, executors, administrators, successors, and/or assigns of such person.

## VII. POST-EFFECTIVE DATE OPERATION OF THE RESORT

   As described above in Sections II and III, under the Plan and in accordance with the terms and conditions set forth in the Settlement and Sale Agreement, the Debtors are transferring substantially all of their assets to the Lenders or Lender Designee(s) and the Lenders or Lender Designee(s) will own and continue to operate the Resort following the consummation of the transactions contemplated by the Plan and the Settlement and Sale Agreement and the Debtors' emergence from chapter 11. The Debtors understand that the Lenders are seeking to hire a third-party property manager to assist the Lenders or Lender Designee(s) in the operation of the Resort and that such third-party property manager will employ the Resort employees post-closing.[53] The Debtors believe that the transfer of the assets to the Lenders or Lender

---

[53] Resort properties of the size and scope of Moonlight Basin Resort are often managed and operated with the assistance of property managers. Such property managers are typically hired for their management expertise and experience and provide everyday advisory and managerial oversight and other negotiated services to the owner.

Designee(s) will ensure the continued, uninterrupted operation of the Resort.

In connection with the transfer of operations to the Lenders or Lender Designee(s), on the Effective Date, the Debtors shall assume and assign to the Lender Designee(s) all executory contracts and unexpired leases specifically designated on Schedule 1 to the Plan, which schedule may be amended in accordance with Section 10.2 of the Plan. Moreover, the Lenders have agreed to pay all cure amounts in connection with the assumption of executory contracts or unexpired leases, which amounts are estimated as of the date of this Disclosure Statement to be $60,262.00. Included in the list of executory contracts to be assumed and assigned on the Effective Date are all of the Membership Agreements with the Golf Members and the Escrow Agreement, as described above in Section IV(B)(1) Accordingly, claims arising out of the Membership Agreements, if any, are not considered General Unsecured Claims and are not classified as either Moonlight Mezz Class 4 Claims or Subsidiary Debtor Class 4 Claims. As the Golf Members' Deposits will continue to be held in escrow post-closing in accordance with the terms of the relevant documents, the Debtors believe that there are no cure amounts owing to any Golf Members as a result of the assumption of their Membership Agreements. For avoidance of doubt, the Deposits will not be withdrawn from the escrow account and delivered to the Lenders or Lender Designee(s) in connection with the assumption and assignment of the Escrow Agreement. Instead, it is the Debtors' interest in the Escrow Agreement and the escrowed funds that are being assigned to the Lenders or Lender Designee(s). In other words, the Lenders or Lender Designee(s) are stepping into the shoes of the Debtors with respect to the Escrow Agreement. Following the assumption and assignment, the Lender Designee(s) will be subject to the terms and conditions of the Membership Agreements and the Escrow Agreement.

The Debtors recognize that the Lenders will not be in a position to analyze completely the Debtors' businesses and develop a business plan for the Resort until after the Lenders take control of the assets. While the Lenders have employed, and will continue to employ, professionals with expertise in the golf industry to consult and advise them with respect to, among other things, the economic feasibility of completion of the Jack Nicklaus Signature Golf Course, the Debtors understand that Lenders have not yet made any decisions with respect to the golf course, including whether to complete the construction of the golf course, or the club house.

## VIII.   CERTAIN FACTORS AFFECTING THE DEBTORS

### A.    RISK OF NON-CONFIRMATION OF THE PLAN

Although the Debtors believe that the Plan will satisfy all requirements necessary for confirmation by the Bankruptcy Court, there can be no assurance that the Bankruptcy Court will reach the same conclusion or that modifications of the Plan will not be required for confirmation or that such modifications would not necessitate resolicitation of votes.

### B.    FAILURE OF CONDITIONS PRECEDENT TO CONFIRMATION OF THE PLAN

The Plan provides for certain conditions that must be satisfied (or waived) prior to Confirmation of the Plan and for certain other conditions that must be satisfied (or waived) prior

to the Effective Date.  As of the date of this Disclosure Statement, there can be no assurance that any or all of the conditions in the Plan will be satisfied (or waived).  Accordingly, there can be no assurance that the Plan will be confirmed by the Bankruptcy Court, and if the Plan is confirmed, there can be no assurance that the Plan will be consummated.

## IX.   CONFIRMATION OF THE PLAN

### A.   REQUIREMENTS FOR CONFIRMATION OF THE PLAN

#### 1.   General Requirements of Section 1129

At the Confirmation Hearing, the Bankruptcy Court will determine whether the following confirmation requirements specified in section 1129 of the Bankruptcy Code have been satisfied:

- The Plan complies with the applicable provisions of the Bankruptcy Code.

- The Debtors have complied with the applicable provisions of the Bankruptcy Code.

- The Plan has been proposed in good faith and not by any means proscribed by law.

- Any payment made or promised by the Debtors or by a Person acquiring property under the Plan for services or for costs and expenses in, or in connection with, the Chapter 11 Cases, or in connection with the Plan and incident to the Chapter 11 Cases, has been disclosed to the Bankruptcy Court, and any such payment made before confirmation of the Plan is reasonable, or if such payment is to be fixed after confirmation of the Plan, such payment is subject to the approval of the Bankruptcy Court as reasonable.

- The Debtor has disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the Plan, as Plan Administrator.

- Any governmental regulatory commission with jurisdiction, after confirmation of the applicable Plan, over the rates of the Debtors, as applicable, has approved any rate change provided for in the applicable Plan, or such rate change is expressly conditioned on such approval.

- With respect to each Class of Claims or Equity Interests, each holder of an impaired Claim or impaired Equity Interest either has accepted the Plan or will receive or retain under the Plan on account of such holder's Claim or Equity Interest, property of a value, as of the Effective Date, that is not less than the amount such holder would receive or retain if the Debtors were liquidated on the Effective Date under chapter 7 of the Bankruptcy Code. See discussion of "Best Interests Test" below.

- Except to the extent the Plan meets the requirements of section 1129(b) of the Bankruptcy Code (discussed below), each Class of Claims or Equity Interests has either accepted the Plan or is not impaired under the Plan.

72

- Except to the extent that the holder of a particular Claim has agreed to a different treatment of such Claim, the Plan provides that Administrative Expense Claims and Other Priority Claims, will be paid in full on the date such Claims become Allowed Claims, or as soon thereafter as practicable.

- Confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtors or any successor to the Debtors under the Plan, unless such liquidation or reorganization is proposed in the Plan. See discussion of "Feasibility Analysis" below.

- All fees payable under section 1930 of title 28, as determined by the Bankruptcy Court at the Confirmation Hearing, have been paid or the Plan provides for the payment of all such fees on the Effective Date of the Plan.

- The Debtors have not obligated themselves to provide such benefits, if any for the continuation, after the Effective Date, of payment of all "retiree benefits" (as defined in section 1114 of the Bankruptcy Code).

**2.     Best Interests Tests**

The "best interests of creditors" requires that, in order to be confirmed, a plan must be in the best interests of each holder of a claim or equity interest in an impaired Class that has not voted to accept the Plan.  Accordingly, if an impaired class does not unanimously accept a plan, the best interests test requires that the bankruptcy court find that the plan provides to each non-consenting holder in such impaired class a recovery on account of such holder's claim or equity interest that has a value at least equal to the value of the distribution that each such holder would receive in a liquidation under chapter 7 of the Bankruptcy Code.

After consideration of the effects that a chapter 7 liquidation would have on the ultimate proceeds available for distribution to creditors in these Chapter 11 Cases, the Debtors have determined that confirmation of the Plan will provide each creditor and equity holder with a recovery that is not less than it would receive pursuant to a liquidation of the Debtors under chapter 7 of the Bankruptcy Code.

**3.     Liquidation Analysis**

A liquidation analysis is to enable each creditor to determine the recovery it would receive in the event the Debtors' bankruptcy cases were liquidated pursuant to the provisions of chapter 7 of the Bankruptcy Code.  Each creditor may compare the results of a chapter 7 liquidation with the treatment provided under the proposed chapter 11 Plan and use that information to determine whether to accept or reject the plan.  To conduct such analysis, the first step is to determine the estimated amount that would be generated from the liquidation of the Debtors' assets in the context of a chapter 7 liquidation case.  The gross amount of cash available to holders of Claims would be the sum of the proceeds from the disposition of the Debtors' assets through the liquidation proceedings and the cash held by the Debtors at the time of the commencement of the chapter 7 case.  This gross amount of cash is then reduced by the

73

amount of any Claims secured by the estates' assets, the costs and expenses of the liquidation, and additional administrative expenses that may result from the termination of the Debtors' businesses and the use of chapter 7 for the purposes of liquidation. Any remaining net cash would be allocated to creditors in strict priority in accordance with section 726 of the Bankruptcy Code. Underlying the liquidation analysis are a number of estimates and assumptions regarding liquidation proceeds that, although considered reasonable by the Debtors, are inherently subject to significant business, economic, and competitive uncertainties beyond the control of the Debtors. As explained below, based on the fact that the Prepetition Lender Secured Claims exceed the value of the Debtors' assets, unsecured creditors are likely to receive a zero recovery in a chapter 7 liquidation. As such, unsecured creditors are receiving a greater recovery under the proposed Plan than they would receive in a chapter 7 liquidation.

The Resort is comprised of the 8 Debtors and the assets and liabilities of each Debtor. Moonlight Mezz owns a 99% limited partnership interest in Moonlight Basin Ranch; Moonlight Mezz also owns Moonlight Inc., which is the 1% general partner of Moonlight Basin Ranch. Moonlight Basin Ranch, in turn, owns 100% of the membership interests in the remaining debtors, Moonlight Basin, Moonlight Lodge, Moonlight Spa, Moonlight Golf, Lone Mountain, Mountain Top, and Treeline.

The value of Moonlight Mezz is the value of Moonlight Basin Ranch above the debt of Moonlight Basin Ranch, which, as explained below, is zero. Moonlight Mezz has no other assets, other than the equity interests in Moonlight Basin Ranch.

LCPI holds a Secured Claim on the equity interest of Moonlight Mezz in the amount of $103,303,205 based on the Prepetition Mezzanine Loan Documents plus the amount of the Senior Secured Super-Priority Debtor-in-Possession Credit Agreement balance which is, at the date of this Disclosure Statement, approximately $10,884,000.48. The total amount of Secured Claims on Moonlight Mezz is $114,187,205.48. LCPI holds a Secured Claim on the equity interests and assets of Moonlight Basin Ranch and its subsidiary Debtors, in the amount of $95,780,309 based on the Prepetition Senior Loan Documents plus the amount of the Senior Secured Super-Priority Debtor-in-Possession Credit Agreement balance of $10,884,000.48. In addition, there are Claims of equipment vendors secured by assets of the Debtors totaling $306,666. The total Secured Claims on Moonlight Basin Ranch and its subsidiaries is $106,970,975.48.

The Debtors believe the value of the Resort falls well below the total amount of the secured debt based on information developed during the pendency of these Chapter 11 Cases. The Debtors, with the assistance and advice of their financial advisor, Getzler, have periodically revised and updated their model used to calculate the value of the Resort. Currently, the Debtors' modeling puts the value of the Resort substantially less than $106,970,975.48.

It is evident that the Secured Claims on the assets of Moonlight Basin Ranch exceed the value of those assets.

As reflected in the below table which summarizes the value of the personal property and real property assets of each Debtor net of claims of senior secured creditors other

74

than LCPI, as such value appears on the Schedules and Statements, LCPI's liens exceed the value of the assets of each Debtor and the aggregate value of the Debtors' assets combined.

| Property | Moonlight Mezz | Moonlight Basin Ranch | Lone Mountain | Moonlight Basin | Moonlight Golf | Moonlight Lodge | Moonlight Spa | Mountain Top | Treeline |
|---|---|---|---|---|---|---|---|---|---|
| Personal | $0 | $11,742,416.00 | $0 | $277,519.00 | $9,509.00 | $1,500.00 | $48,422.00 | $13,900.00 | $0 |
| Real | $0 | $32,757,479.00 | $0 | $0 | $0 | $13,600,000.00 | $0 | $0 | $0 |

In none of the individual Debtor cases are there any assets the value of which exceed the prepetition and postpetition Secured Claims of LCPI.

The Moonlight Basin Ranch Schedules and Statements show personal property assets, net of claims of senior secured creditors other than LCPI, with a value of $11,742,416; the Moonlight Basin Ranch real property assets are valued on its Schedules at $32,757,479. The total value of the Moonlight Basin Ranch assets subject to the LCPI liens is $44,499,895. As noted above, the LCPI claims secured by the assets of the Moonlight Basin Ranch total $106,664,309.

The Moonlight Lodge Schedules and Statements show personal property valued at $1,500 and real property valued at $13,600,000. LCPI's Secured Claims, after reduction from the liquidation of  Moonlight Basin Ranch,[54] exceeds the value of Moonlight Lodge personal and real property by $48,562,914.

The Moonlight Spa Schedules and Statements show personal property valued at $48,422. The LCPI liens exceed the value of this property (after liquidation of the Moonlight Basin Ranch and Moonlight Lodge property) by $48,514,492.

The Mountain Top Schedules and Statements show personal property valued at $13,900. The remaining LCPI claims, following the above analysis, exceed the value of this property by $48,500,592.

The Moonlight Basin Schedules and Statements show personal property valued at $277,519. The remaining LCPI claims, following the above analysis, exceed the value of this property by $48,223,073.

The Moonlight Golf Schedules and Statements show personal property valued at $9,509. The remaining LCPI claims, following the above analysis, exceed the value of this property by $48,213,564.

The Lone Mountain and Treeline Springs Schedules and Statements show no personal or real property.

---

[54] This reduction is being applied for illustrative purposes only, as LCPI is entitled to assert the full amount of its claim against each Debtor.

In the event of a chapter 7 liquidation, it is likely that LCPI would move for relief from the automatic stay and given the lack of equity of the bankruptcy estates, the chapter 7 trustee would consent. LCPI would then foreclose its liens on the assets of the Debtors. If this occurs, there will be no distribution to the unsecured creditors. In the unlikely event the chapter 7 trustee was allowed to sell the Debtors' assets, it is clear that the secured creditors, including LCPI, would receive all of the sale proceeds, again resulting in no distribution to the unsecured creditors.

The Debtors' conclusion, based upon the foregoing, is that upon a chapter 7 liquidation, there would be no distribution made to the unsecured claims.

### 4. Feasibility

The Bankruptcy Code requires that a debtor demonstrate that confirmation of a plan is not likely to be followed by liquidation or the need for further financial reorganization. For purposes of determining whether the Plan meets this requirement, the Debtors have analyzed their ability to meet their obligations under the Plan.

The Debtors believe that the proceeds of the Cash Reserves will be sufficient to satisfy all of the Debtors' obligations under the Plan. The Cash Reserves will consist of funds advanced to Moonlight Basin Ranch by LCPI under the DIP Loan Documents in amounts necessary to fund distributions as provided for in the Plan and to pay or satisfy, as applicable, the Plan Administration Costs.

### B. REQUIREMENTS OF SECTION 1129(b) OF THE BANKRUPTCY CODE

The Bankruptcy Code permits the Bankruptcy Court to confirm a chapter 11 plan of reorganization over the dissent of any Class of Claims or Equity Interests as long as the standards in section 1129(b) are met. This power to confirm a plan over dissenting classes – often referred to as "cram down" – is an important part of the reorganization process. It assures that no single group (or multiple groups) of claims or interests can block a restructuring that otherwise meets the requirements of the Bankruptcy Code and is in the interests of the other constituents in the case.

The Bankruptcy Court may confirm the Plan over the rejection or deemed rejection of the Plan by a Class of Claims or Equity Interests if the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to such class. The Debtors believe the Plan will satisfy both the "no unfair discrimination" requirement and the "fair and equitable" requirement should any impaired Class of Claims reject the Plan. (These requirements only apply in the event an impaired Class of Claims votes to reject the Plan.)

If the Class of General Unsecured Claims against any Debtor rejects the Plan, the Debtors submit that the Bankruptcy Court may still confirm the Plan because the Plan "does not discriminate unfairly." With respect to an objecting impaired class of unsecured creditors, the Bankruptcy Code's "unfair discrimination" requirement prohibits disparate treatment of similarly situated creditors absent a legitimate business or economic justification. In this case, the Plan does not violate the "unfair discrimination" prohibition as the only other Class of equal priority

76

to the Class of General Unsecured Claims under the Plan is the Convenience Claims Class against each Debtor.  Section 1122(b) of the Bankruptcy Code explicitly permits the creation of a convenience class, and convenience classes are common in bankruptcy plans.  In addition, any holder of an Allowed General Unsecured Claim can elect to voluntarily reduce such Claim to $10,000 and be treated as the holder of an Allowed Convenience Claim.  Moreover, no classes of creditors would be entitled to any payment from the Debtors' estates if the Lenders did not agree to make payments to such creditors.

Also, if the Class of General Unsecured Claims against any Debtor rejects the Plan, the Debtors submit that the Bankruptcy Court may still confirm the Plan because it satisfies the "fair and equitable" requirement.  With respect to an objecting impaired class of unsecured creditors, the "fair and equitable" requirement requires that either (i) the Allowed value of the claim be paid in full or (ii) no holder of any claim or interest that is junior to the rejecting unsecured class receive or retain under the plan any property on account of such junior claim or interest.  This is commonly referred to as the "absolute priority rule."  In this case, the equity interests in each of the Debtors shall be cancelled, extinguished without further action under any applicable law, regulation, or rule, and deemed of no force and effect.  The Plan clearly provides in Sections 5.6 and 6.6 that such equity holders are not receiving a recovery under the Plan.  Rather, as explained in Sections 8.4(b) and 8.4(c) of the Plan, on the Effective Date, the Plan Administrator shall be deemed to hold 100% of the equity interests in each of the Debtors for purposes of winding down the Debtors' estates.  The Settlement Payment does not implicate the absolute priority rule.  Although Poole owns an indirect ownership interest in Moonlight Mezz, he is not a direct equity holder of any of the Debtors.  He is not receiving any payment from the Debtors' estates and is not receiving any payment on account of his indirect equity interests.  The Lenders are making the payment to Poole outside of the Plan as part of global settlement relating to the Adversary Proceeding, in exchange for which the Lenders are receiving the transfer of certain Insider Assets, the settlement of Poole's claims against the Lenders, Poole's cooperation in ensuring the smooth transfer of assets, important representations and warranties, certain releases granted by the Insiders to the Lenders, and certain post-closing cooperation, as described above.  As discussed above in more detail, this cooperation provides great value to the Lenders.  Moreover, no creditors would receive any recovery in this case if the Lenders did not agree to fund such recoveries.

The negotiations regarding the Settlement Payment occurred primarily between the Lenders and Poole, who was represented by his own counsel.  The Debtors did, however, devote time and effort seeking to keep the global settlement intact and moving toward the finalization and execution of the Settlement and Sale Agreement.

The Debtors believe that the Lenders are free to negotiate with Poole as they see fit in order to obtain a global settlement in these Chapter 11 Cases.  Further, it is noteworthy that the Lenders are funding 100% of the recoveries to creditors, both administrative and unsecured, in these cases.  As explained in the Liquidation Analysis in Section IX(A)(3), upon a liquidation of the Debtors' assets, there would not be any distribution made to the holders of unsecured claims.

For the reasons described above, the Debtors believe that the proposed Plan, which incorporates and effectuates the Settlement and Sale Agreement, is "fair and equitable," does not unfairly discriminate, and complies with section 1129(b) of the Bankruptcy Code.

## X. ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

### A. LIQUIDATION UNDER CHAPTER 7

If no plan is confirmed, the Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be elected or appointed to liquidate the Debtors' assets for distribution to creditors in accordance with the priorities set forth in the Bankruptcy Code. It is impossible to predict precisely how the proceeds of the liquidation would be distributed to the respective holders of Claims against or Equity Interests in the Debtors. A discussion of the effects that a chapter 7 liquidation would have on the recovery of holders of claims and equity interests and the Debtors' liquidation analysis are set forth in Section VIII(A)(3) above. The Debtors believe that liquidation under chapter 7 would result in smaller distributions being made to unsecured creditors than those provided for in the Plan. In a chapter 7 liquidation, the Debtors believe that there would be no distribution to the holders of General Unsecured Claims, Convenience Claims, or the holders of Equity Interests. Please refer to the Liquidation Analysis above.

### B. ALTERNATIVE PLAN OF REORGANIZATION

The Debtors believe that the Plan affords holders of Claims the potential for the greatest realization on the Debtors' assets under the circumstances, as described herein. If, however, the Plan is not confirmed and/or consummated, the theoretical alternatives include: (i) formulation of an alternative plan or plans of reorganization by the Debtors, or if the Debtors' exclusive period in which to file a chapter 11 plan has expired, any other party in interest or (ii) liquidation of the Debtors under chapter 7 or 11 of the Bankruptcy Code.

## XI. CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

The following discussion summarizes certain U.S. federal income tax consequences of the implementation of the Plan to the Debtors and to certain holders of Claims. The following summary does not address the U.S. federal income tax consequences to creditors whose Claims are unimpaired or otherwise entitled to payment in full in Cash under the Plan (*e.g.*, Priority Non-Tax Claims and Other Secured Claims), or to holders of Prepetition Lender Secured Claims, Prepetition Lender Deficiency Claims or Equity Interests.

The following summary is based on the Internal Revenue Code of 1986, as amended (the "Tax Code"), Treasury Regulations promulgated thereunder, judicial decisions, and published administrative rules and pronouncements of the Internal Revenue Service ("IRS"), all as in effect on the date hereof. Changes in such rules or new interpretations thereof may have retroactive effect and could significantly affect the U.S. federal income tax consequences described below.

The U.S. federal income tax consequences of the Plan are complex and are subject to significant uncertainties.  The Debtors have not requested a ruling from the IRS or an opinion of counsel with respect to any of the tax aspects of the Plan.  Thus, no assurance can be given as to the interpretation that the IRS will adopt.  In addition, this summary addresses neither the foreign, state, or local income or other tax consequences of the Plan, nor the U.S. federal income tax consequences of the Plan to special classes of taxpayers (such as foreign taxpayers, broker dealers, traders that mark-to-market their securities, banks, mutual funds, insurance companies, other financial institutions, small business investment companies, regulated investment companies, real estate investment trusts, retirement plans, taxpayers whose functional currency is not the U.S. dollar, persons subject to the alternative minimum tax, tax-exempt organizations, persons holding Claims as part of a hedge, integrated constructive sale, conversion transaction or straddle, and investors that are, or hold Claims through, partnerships or other pass-through entities for U.S. federal income tax purposes).

The following discussion generally assumes that the Plan will be treated as a plan of liquidation of the Debtors for U.S. federal income tax purposes and that all distributions to holders of Claims will be taxed accordingly.  Additionally, this discussion assumes that the various debt and other arrangements to which any of the Debtors is a party will be respected for U.S. federal income tax purposes in accordance with their form.

***The following summary of certain U.S. federal income tax consequences is for informational purposes only and is not a substitute for careful tax planning and advice based upon the individual circumstances pertaining to a holder of a Claim.***

**IRS CIRCULAR 230 NOTICE:  TO ENSURE COMPLIANCE WITH IRS CIRCULAR 230, HOLDERS OF CLAIMS AND EQUITY INTERESTS ARE HEREBY NOTIFIED THAT:  (A) ANY DISCUSSION OF FEDERAL TAX ISSUES CONTAINED OR REFERRED TO IN THIS DISCLOSURE STATEMENT IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY HOLDERS OF CLAIMS OR EQUITY INTERESTS FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON THEM UNDER THE INTERNAL REVENUE CODE; (B) SUCH DISCUSSION IS WRITTEN IN CONNECTION WITH THE PROMOTION OR MARKETING BY THE DEBTORS OF THE TRANSACTIONS OR MATTERS ADDRESSED HEREIN; AND (C) HOLDERS OF CLAIMS AND EQUITY INTERESTS SHOULD SEEK ADVICE BASED ON THEIR PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.**

A.    CONSEQUENCES TO THE DEBTORS

The Debtors are treated as partnerships or "disregarded entities" for U.S. federal income tax purposes.  Accordingly, the U.S. federal income tax consequences of the Plan generally will not be borne by the Debtors, but instead will be borne by their respective partners or owners for U.S. federal income tax purposes.

Pursuant to the Plan, the Debtors will transfer the Debtor Purchased Assets to the Lender Designee(s) pursuant to the terms set forth in the Settlement and Sale Agreement in a taxable transaction.  Because the Debtors are entities treated as partnerships or disregarded entities for

U.S. federal income tax purposes, any gain or loss realized on such transfer of assets will be realized by the partners or owners of the Debtors for U.S. federal income tax purposes. Additionally, any cancellation of indebtedness income resulting from the implementation of the Plan will be realized by the partners or owners of the Debtors for U.S. federal income tax purposes.

### B.    CONSEQUENCES TO CERTAIN HOLDERS OF ALLOWED CLAIMS

Pursuant to the Plan, holders of Allowed General Unsecured Claims and Allowed Convenience Claims will receive a Cash distribution in respect of their Claims.

### 1.    Gain or Loss

In general, a holder of an Allowed General Unsecured Claim or an Allowed Convenience Claim will recognize gain or loss in an amount equal to the difference, if any, between (i) the amount of Cash received by the holder in respect of its Claim (other than any Claim for accrued but unpaid interest) and (ii) the holder's adjusted tax basis in its Claim (other than tax basis attributable to accrued but unpaid interest).  See "—Distributions in Discharge of Accrued but Unpaid Interest," below.

Because distributions may be made to holders after the Effective Date, any loss and a portion of any gain realized by such holder may be deferred until such time as such holder has received its final distribution.  All holders of Allowed General Unsecured Claims and Allowed Convenience Claims are urged to consult their tax advisors regarding the possible application of (or ability to elect out of) the "installment method" of reporting any gain that may be recognized by such holder in respect of its Allowed General Unsecured Claim or Allowed Convenience Claim.

Where gain or loss is recognized by a holder, the character of such gain or loss as long-term or short-term capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the holder, whether the Claim constitutes a capital asset in the hands of the holder and how long it has been held, whether the Claim was acquired at a market discount, and whether and to what extent the holder previously claimed a bad debt deduction.  A holder of an Allowed General Unsecured Claim or Allowed Convenience Claim that purchased its Claim from a prior holder at a market discount may be subject to the market discount rules of the Tax Code.  Under those rules, assuming that the holder has made no election to amortize the market discount into income on a current basis with respect to any market discount instrument, any gain recognized on the exchange of its Claim (subject to a de minimis rule) generally would be characterized as ordinary income to the extent of the accrued market discount on such Claim as of the date of the exchange.

### 2.    Distributions in Discharge of Accrued but Unpaid Interest

In general, to the extent that any consideration received pursuant to the Plan by a holder of an Allowed General Unsecured Claim or Allowed Convenience Claim is received in satisfaction of interest accrued but unpaid during its holding period, such amount will be taxable to the holder as interest income (if not previously included in the holder's gross income).

80

Conversely, a holder generally recognizes a deductible loss to the extent that any accrued interest claimed was previously included in its gross income and is not paid in full.

Pursuant to the Plan, all distributions in respect of Allowed General Unsecured Claims and Allowed Convenience Claims will be allocated first to the principal portion of any such Claim (as determined for U.S. federal income tax purposes), and, only after the principal portion of such Claim is satisfied in full, to any other portion (including accrued but unpaid interest) of such Claim (but solely to the extent that such other portion is an allowable portion of such Claim). However, there is no assurance that such allocation would be respected by the IRS for U.S. federal income tax purposes. Each holder of a Claim is urged to consult its tax advisor regarding the allocation of consideration and the deductibility of unpaid interest for tax purposes.

### 3.   **Information Reporting and Withholding**

All distributions to holders of Allowed Claims (including Allowed General Unsecured Claims and Allowed Convenience Claims) under the Plan are subject to any applicable withholding (including employment tax withholding). Under U.S. federal income tax law, interest, dividends, and other reportable payments may, under certain circumstances, be subject to "backup withholding" at the then applicable rate (currently 28%). Backup withholding generally applies if the holder (a) fails to furnish its social security number or other taxpayer identification number ("<u>TIN</u>"), (b) furnishes an incorrect TIN, (c) fails properly to report interest or dividends, or (d) under certain circumstances, fails to provide a certified statement, signed under penalty of perjury, that the TIN provided is its correct number and that it is not subject to backup withholding. Certain persons are exempt from backup withholding, including, in certain circumstances, corporations and financial institutions. Backup withholding is not an additional tax but merely an advance payment, which may be refunded to the extent it results in an overpayment of tax and the appropriate information is timely supplied to the IRS.

In addition, from an information reporting perspective, Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds. Holders are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the holder's tax returns.

***The foregoing summary has been provided for informational purposes only. All holders of Claims receiving a distribution under the Plan are urged to consult their tax advisors concerning the federal, state, local, and foreign tax consequences applicable under the Plan.***

## XII.   CONCLUSION

For all the reasons set forth in this Disclosure Statement, the Debtor believes that confirmation and consummation of the Plan is in the best interests of all creditors, and urges all holders of a Claim entitled to vote to accept the Plan and to evidence such acceptance by returning their Ballots so that they will be received no later than October 3, 2011.

Dated: August 26, 2011

Respectfully submitted,

**MOONLIGHT BASIN RANCH L.P.**

**MOONLIGHT BASIN, LLC**

**MOONLIGHT GOLF, LLC**

**MOONLIGHT LODGE, LLC**

**MOONLIGHT BASIN MEZZ, LLC**

**MOONLIGHT SPA, LLC**

**LONE MOUNTAIN FOOD & BEVERAGE, LLC**

**MOUNTAIN TOP CONSTRUCTION COMPANY, LLC**

**TREELINE SPRINGS, LLC**

By:  */s/ Russ McElyea*
     Russ McElyea, Chief Operating Officer